<div style="border:1px solid red">EXHIBIT A</div>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**(FORT WORTH DIVISION)**

| | |
|---|---|
| NEXTGEAR CAPITAL, INC. AND AUTOMOTIVE FINANCE CORPORATION,<br><br>         Plaintiffs,<br><br>  v.<br><br>DRUIEN, INC. D/B/A LAWTON AUTO AUCTION A/K/A LAWTON CACHE AUTO AUCTION, LISA DRUIEN, MICHAEL VERNON GARRISON D/B/A ROCK HILL USED CARS, AND EMMETT DRUIEN,<br><br>        Defendants. | Civil Action No. 4:20-cv-00959-P |

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

Plaintiffs, NextGear Capital, Inc. and Automotive Finance Corporation (collectively, the "Plaintiffs"), by and through their undersigned counsel, file this their Second Amended Complaint (the "Complaint") against Druien, Inc. d/b/a Lawton Auto Auction a/k/a Lawton Cache Auto Auction, Lisa Druien, Michael Vernon Garrison d/b/a Rock Hill Used Cars, and Emmett Druien (collectively, the "Defendants") pursuant to the Order of this Court [Doc. # 6] entered on September 21, 2020, and complain as follows:

**I.**
**JURISDICTION AND VENUE**

1.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum or value of $75,000.00 exclusive of interest and costs, and is between citizens of different states.  Neither Plaintiff is a citizen of a state in which any Defendant is a citizen.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3).[1]  Defendant

Druien, Inc. d/b/a Lawton Auto Auction a/k/a Lawton Cache Auto Auction ("LAA") is a Texas

corporation whose registered office is located at 4944 Whisper Win, Wichita Falls, Texas 76310,

which is located within the Northern District of Texas.  Pursuant to 28 U.S.C. § 1391(c)(2), an

entity such as LAA is deemed to reside in any judicial district in which such defendant is subject

to the court's personal jurisdiction with respect to the civil action in question.  Thus, defendant

LAA resides in the Northern District of Texas, although LAA's principal place of business is

located in Oklahoma.

3.      LAA also had a checking account at the First National Bank located in Wichita

Falls, Texas, from which LAA conducted business for several years and, pursuant to defendant

Lisa Druien's written authorization, authorized floor plan lenders such as NextGear to initiate

electronic credit or debit entries.  Additionally, defendant Michael Vernon Garrison d/b/a Rock

Hill Used Cars ("M. Garrison") executed agreements with Plaintiffs whereby M. Garrison

expressly agreed and consented to Plaintiffs' choice of forum as long as the court handling the

case was a court of competent jurisdiction.  Specifically, the forum selection clause in NextGear

Capital, Inc.'s contracts with M. Garrison read as follows:

> Borrower acknowledges and agrees that Lender [NextGear]
> reserves the right to initiate and prosecute any action against
> Borrower in any court of competent jurisdiction, **and Borrower
> consents to such forum as Lender may elect.**[2]

Likewise, Automotive Finance Corporation's forum selection clause with defendant M. Garrison

provides as follows:

---

[1] Section 1391(b)(1) of the venue statute is not applicable because one of the defendants, Lisa Druien, resides in Oklahoma.  Had defendant Lisa Druien lived anywhere in Texas, then venue would be proper in the Northern District under § 1391(b)(1).
[2] *See* Exhibit A, para. 21; Exhibit F, para. 21 (emphasis added).

> Lender may bring any suit against Dealer in any court of
> competent jurisdiction, and **Dealer hereby consents to Lender's
> choice in forum**.[3]

Accordingly, M. Garrison waived his venue rights by expressly consenting to Plaintiffs' choice

of venue.[4]  LAA also expressly waived its right to choose venue by entering into an agreement

with AFC that allows AFC to choose venue.  Specifically, the auction agreement between LAA

and AFC reads in relevant part as follows:

> AFC may bring any action against Auction [LAA] relating to this
> Agreement in any court of competent jurisdiction, and **Auction
> hereby consents to AFC's choice of forum**.[5]

4.      In addition to the foregoing, the advances that are the subject of this Second

Amended Complaint were tendered by Plaintiffs under floor plan financing agreements on behalf

of defendant M. Garrison was paid to LAA either at First National Bank in Wichita Falls or other

financial institutions located in Oklahoma.   The vehicles that are the subject of this First

Amended Complaint were all sold at the LAA's principal place of business in Oklahoma, and the

various fraudulent transactions that are the subject of this First Amended Complaint involving all

Defendants occurred in Oklahoma.   Additionally, the floor plan finance agreement NextGear

Capital, Inc. has with defendants M. Garrison reference 1320 City Center Drive, Suite 100,

Carmel, Indiana 46032 as the place of performance for tendering payments.   Likewise, AFC's

floor plan financing agreement references the place of performance for tendering payments as

AFC's principal office located in Indiana.

5.      Accordingly, 28 U.S.C. § 1391(b)(2) is inapplicable because a substantial part of

the events or omissions giving rise to Plaintiffs' claims against the Defendants arose in

---

[3] *See* Exhibit H, para. 9.11 (emphasis added).
[4] *City of New Orleans v. Municipal Administrative Services, Inc.*, 376 F.3d 501, 504 (5th Cir. 2017) ("A party may waive its rights by explicitly stating that it is doing so, **by allowing the other party the right to choose venue**, or by establishing an exclusive venue within the contract.") (emphasis added).
[5] *See* Exhibit M, pp. 4 (emphasis added).

Oklahoma as a result of Defendants' concerted action to fraudulently sell and/or purchase and finance vehicles at LAA's auction located in Oklahoma. Therefore, venue is proper pursuant to 28 U.S.C. § 1391(b)(3) and pursuant to the express consent of all defendants LAA and M. Garrison. Moreover, if venue is proper in one division of a district, then venue is proper in another division within that same district. *Martinez v. City of Fort Worth, Texas*, 2003 WL 21289654, *1 (N.D. Tex. 2003).

6. This Court has personal jurisdiction over all Defendants because LAA is a Texas corporation whose registered agent, Emmett Druien, has LAA's registered office located in Texas. LAA also had a checking account at the First National Bank located in Wichita Falls, Texas, from which LAA conducted business for several years and, pursuant to defendant Lisa Druien's written authorization, authorized floor plan lenders such as NextGear to initiate electronic credit or debit entries. Additionally, defendant Lisa Druien notarized at least one assignment of title of a NextGear-financed 2005 Chevrolet Silverado from Emmett Druien, as seller, to Texas dealer, M. Garrison, as buyer. Lisa Druien also had contacts and relationships with individuals operating Texas motor vehicle dealerships such as M. Garrison. Likewise, the Court has personal jurisdiction over Emmett Druien because LAA's invoices show that Emmett Druien, as seller, sold to M. Garrison at least two motor vehicles which were financed by Plaintiffs consisting of a 2001 HDAB Trailer and 1995 Great Dane Trailer. Moreover, defendant M. Garrison is an individual residing in Texas and conducts business in Texas. Therefore, this Court has personal jurisdiction over all named defendants.

## II.
## PARTIES

7. Plaintiff NextGear is a Delaware corporation with its principal office located in Indiana.

8.      Plaintiff AFC is an Indiana corporation with its principal office located in Indiana.

9.      Defendant LAA is a Texas corporation who has been served by and through its registered agent, Emmett Druien, and has entered an appearance in this case.

10.     Defendant Lisa Druien is an individual residing in Oklahoma who was properly served with process and has entered an appearance in this case.

11.     Defendant Michael Vernon Garrison d/b/a Rock Hill Used Cars ("M. Garrison") is an individual who resides in Texas, was properly served with process, and entered an appearance in this case.

12.     Defendant Austin Michael Garrison a/k/a Mike Garrison d/b/a Austin Financial Services ("A. Garrison") is an individual who resides in Texas, was properly served with process, and has entered an appearance in this case.

13.     Defendant Emmett Druien is an individual residing in Oklahoma who may be served with process at his last known address of 8802 NW Cache Rd., Apartment # 803, Lawton, Oklahoma 73505, or his business address at #9 SW 112th St. Lawton, Oklahoma 73505, or wherever he may be found.

### III.
### CLAIMS OF NEXTGEAR AGAINST DEFENDANTS AND FACTUAL BACKGROUND

#### Facts Relevant to M. Garrison

14.     At all times relevant to these proceedings, M. Garrison operated a retail motor vehicle dealership located at 519 Interstate Highway 30 E, Sulphur Springs, Texas 75482.

15.     On or about May 6, 2015, NextGear and M. Garrison entered into a floor plan financing agreement whereby M. Garrison executed a Demand Promissory Note and Loan and Security Agreement (the "M. Garrison NextGear Note") and whereby NextGear, as Lender, agreed to make Advances, as defined in paragraph (2) of Appendix A of the M. Garrison

NextGear Note, in its sole discretion, to M. Garrison. A true and correct copy of the M. Garrison NextGear Note with attached Appendix A, Advanced Schedule, and Power of Attorney thereto is attached hereto and incorporated by reference for all purposes as Exhibit "A."

16.     Under §4(f) the M. Garrison NextGear Note, M. Garrison is obligated "[t]o hold all amounts received from the sale of any Unit of Lender Financed Inventory in the form as received in trust for the sole benefit of and for Lender, and to remit such funds satisfying all amounts due Lender and owing by Borrower for and in connection with such Receivable, in each case within twenty-four (24) hours of Borrower's receipt of such funds (or receipt of such funds by any Affiliate of Borrower)."

17.     Pursuant to ¶ 2 of the M. Garrison NextGear Note, M. Garrison granted to NextGear a security interest in the Lender Financed Inventory and the Titles thereto (as defined in the M. Garrison NextGear Note) and also granted to NextGear a security interest in all of M. Garrison's other Collateral (as defined in ¶ 2(a) the M. Garrison NextGear Note).

18.     NextGear perfected its security interests against M. Garrison's Collateral by filing a UCC-1 Financing Statement with the Texas Secretary of State as to M. Garrison, as debtor, on May 11, 2015, which was assigned filing # 15-0014536196.   NextGear timely filed a continuation statement to its UCC-1 Financing Statement with the Texas Secretary of State on December 24, 2019.

19.     True and correct copies of the UCC-1 Financing Statement and continuation statement filed by NextGear on M. Garrison are collectively attached hereto and incorporated by reference for all purposes as Exhibit "B."  The foregoing UCC-1 Financing Statement was duly filed in full compliance with the filing provisions of Tex. Bus. & Comm. Code §9.101 *et seq.*

20.     In conjunction with the execution of the M. Garrison NextGear Note, and to ensure payment of the indebtedness thereunder, M. Garrison signed and executed an Individual Guaranty (the "M. Garrison Guaranty") on or about May 6, 2015, whereby M. Garrison voluntarily, unconditionally, and absolutely guaranteed full and prompt payment when due, whether by acceleration or otherwise, of all Liabilities as defined in paragraph 1(b) of the M. Garrison Guaranty.

21.     A true and correct copy of the M. Garrison Guaranty is attached hereto and incorporated herein by reference for all purposes as Exhibit "C."

22.     NextGear advanced funds to M. Garrison and to certain third parties on M. Garrison's behalf in order to finance motor vehicle inventory as Collateral pursuant to the terms of the M. Garrison NextGear Note.

23.     The funds advanced by NextGear to M. Garrison and to certain third parties on M. Garrison's behalf have not been fully repaid as agreed.  Specifically, M. Garrison is indebted to NextGear for fifty-five (55) motor vehicles for which NextGear provided advances under the M. Garrison NextGear Note.  The fifty-five (55) vehicles (hereinafter, the "Rock Hill NextGear Vehicles") are identified by vehicle identification number, NextGear stock number, year, make, model and color in NextGear's Receivable Detail Report for M. Garrison (the "Rock Hill RDR") dated May 1, 2020.

24.     A true and correct copy of the Rock Hill RDR is attached hereto as Exhibit "D" and incorporated herein by reference for all purposes.

25.     M. Garrison defaulted under the M. Garrison NextGear Note by, *inter alia*, failing to make payments of the principal and/or interest due thereunder.

26.     NextGear conducted an audit of M. Garrison's sales lot, and based on the results of the lot audit, NextGear determined that M. Garrison sold at least five (5) of the Rock Hill NextGear Vehicles to third parties without timely remitting to NextGear the sales proceeds as required by paragraph 4(f) of the M. Garrison NextGear Note.

27.     A list of the five (5) Rock Hill NextGear Vehicles sold out of trust by M. Garrison (collectively referred to herein as the "SOT Vehicles") is attached hereto as Exhibit "E" and identifies for each SOT Vehicle the year, make, model, full vehicle identification number, and remaining principal balance due for each such SOT Vehicle.  As set forth in Exhibit "E," M. Garrison failed to pay back any portion of the original principal amount advanced for the SOT Vehicles, and the total principal amount due for the SOT Vehicles is $115,810.00.  Subsequent to the Exhibit "E" SOT report date of May 1, 2020, NextGear was able to recover three (3) of the five (5) SOT Vehicles as follows:

| Year | Make | Model | VIN # |
|------|------|-------|-------|
| 2015 | RAM | 3500 | 3C63RRHLXFG642243 |
| 2000 | FORD | MUSTANG | 1FAFP4446YF239383 |
| 2008 | FORD | F550 4X4 EX | 1FDAX57R18ED86326 |

However, NextGear was unable to locate, recover or sell the remaining two (2) SOT Vehicles identified in the Exhibit "E" SOT Report (the "Unrecovered SOT Vehicles"), whose combined total payoff equals $52,138.81.  In addition to the foregoing, NextGear was able to repossess and secure the remaining Rock Hill NextGear Vehicles listed in the Exhibit "D" Rock Hill RDR.

28.     M. Garrison has disposed of the proceeds from the sale of the SOT Vehicles in direct contravention to NextGear's perfected, first-priority security interest in those proceeds. With respect to the two SOT Vehicles NextGear was unable to locate or recover, those SOT Vehicles have been sold presumably free and clear of NextGear's security interest, and NextGear

no longer has collateral securing that portion of the indebtedness owed by M. Garrison under the M. Garrison NextGear Note.

29.     As a result of the occurrence and continuance of the several Events of Default, as that term is defined in the M. Garrison NextGear Note, NextGear declared the entire indebtedness due under the M. Garrison NextGear Note immediately due and payable.

30.     NextGear has exercised its default remedies with respect to forty-eight (48) of the following repossessed vehicles from M. Garrison and sold them at a public auction to the highest bidder for the following amounts (the "NG Sold Vehicles"):

| Year | Make | Model | VIN # | Floored Amount | Gross Sales Proceeds | Net Sales |
|------|------|-------|-------|----------------|----------------------|-----------|
| 2004 | CHEVROLET | AVALANCHE 4X2 CR | 3GNEC12T04G171303 | $11,230 | $2,200 | $1,869.40 |
| 2013 | LEXUS | ES 350 | JTHBK1GG6D2020256 | $15,280 | $8,500 | $8,315.00 |
| 2008 | FORD | F550 4X4 RG | 1FDAF57R48EB34427 | $28,990 | $8,250 | $8,170.00 |
| 1999 | DODGE | RAM 2500 | 1B7KF2368XJ512080 | $9,702 | $1,700 | $1,355.40 |
| 2003 | GMC | C5500 | 1GDJ5C1114F500844 | $34,470 | $1,000 | $815.00 |
| 2013 | FORD | F-150 | 1FTFW1ET7DFB02285 | $17,500 | $9,900 | $9,795.00 |
| 2004 | MITSUBISHI | FE639 | JL6AAE1H44K000734 | $29,490 | $1,250 | $1,070.00 |
| 2004 | FORD | 350 SRW 4X4 CR | 1FTSW31P04EA21086 | $16,780 | $3,500 | $2,969.80 |
| 2007 | DODGE | RAM3500 4X4 QD | 3D7MX48CX7G723854 | $19,320 | $4,000 | $3,685.40 |
| 2004 | GMC TRUCK | C7500 | 1GDM7C1384F512353 | $34,325 | $5,500 | $4,596.30 |
| 2006 | CHEVROLET | 3500 4X4 CR | 1GCJK33D46F252242 | $21,940 | $9,500 | $ 9,315.00 |
| 2011 | RAM | 2500 4X4 CR | 3D7TT2CT2BG511932 | $22,940 | $15,300 | $15,010.40 |
| 2015 | FORD | F250 4X4 CR | 1FT7W2BTXFEC10911 | $26,970 | $15,100 | $14,866.00 |
| 2011 | GMC TRUCK | SIERA 35 4X4 EX | 1GT523C81BZ265964 | $27,125 | $5,200 | $4,893.40 |
| 2009 | DODGE | RAM 2500 4X2 6C | 3D7KR28L39G535332 | $20,625 | $4,500 | $4,115.40 |
| 1996 | FORD | F250 4X4 REG | 1FTHF26H2TEB02756 | $10,000 | $600 | $401.00 |
| 1996 | FORD | WINDSTAR FWD | 2FMDA5148TBB47033 | $8,190 | $300 | $115.00 |
| 2016 | RAM | 3500 4X4 CR | 3C7WRTCL9GG178005 | $26,470 | $13,700 | $13,515.00 |
| 2014 | FORD | EXPEDITN EL 4X4 | 1FMJK1J57EEF15145 | $23,440 | $8,500 | $8,297.00 |

| 2002 | FORD | F250 4X4 CR | 1FTNW21F42EA89984 | $23,940 | $7,250 | $7,065.00 |
| 2012 | FORD | 350 DRW 4X4 C/C | 1FD8W3HT5CEC10971 | $24,125 | $11,500 | $11,119.00 |
| 1994 | FORD | F150 4X2 EXT | 1FTEX15N9RKA15724 | $8,990 | $700 | $360.40 |
| 1989 | FORD | MED HVY CONVNTN | 1FDXK84A3KVA37099 | $25,100 | $5,500 | $ 4,900.00 |
| 2015 | RAM | 3500 | 3C63RRGL4FG702552 | $23,940 | $8,000 | $7,895.00 |
| 2008 | FORD | F550 4X4 EX | 1FDAX57R18ED86326 | $28,675 | $4,000 | $3,805.00 |
| 2009 | FORD | F250SD | 1FTSX20R19EA01706 | $16,280 | $1,150 | $986.00 |
| 2007 | INTNL | L SEMI | 2HSCNSCR97C389008 | $27,480 | $3,200 | $3,015.00 |
| 2014 | FORD | F350SD | 1FT8W3DT0EEB34184 | $30,450 | $7,200 | $6,895.00 |
| 2007 | INTNL | 7000 | 1HTWBAAR67J461931 | $35,070 | $7,900 | $7,574.00 |
| 2006 | NISSAN | MAXIMA | 1N4BA41E46C810994 | $7,180 | $1,000 | $786.00 |
| 2015 | FORD | F350SD | 1FT8W3DT0FEA26911 | $23,500 | $6,400 | $5,892.43 |
| 2011 | CHEVROLET | TAHOE | 1GNSCDFJ5BR260679 | $26,940 | $9,900 | $9,561.00 |
| 2007 | DODGE | RAM | 3D6WH46A27G712729 | $28,990 | $3,500 | $2,663.90 |
| 2007 | DODGE | RAM | 3D6WG36A67G817092 | $26,470 | $2,800 | $2,627.00 |
| 2014 | FORD | F350 | 1FD8W3GT5EEA25582 | $26,750 | $6,750 | $6,307.40 |
| 2014 | FORD | F350 | 1FD8W3GT7EEA25583 | $29,000 | $11,300 | $11,053.00 |
| 2002 | DODGE | RAM | 3B7KC23C92M236518 | $15,170 | $2,250 | $2,016.00 |
| 2006 | CHEVROLET | SILV | 1GCJK33245F935684 | $21,940 | $10,250 | $9,864.80 |
| 2011 | FORD | F350 | 1FT7X3B64BEB25540 | $17,725 | $2,250 | $2,051.00 |
| 2005 | DODGE | RAM | 3D7KS28C05G751217 | $16,725 | $4,000 | $3,723.40 |
| 2015 | RAM | 3500 | 3C63RRHLXFG642243 | $27,125 | $10,500 | $9,320.57 |
| 2000 | INTER | DUMP | 1HTSDAAN2YH314391 | $26,100 | $2,500 | $2,350.00 |
| 1982 | GMC | DUMP | 1GDG6H1J6NJ501295 | $19,100 | $600 | $450.00 |
| 2005 | DODGE | RAM | 3D7KR28C65G706682 | $14,270 | $4,400 | $4,050.40 |
| 2009 | FORD | F350 | 1FTWW33R09EA44875 | $19,820 | $2,500 | $2,150.40 |
| 2007 | FORD | F750 | 3FRXF75S95V156426 | $29,990 | $4,500 | $4,350.00 |
| 2000 | FORD | MUSTANG | 1FAFP4446YF239383 | $10,285 | $850 | $686.00 |
| 2015 | FORD | COMM | 1FDXE4FSXFDA07194 | $25,440 | $8,500 | $8,089.00 |

31.   The net proceeds received by NextGear from the sale of all the NG Sold Vehicles totals **$256,913.80**.  All of the NG Sold Vehicles were sold "as is," although several NG Sold Vehicles exhibited structural damage and were in poor condition.  For all NG Sold Vehicles, the gross sales proceeds were significantly below the stated sales price in the Exhibit "E" LAA auction invoices for the same NG Sold Vehicles, which is referenced below in additional detail.

32.     As of the date of filing this Original Complaint, NextGear has not yet sold the remaining Rock Hill NextGear Vehicles which were not otherwise included in the NG Sold Vehicles or sold out of trust by M. Garrison.  Two of the remaining, unsold units recovered by NextGear have missing vehicle identification plates, so the units cannot be sold.  The process for obtaining the necessary vehicle identification reassignment by the Texas Department of Motor Vehicles can potentially take several months, and based on the poor condition of the unsold vehicles, the cost and expense of obtaining a VIN reassignment may exceed any net proceeds that can be recovered by NextGear.  The other units can only run through auction that is specifically tailored for heavy truck sales that generally take place once per month.  Accordingly, the timeframe to liquidate these units may take several additional months.  To the extent NextGear sells any additional Rock Hill NextGear Vehicles, NextGear will credit such net sales proceeds to the amount due and owing by M. Garrison.

33.     After consideration of the net sales proceeds from the sale of the NG Sold Vehicles, in addition to all other lawful offsets, credits, and payments by M. Garrison, the remaining balance due and owing under the M. Garrison NextGear Note is **$936,999.94**, exclusive of attorneys' fees and costs.

34.     As a result of M. Garrison's default, NextGear has incurred additional expenses under the M. Garrison NextGear Note, including, without limitation, attorneys' fees and court costs, all of which NextGear is entitled to recover as holder of the M. Garrison NextGear Note.

### Facts Relevant To Lawton Auto Auction

35.     NextGear, previously doing business as Dealer Services Corporation, entered into a Universal Funding Agreement with LAA dated September 27, 2010 (the "Funding Agreement").

11

36.     LAA is a dealer-only auction that caters to the sale of motor vehicles by wholesale and retail motor vehicle dealers who have General Distinguishing Numbers and are authorized and licensed to sell such vehicles by the Texas Department of Motor Vehicles.

37.     Pursuant to paragraph five (5) of the Funding Agreement, LAA represented and warranted (with emphasis added):

> …that with respect to each purchase of a Vehicle by a Dealer with Credit through Auction for which Auction requests the Auction Payment be funded by DSC to Auction that: (a) such Vehicle actually exists; **(b) Such Vehicle was the subject of an "across the block" sale at one of Auction's regularly scheduled sales, and such sale was conducted by Auction in the ordinary course of Auction's business**; (c) Such Vehicle is available immediately for the purchasing Dealer's actual possession; (d) The certificate of title for such Vehicle is valid and is under the control of Auction on the day of funding; **(e) the Bill of Sale for such Vehicle accurately reflects** (i) the name, address and phone number for the buying Dealer and the seller; (ii) the signature of the buying Dealer and seller; (iii) the make, model, year, color, mileage and the entire vehicle identification number for the subject Vehicle; **(iv) the sale date for the Subject Vehicle**; (v) the sale price for the subject Vehicle; and (vi) each Auction charge for which Auction has requested to be funded in the subject Auction Payment.

38.     A true and correct copy of the Funding Agreement is attached hereto as Exhibit "F" and is incorporated herein by reference for all purposes.

39.     NextGear relied upon the written representations and warranties made by LAA when deciding whether to approve Credit (as defined in the Funding Agreement) or Auction Payments (as defined in the Funding Agreement) to LAA for the sale of any specific Vehicle (as defined in the Funding Agreement). Accordingly, the Funding Agreement required LAA to run all Vehicles through a live, competitive and public auction during LAA's regularly scheduled auctions, which generally occurred every Wednesday each week.

40.     LAA knowingly failed to run the following twenty-two (22) Rock Hill NextGear Vehicles through a live, competitive auction on the dates specified in the auction bills of sale (hereinafter referred to as the "NG Fraud Vehicles"):

| Unit Year | Unit Make | Unit Model | VIN | Financed Amount | Reassignment Date | Auction Sale Date |
|---|---|---|---|---|---|---|
| 2004 | Chevrolet | Avalanche | 3GNEC12T04G171303 | $11,230.00 | 6/8/2019 | 8/14/2019 |
| 2008 | FORD | SUPER DUTY | 1FDAF57R48EB34427 | $28,990.00 | 4/15/2019 | 10/16/2019 |
| 2004 | GMC | C5C | 1GDJ5C1114F500844 | $34,470.00 | | 10/16/2019 |
| 2009 | Ford | F250SD | 1FTSX20R19EA01706 | $16,280.00 | 5/3/2019 | 10/16/2019 |
| 2011 | Chevrolet | Tahoe | 1GNSCDFJ5BR260679 | $25,940.00 | 6/17/2019 | 10/30/2019 |
| 2004 | Ford | F350SD | 1FTSW31P04EA21086 | $16,780.00 | 8/29/2018 | 11/20/2019 |
| 2001 | HDAB | 53' | 1H9CE53311A263507 | $27,480.00 | 5/21/2019 | 11/20/2019 |
| 1995 | GDAN | 1GR | 1GRAA922XSB029801 | $16,280.00 | 12/11/2018 | 11/27/2019 |
| 2007 | Dodge | Ram 3500 | 3D7MX48CX7G723854 | $19,320.00 | 11/22/2019 | 12/4/2019 |
| 2015 | Ford | F350SD | 1FT8W3DT0FEA26911 | $23,500.00 | 6/28/2019 | 12/18/2019 |
| 2002 | Dodge | Ram 2500 | 3B7KC23C92M236518 | $15,170.00 | 12/31/2019 | 1/3/2020 |
| 2006 | Chevrolet | Silverado 3500 | 1GCJK33D46F252242 | $21,940.00 | 12/3/2019 | 1/8/2020 |
| 2011 | Ram | 2500 | 3D7TT2CT2BG511932 | $22,940.00 | 12/23/2019 | 1/8/2020 |
| 2015 | Ford | F250SD | 1FT7W2BTXFEC10911 | $26,970.00 | 12/20/2019 | 1/22/2020 |
| 2005 | Dodge | Ram 2500 | 3D7KR28C65G706682 | $14,270.00 | 1/15/2020 | 1/22/2020 |
| 1996 | Ford | Windstar Vans | 2FMDA5148TBB47033 | $8,190.00 | 7/12/2019 | 1/29/2020 |
| 2006 | Nissan | Maxima | 1N4BA41E46C810994 | $7,180.00 | 7/12/2019 | 1/29/2020 |
| 2009 | Ford | F350SD | 1FTWW33R09EA44875 | $19,820.00 | 7/25/2019 | 1/29/2020 |
| 2005 | FORD | F750 | 3FRXF75S95V156426 | $29,990.00 | 8/6/2019 | 2/19/2020 |

| 2002 | Ford | F250SD | 1FTNW21F42EA89984 | $23,940.00 | 2/20/2020 | 2/26/2020 |
| 1994 | Ford | F150 | 1FTEX15N9RKA15724 | $8,990.00 | 2/21/2020 | 3/4/2020 |
| 2015 | Ford | Commercial Vans | 1FDXE4FSXFDA07194 | $25,440.00 | 3/10/2020 | 3/11/2020 |

41.     True and correct copies of the Certificates of Title and Lawton Auction invoices for the twenty-two (22) NG Fraud Vehicles are collectively attached hereto as Exhibit "G" and incorporated herein by reference.  The amount NextGear tendered to LAA for each NG Fraud Vehicle identified in the above table is listed under the column "Financed Amount" pursuant to the amounts listed in the Exhibit "G" auction invoices generated by LAA for each NG Fraud Vehicle.  Pursuant to the Exhibit "D" Rock Hill RDR, the total payoff for all NG Fraud Vehicles is **$422,269.70**.

42.     Additionally, the reassignment date reflected on each of the NG Fraud Vehicles' certificate of title that discloses the assignment of each NG Fraud Vehicle from the seller to M. Garrison, as buyer, is identified under the column "Reassignment Date."

43.     Meanwhile, the "Auction Sale Date" in the above table reflects the purported date each NG Fraud Vehicle was sold by LAA according to the invoices and other documents generated by LAA, which were provided to NextGear by LAA.

44.     For most of the NG Fraud Vehicles, the title reassignment date on the back of such vehicles' respective certificates of title as set forth in Exhibit "G" reveals that the NG Fraud Vehicles were actually sold to M. Garrison days, and in some cases *months*, prior to their stated sale date at LAA, when compared to the corresponding Exhibit "G" invoices generated by LAA reflecting different dates of sale at auction.

45.     With respect to the alleged auction sale of NG Fraud Vehicles, LAA did not run any of the NG Fraud Vehicles through a live, competitive auction as reflected on their invoices, as required by the Funding Agreement.

46.     Instead, the times and dates as stated in the LAA invoices provided to NextGear for purposes of facilitating an Auction Payment were deliberately fabricated LAA and/or Lisa Druien.

47.     Further, the sale dates reflected in the reassignments to the NG Fraud Vehicles do not correspond to the normal public auction dates and times for LAA and instead generally fall on days other than a Wednesday, LAA's public auction run day.  Thus, the purported sales of the NG Fraud Vehicles were not "across the block" sales at one of LAA's regularly scheduled sales and were not sold in the ordinary course of LAA's business.

48.     For example, the Reassignment Date of June 8, 2019, for the 2004 Chevrolet Avalanche with VIN ending in 171303 corresponds to a Saturday, which is not a typical public auction day for LAA.  Although the alleged auction sale date reflected in the LAA invoice of August 14, 2019, falls on a Wednesday, the sale of the 2004 Avalanche with VIN ending in 171303 could not have occurred on August 14, 2019, because the reassignment of title reflected a purchase of the vehicle by M. Garrison *months* prior to the alleged auction date of August 14, 2019.  There are numerous other instances of such sales discrepancies by LAA as set forth in the table reflecting the reassignment dates and auction sale dates, all of which are based on the data set forth in Exhibit "G."

49.     For all such NG Fraud Vehicles, the purported sales price as stated on the LAA invoice was both fabricated and inflated by LAA and/or M. Garrison.  These false and fraudulent representations by LAA and M. Garrison are contrary to LAA's representations and warranties in

the Funding Agreement and M. Garrison's representations and warranties in the M. Garrison NextGear Note.

50.    Lisa Druien is an active officer of LAA, regularly engages in the day-to-day operations of LAA and conducts business on behalf of LAA.

51.    Lisa Druien is the Vice President of LAA.

52.    In many instances in which NG Fraud Vehicles were sold through LAA, Lisa Druien notarized title documents prior to such alleged sale by LAA that reflect a purchase or assignment date of the NG Fraud Vehicles on a different date that the LAA invoice shows for such auction sale date.

53.    Lisa Druien had direct and personal knowledge concerning the discrepancies between the reassignment dates reflected on the certificates of title for the NG Fraud Vehicles and the sales date reflected on the Exhibit "G" auction invoices.

54.    Despite having knowledge that discrepancies existed between the reassignment dates reflected on the certificates of title for the NG Fraud Vehicles and the sales date reflected on the Exhibit "G" auction invoices for each corresponding NG Fraud Vehicle, Lisa Druien intentionally withheld disclosing such information to NextGear.

55.    Further, Lisa Druien regularly communicated with M. Garrison to facilitate the transfer of the NG Fraud Vehicles and completed the necessary paperwork on behalf of LAA to make it appear the NG Fraud Vehicles were sold at a public auction on a regularly scheduled auction day.

56.    However, Lisa Druien knew that the NG Fraud Vehicles were not the subject of an "across the block" sale at one of LAA's regularly scheduled sales.

57.     Lisa Druien also knew that the NG Fraud Vehicles were not sold in the ordinary course of LAA's business.

58.     Lisa Druien, LAA, and M. Garrison colluded with one another, and perhaps others, to establish an artificial sales price for the purposes of obtaining financing from NextGear at a premium for vehicles whose value was substantially less than the market value of the amount financed.

59.     LAA and/or Lisa Druien knowingly and intentionally generated false and fraudulent auction invoices and tickets with respect to the sale of NG Fraud Vehicles.

60.     LAA, Lisa Druien, and/or M. Garrison were aware the LAA invoices in Exhibit "G" that were provided to NextGear contained false information with respect to the auction sale date and amount in order to deceive NextGear into believing the NG Fraud Vehicles were sold at a public auction at fair market value.

61.     Had NextGear been aware the auction invoices and tickets associated with the NG Fraud Vehicles contained incorrect, false, or fictitious information pertaining to the sale date or sales amount, NextGear would not have provided financing to M. Garrison based on the alleged sales price of the NG Fraud Vehicles as set forth in the Exhibit "G" LAA invoices.

**Fraudulent Insider Sales**

62.     In addition to the foregoing sale of the NG Fraud Vehicles, LAA, Lisa Druien, and Emmett Druien also supervised, facilitated and/or colluded with M. Garrison to conduct additional fraudulent sales of motor vehicles financed by NextGear.  NextGear discovered irregularities with respect to the following seventeen (17) motor vehicles financed with M. Garrison under the M. Garrison NextGear Note (the "Insider Fraud Vehicles"):

| Unit Year | Unit Make | Unit Model | VIN | Financed Amount | Auction Seller |
|---|---|---|---|---|---|
| 2013 | Lexus | ES 350 | JTHBK1GG6D2020256 | $15,280.00 | Mainer Ford |
| 1999 | Dodge | Ram 2500 | 1B7KF2368XJ512080 | $9,702.00 | Lawton Cache Auto Auction |
| 2007 | International | Semi | 2HSCNSCR97C389008 | $27,480.00 | Big Dawg Motors |
| 2007 | Dodge | Ram 3500 | 3D6WH46A27G712729 | $28,990.00 | Star Motors |
| 2004 | Mitsubish | FE6 | JL6AAE1H44K000734 | $29,490.00 | Austin Financial Services/Michael Garrett |
| 2007 | dodge | ram | 3D6WG36A67G817092 | $26,470.00 | Farmers Electric Cooperative |
| 2014 | Ford | F350SD | 1FD8W3GT5EEA25582 | $26,970.00 | Bottoms Up Motorsports/ Michael Lawson |
| 2014 | Ford | F350SD | 1FD8W3GT7EEA25583 | $29,000.00 | Bottoms Up Motorsports/ Michael Lawson |
| 2007 | VOLVO | VN | 4V4NC9GH87N469707 | $28,990.00 | Kenney W. Self/ Kenney Self |
| 2005 | Chevrolet | Silverado 3500 | 1GCJK33245F935684 | $26,470.00 | Lawton Cache Auto Auction/ Emmett Druien |
| 2007 | international | 7000 | 1HTWBAAR67J461931 | $35,070.00 | Bottoms Up Motorsports/ Michael Lawson |
| 1996 | Ford | F250 | 1FTHF26H2TEB02756 | $10,000.00 | Lawton Cache Auto Auction/ Emmett Druien |
| 2014 | Ram | 3500 | 3C63RRGL7EG235772 | $36,070.00 | Big Dawg/Kyle Way |
| 2016 | Ram | 3500 | 3C7WRTCL9G178005 | $26,470.00 | Manual Gomez/ Manual Gomez |
| 2014 | Ford | Expedition EL | 1FMJK1J57EEF15145 | $23,440.00 | Mainer Ford/Christi Sanders |
| 2006 | Dodge | Ram 3500 | 3D7MX48C06G223278 | $21,940.00 | Vaughn Motor Co/David Vaughn |
| 2015 | Ram | 3500 | 3C63RRGL4FG702552 | $23,940.00 | Austin Financial Services/Michael Garrett |

The amount NextGear tendered to LAA for each Insider Fraud Vehicle identified in the above table is listed under the column "Financed Amount" as referenced by the Exhibit "D" Rock Hill

RDR.   Additionally, the seller of each Insider Fraud Vehicle that was identified by LAA is referenced in the column labeled "Auction Seller."  The buyer for each Insider Fraud Vehicle is M. Garrison.

63.      The documents associated with the sale of the Insider Fraud Vehicles indicates such vehicles were not sold by LAA in the ordinary course of business.  For instance, in at least three (3) separate cases, the Lawton Auto Auction is identified as the *seller* of the Insider Fraud Vehicles.  The specific Insider Fraud Vehicles that were sold by LAA are as follows:

| Unit Year | Unit Make | Unit Model | VIN | Financed Amount | Auction Seller |
|-----------|-----------|------------|-----|-----------------|----------------|
| 1999 | Dodge | Ram 2500 | 1B7KF2368XJ512080 | $9,702.00 | Lawton Cache Auto Auction |
| 2005 | Chevrolet | Silverado 3500 | 1GCJK33245F935684 | $26,470.00 | Lawton Cache Auto Auction/ Emmett Druien |
| 1996 | Ford | F250 | 1FTHF26H2TEB02756 | $10,000.00 | Lawton Cache Auto Auction/ Emmett Druien |

It is unusual and outside the ordinary course of business for an auction or its principal such as Emmett Druien to sell vehicles that are run through its own auction.  Such conduct by an auction is an indication that the true nature of the sales transaction, including the true identity of the seller and/or the true underlying sales price, has been concealed or altered.

64.      In the instant case, upon information and belief, the sales prices of these three Insider Fraud Vehicles were inflated beyond their fair market value based on their condition at the time of the alleged sale at LAA, enabling M. Garrison and/or LAA to receive additional financing from NextGear that they were otherwise not entitled to receive under the Note and/or Funding Agreement.

65.      In addition to the foregoing, there are several other irregularities in the auction sales process that indicates the Insider Fraud Vehicles were not sold by LAA at all, or

alternatively, were not sold in the ordinary course of business or that the sales price of such Insider Fraud Vehicles was artificially inflated by the parties to the transaction.

66. For instance, with respect to the 2004 GMC with VIN ending in 500844, M. Garrison is listed as both the buyer *and* seller of the vehicle. Any such transaction in which the buyer and seller are the same person or entity is a fictitious transaction and is certainly outside the ordinary course of LAA's business.

67. Additionally, with respect to the 2007 Dodge Ram with VIN ending in 817092 and the 1995 GDAN with VIN ending in 029801, the sellers are not motor vehicle retail dealers. However, LAA is a dealer-only auction that caters to the sale of motor vehicles by wholesale and retail motor vehicle dealers who have General Distinguishing Numbers and are authorized to sell such vehicles by the Texas Department of Motor Vehicles. Thus, the alleged sale of these two vehicles by non-dealers was not done in the ordinary course of LAA's business contrary to the Funding Agreement.

68. Further, several of the following Insider Fraud Vehicles had been owned by M. Garrison's affiliated entity, Austin Garrison d/b/a Austin Financial Services, prior to being sold at LAA:

| Unit Year | Unit Make | Unit Model | VIN | Financed Amount | Auction Seller |
|-----------|-----------|------------|-----|-----------------|----------------|
| 2004 | Mitsubish | FE6 | JL6AAE1H44K000734 | $29,490.00 | Austin Financial Services/Michael Garrett |
| 2014 | Ford | F350SD | 1FD8W3GT5EEA25582 | $26,970.00 | Bottoms Up Motorsports/ Michael Lawson |
| 2014 | Ford | F350SD | 1FD8W3GT7EEA25583 | $29,000.00 | Bottoms Up Motorsports/ Michael Lawson |
| 2015 | Ram | 3500 | 3C63RRGL4FG702552 | $23,940.00 | Austin Financial Services/Michael Garrett |

69.     LAA, Lisa Druien, Emmett Druien, and/or M. Garrison colluded amongst each other to generate invoices that reflect fictitious sales of the Insider Fraud Vehicles and other vehicles allegedly run through the LAA at a public auction, when in fact no such public auction sales occurred.

70.     LAA, Lisa Druien, Emmett Druien, and/or M. Garrison colluded amongst each other to sell the aforementioned four (4) Insider Fraud Vehicles outside the ordinary course of LAA's business with inflated sales prices.

71.     Further, the auction seller identified as Michael Garret is, upon information and belief, a pseudonym or fictitious name and instead refers to the principal of M. Garrison, Michael Garrison, who was involved in orchestrating the fictitious and fraudulent sales of these vehicles at LAA.

72.     The NG Fraud Vehicles and Insider Fraud Vehicles were in poor condition when allegedly run through the auction, if they were run through the auction at all.

73.     The NG Fraud Vehicles and Insider Fraud Vehicles also have discrepancies in their odometer readings between the time they were sold at LAA auction and the time period NG repossessed a portion of the Rock Hill NextGear Vehicles from M. Garrison.  Based on NextGear's review of the odometers in several of the recovered Rock Hill NextGear Vehicles, the odometer readings set forth in the Exhibit "G" LAA invoices are not correct and/or understate the true odometer reading in the Odometer Disclosure Statement.

74.     LAA, Lisa Druien, Emmett Druien, and/or M. Garrison were aware and had knowledge of the poor condition of the NG Fraud Vehicles and Insider Fraud Vehicles prior to their purported "sales" at LAA.

75.     LAA, Lisa Druien, Emmett Druien, and/or M. Garrison knew the odometer

readings set forth in the Odometer Disclosure Statement portion of the Exhibit "G" LAA invoices were incorrect at the time the invoices were generated and/or provided to NextGear.

76.     However, since LAA did not conduct a public auction of the NG Fraud Vehicles and/or Insider Fraud Vehicles, the sales price listed in the invoices generated by LAA did not account for the poor condition of the NG Fraud Vehicles and Insider Fraud Vehicles.

77.     LAA, Lisa Druien, Emmett Druien, and/or M. Garrison knew that by selling all or a portion of the NG Fraud Vehicles and Insider Fraud Vehicles at a non-public auction and outside the ordinary course of business, they would be able to manipulate the sales prices of such vehicles.

78.     LAA, Lisa Druien, Emmett Druien, and/or M. Garrison knew that by falsifying the sales information included in LAA invoices provided to NextGear, they would be able to manipulate the sales prices of such NG Fraud Vehicles and Insider Fraud Vehicles.

79.     LAA, Lisa Druien, Emmett Druien, and/or M. Garrison knew that by manipulating and artificially inflating the sales prices of the NG Fraud Vehicles and Insider Fraud Vehicles, NextGear would be harmed by such conduct.

80.     Defendants LAA, M. Garrison, Emmett Druien, and/or Lisa Druien intentionally and knowingly colluded amongst each other to improperly inflate the value and sales prices of the NG Fraud Vehicles and Insider Fraud Vehicles in order to obtain additional financing from NextGear in violation of the terms of the Funding Agreement and the M. Garrison NextGear Note.

**IV.**
**CLAIMS OF AFC AGAINST DEFENDANTS AND FACTUAL BACKGROUND**

**Facts Relevant to M. Garrison**

81.     Plaintiffs incorporate by reference all previous paragraphs to this Complaint as if set forth fully hereon.

82.     On or about September 3, 2013, AFC and M. Garrison entered into a Demand Promissory Note and Security Agreement (the "AFC Note").

83.     A true and correct copy of said AFC Note, including any applicable amendments, term sheets, and U.S. Aggregate Advance Limit Amendments, is attached hereto and incorporated by reference for all purposes as Exhibit "H."

84.     Pursuant to ¶9.11 of the AFC Note, the agreement and any disputes arising therefrom are governed by the laws of the State of Indiana.

85.     Under the AFC Note, Mr. Garrison became obligated to repay each Advance (as defined in ¶1.2 of the AFC Note and as if fully set forth herein) as specified in the relevant terms sheet for the AFC Note. Specifically, M. Garrison is obligated to pay to AFC at the offices of AFC all Purchase Money Inventory Obligations (as defined in ¶1.23 of the AFC Note and as if fully set forth herein), on demand and without notice, with respect to an Item of Purchase Money Inventory (as defined in ¶1.22 the AFC Note and as if fully set forth herein) on the earlier of:  (a) AFC's demand; (b) forty-eight (48) hours after the disposition by sale or otherwise of an Item of Purchase Money Inventory; or (c) the Curtailment Date (as defined in ¶1.7 of the AFC Note and as if fully set forth herein).

86.     Pursuant to ¶3.0 of the AFC Note, AFC retains a purchase money security interest in the Purchase Money Inventory, as well as a blanket security interest in all inventory and assets of M. Garrison identified as Collateral (as defined in ¶ 1.6 of the AFC Note). AFC perfected said

security interest in the Purchase Money Inventory and Collateral by the filing a UCC-1 Financing Statement with the Texas Secretary of State as to M. Garrison, as debtor, on September 5, 2013, which was assigned filing # 13-0028278970. AFC timely filed a continuation statement to its UCC-1 Financing Statement with the Texas Secretary of State on March 13, 2018, which was assigned filing # 18-00083882.  True and correct copies of the UCC-1 Financing Statement and continuation statement filed by AFC with the office of the Texas Secretary of State are collectively attached hereto and incorporated by reference for all purposes as Exhibit "I."

87.     On or about September 3, 2013, M. Garrison signed and executed an Unconditional and Continuing Guaranty ("AFC Guaranty") with respect to the AFC Note. A true and correct copy of the AFC Guaranty is attached hereto as Exhibit "J" and is incorporated herein by reference for all purposes.

88.     M. Garrison has wholly failed to comply with his individual obligations to AFC pursuant to the AFC Guaranty.

89.     AFC advanced funds to M. Garrison and to certain third parties on M. Garrison's behalf for the purchase of motor vehicle inventory as Collateral pursuant to the terms of the AFC Note.

90.     The funds advanced by AFC to M. Garrison and to certain third parties on M. Garrison's behalf have not been fully repaid as agreed.  Specifically, M. Garrison is indebted to AFC for twenty-eight (28) motor vehicles for which AFC provided advances under the Note. The twenty-eight (28) vehicles (hereinafter, the "AFC Vehicles") are identified by vehicle identification number, AFC stock number, year, make, model and color in AFC's Dealer Payoff Report (the "DPR") dated May 11, 2020.

91.     A true and correct copy of the DPR is attached hereto as Exhibit "K" and incorporated herein by reference for all purposes.

92.     M. Garrison defaulted under the AFC Note by, *inter alia*, failing to make payments of the principal and/or interest due thereunder.

93.     AFC conducted an audit of M. Garrison' sales lot, and based on the results of the lot audit, AFC determined that M. Garrison sold at least one (1) of the AFC Vehicles to third parties without timely remitting to AFC the sales proceeds as required by ¶1.19 of the AFC Note.

94.     To date, the remaining twenty-seven (27) AFC Vehicles have been repossessed by AFC (hereinafter, the "Repossessed Vehicles").  The following one (1) AFC Vehicle was not among the Repossessed Vehicles but instead was sold out of trust by M. Garrison (the "AFC SOT Vehicle"):

| Unit Year | Unit Make | Unit Model | VIN | Financed Amount | Principal Amount Due |
|-----------|-----------|------------|-----|-----------------|----------------------|
| 2015 | Ford | F-250 | 1FT7W2BTXFEA02463 | $28,490.00 | $28,304.42 |

95.     M. Garrison has disposed of the proceeds from the sale of the AFC SOT Vehicle in direct contravention to AFC's perfected, first-priority security interest in those proceeds.  Now that the AFC SOT Vehicle has been sold presumably free and clear of AFC's security interest, AFC no longer has collateral securing that portion of the indebtedness owed by M. Garrison under the AFC Note.

96.     As a result of the occurrence and continuance of the several Events of Default, as that term is defined in the AFC Note, AFC declared the entire indebtedness due under the AFC Note immediately due and payable.

97.     AFC has exercised its default remedies with respect to twenty-seven (27) of the following Repossessed Vehicles and sold them at a public auction to the highest bidder for the following amounts (the "AFC Sold Vehicles"):

| Year | Make | Model | VIN # | Floored Amount | Gross Sales Proceeds | Net Sales Proceeds |
|------|------|-------|-------|----------------|----------------------|--------------------|
| 2006 | Dodge | Ram | 3D7ML48C26G178761 | 21,940.00 | $6,000.00 | $5,501.00 |
| 2008 | Dodge | Ram | 3D7ML48A18G219298 | 25,440.00 | $5,300.00 | $4,771.00 |
| 2007 | Ford | F250 | 1FTSW21P57EB14538 | 20,440.00 | $3,000.00 | $2,535.00 |
| 2002 | Chevrolet | Suburban | 1GNEC16Z82J293191 | 15,280.00 | $600.00 | $321.00 |
| 2006 | Mazda | 6 | JM1GG12L761105547 | 13,270.00 | $1,200.00 | $746.00 |
| 2010 | Dodge | Challenger | 2B3CJ4DV0AH184071 | 14,270.00 | $4,400.00 | $3,956.00 |
| 2009 | Ford | F250 | 1FTSX20R89EA01704 | 22,440.00 | $1,200.00 | $780.00 |
| 2011 | Chevrolet | Silverado | 1GC0KVCG2BZ387391 | 16,780.00 | $2,000.00 | $1,710.00 |
| 2015 | Ford | F250 | 1FT7W2BTXFEC20953 | 30,500.00 | $23,000.00 | $22,721.00 |
| 2014 | Ram | 3500 | 3C63RRGL8EG149807 | 27,980.00 | $15,600.00 | $15,146.00 |
| 2004 | GMC | Sierra | 1GTJK33214F263548 | 24,940.00 | $6,800.00 | $6,360.00 |
| 2012 | Ford | Expedition | 1FMJU1K54CEF09406 | 23,440.00 | $8,600.00 | $8,176.00 |
| 2011 | Ford | Explorer | 1FMHK8F89BGA68442 | 26,280.00 | $5,600.00 | $5,176.00 |
| 2004 | Dodge | Ram | 3D7KU28C64G204039 | 20,840.00 | $4,200.00 | $3,690.00 |
| 2007 | Dodge | Ram | 3D7MX48A37G804242 | 22,940.00 | $9,200.00 | $8,750.00 |
| 2008 | Dodge | Ram | 3D7KR28A48G116225 | 16,280.00 | $3,600.00 | $3,235.00 |
| 2016 | Honda | Pioneer | 1HFVE04R7G4000179 | $17,290.00 | $9,250.00 | $8,830.00 |
| 2005 | Chevrolet | Silverado | 1GCJK33265F919308 | $24,940.00 | $3,700.00 | $3,235.00 |
| 2008 | Chevrolet | Silverado | 1GCJK33648F114088 | $18,790.00 | $9,100.00 | $8,582.50 |
| 2015 | Ford | F350 | 1FD8W3HT2FEA32814 | $35,070.00 | $17,000.00 | $16,516.00 |
| 2015 | Ford | F250sd | 1FT7W2BTXFEA02463 | $28,490.00 | $10,800.00 | $10,471.00 |
| 2013 | Freightliner | M2 | 1FVACWDU5DHFA3237 | $29,940.00 | $11,000.00 | $10,225.00 |
| 1999 | International | 8000-Series | 1HSHBAHNXXH659029 | $28,490.00 | $1,600.00 | $1,355.00 |
| 1988 | Ford | LN 7000 | 1FDNR72P7JVA28327 | $18,290.00 | $1,200.00 | $455.00 |
| 2017 | Apalm | Car Trailer | 5UTGN2428HM007662 | $29,740.00 | $3,000.00 | $2,555.00 |
| 2005 | Take Three | Trailer | 1T9AS40285B540094 | $16,780.00 | $4,000.00 | $3,555.00 |
| 1996 | Ford | F250 | 1FTHX25F0TEB25935 | $12,770.00 | $3,600.00 | $3,045.00 |

98.     True and correct copies of the Sales Recap sheets reflecting the auction handling the sale, auction sale date, gross sales proceeds, charges incurred by AFC, and net sales proceeds for each of the above-referenced AFC Sold Vehicles are collectively attached hereto as Exhibit "L" and incorporated herein by reference for all purposes.  The net proceeds received by AFC from the sale of the AFC Sold Vehicles was $162,398.50.

99.     After consideration of the net sales proceeds from the sale of the AFC Sold Vehicles, in addition to all other lawful offsets, credits, and payments by M. Garrison, the remaining balance due and owing under the AFC Note is $392,994.79, exclusive of attorneys' fees and costs.

100.    As a result of M. Garrison' default, AFC has incurred additional expenses under the AFC Note, including, without limitation, attorneys' fees and court costs, all of which AFC is entitled to recover as holder of the Note.

### Facts Relevant to Lawton Auto Auction

101.    AFC entered into an Auction Servicing Agreement dated December 17, 2013 (the "Auction Agreement"), with LAA.  Pursuant to paragraph two (2) of the Auction Agreement, LAA represented and warranted to AFC (with emphasis added):

> … that all information provided in any documentation sent to AFC pursuant to this Agreement **is accurate and complete** in all respects and that such documentation is sufficient to transfer marketable title to the subject vehicle(s).

Furthermore, the paragraph 1(c) of the Auction Agreement states (with emphasis added) that

> Auction shall … provide AFC with documentation for vehicles purchased by any Dealer with Credit, specifying for each such vehicle (i) the year, make, model, color, body style, and vehicle identification number; (ii) the name and address of the purchasing Dealer; (iii) the actual sale price; and (iv) the buyer's fee due to Auction; (v) the mileage listed on the odometer; (vi) **whether or not such vehicle was purchased during an auction sale on the auction block or off of the auction block**; and (vii) whether or not

27

such **vehicle was on site at the Auction Facility at the time of such sale**. Regardless of the amount of a Dealer's available Credit, Auction shall not place any vehicle purchase on a Dealer's AFC floor plan without the Dealer's express authorization.

102.   A true and correct copy of the Auction Agreement is attached hereto as Exhibit "M" and is incorporated herein by reference for all purposes.

103.   AFC relied upon the written representations and warranties made by LAA when deciding whether to approve Credit (as defined in the Auction Agreement) or Original Credit (as defined in the Auction Agreement) to LAA for the sale of any specific vehicle.

104.   LAA ran the following twenty-eight (28) AFC Vehicles through auction on the dates specified in the auction bills of sale, whereby M. Garrison was purchaser:

| Unit Year | Unit Make | Unit Model | VIN | Financed Amount | Reassignment Date | Auction Sale Date |
|---|---|---|---|---|---|---|
| 2006 | Dodge | Ram 3500 | 3D7ML48C26G178761 | $21,940.00 | 8/1/2019 | 7/31/2019 |
| 2008 | Dodge | Ram 3500 | 3D7ML48A18G219298 | $25,440.00 | 7/29/2019 | 7/31/2019 |
| 2007 | Ford | F250SD | 1FTSW21P57EB14538 | $20,440.00 | 5/31/2019 | 8/21/2019 |
| 2017 | Car Trailer | | 5UTGN2428HM007662 | $29,740.00 | Reassignment date blank on title | 9/4/2019 |
| 2002 | Chevrolet | Suburban | 1GNEC16Z82J293191 | $15,280.00 | 5/31/2019 | 9/25/2019 |
| 2006 | Mazda | 6 | JM1GG12L761105547 | $13,270.00 | 5/31/2019 | 9/25/2019 |
| 1995 | Trailer | | 1GRAA9224SB029809 | $29,490.00 | 10/11/2019 | 10/2/2019 |
| 2010 | Dodge | Challenger | 2B3CJ4DV0AH184071 | $14,270.00 | Reassignment date blank on title | 10/9/2019 |
| 2009 | Ford | F250SD | 1FTSX20R89EA01704 | $22,440.00 | 5/3/2019 | 10/9/2019 |
| 1999 | International Transtar | 8000-Series | 1HSHBAHNXXH659029 | $28,490.00 | Reassignment date blank on title | 10/16/2019 |
| 1988 | Ford | N-Series | 1FDNR72P7JVA28327 | $18,290.00 | 10/20/2019 | 10/16/2019 |

| 2011 | Chevrolet | Silverado 2500 | 1GC0KVCG2BZ387391 | $16,780.00 | 10/26/2019 | 10/30/2019 |
|---|---|---|---|---|---|---|
| 2015 | Ford | F250SD | 1FT7W2BTXFEC20953 | $30,500.00 | Reassignment date blank on title | 11/27/2019 |
| 2015 | Ford | F350SD | 1FD8W3HT2FEA32814 | $35,070.00 | 12/23/2019 | 1/3/2020 |
| 2005 | Trailer | | 1T9AS40285B540094 | $16,780.00 | 12/21/2019 | 1/3/2020 |
| 2014 | Dodge | Ram 3500 | 3C63RRGL8EG149807 | $27,980.00 | Reassignment date blank on title | 1/8/2019 |
| 2015 | Ford | F250SD | 1FT7W2BTXFEA02463 | $28,490.00 | 1/14/2020 | 1/15/2019 |
| 2004 | GMC | Sierra 3500 | 1GTJK33214F263548 | $24,940.00 | 1/13/2020 | 1/15/2019 |
| 2012 | Ford | Expedition | 1FMJU1K54CEF09406 | $23,440.00 | Reassignment date blank on title | 1/22/2020 |
| 2011 | Ford | Explorer | 1FMHK8F89BGA68442 | $16,280.00 | 7/12/2019 | 1/22/2020 |
| 2004 | Dodge | Ram 2500 | 3D7KU28C64G204039 | $20,840.00 | Reassignment date blank on title | 1/29/2020 |
| 2007 | Dodge | Ram 3500 | 3D7MX48A37G804242 | $22,940.00 | Reassignment date blank on title | 1/29/2020 |
| 2008 | Dodge | Ram 2500 | 3D7KR28A48G116225 | $16,280.00 | 2/4/2020 | 2/12/2020 |
| 1996 | Ford | F250 | 1FTHX25F0TEB25935 | $12,770.00 | 2/14/2020 | 2/19/2020 |
| 2013 | Freightliner | Cascadia | 1FVACWDU5DHFA3237 | $29,490.00 | Reassignment date blank on title | 2/19/2020 |
| 2005 | Chevrolet | Silverado 3500 | 1GCJK33265F919308 | $24,940.00 | 2/10/2020 | 2/26/2020 |
| 2008 | Chevrolet | Silverado 3500 | 1GCJK33648F114088 | $18,790.00 | 2/25/2020 | 3/4/2020 |
| 2016 | Pioneer | 1000-5 Deluxe | 1HFVE04R7G4000179 | $17,290.00 | Reassignment date blank on title | 3/11/2020 |

105.     True and correct copies of the invoices generated by LAA with respect to the sale of the AFC Vehicles are collectively attached hereto as Exhibit "N" and incorporated herein by reference.

106.     True and correct copies of the certificates of title reflecting the reassignment and sale of the AFC Vehicles are collectively attached hereto as Exhibit "O" and incorporated herein by reference.  The date of the reassignment on each of AFC Vehicles' certificates of title in Exhibit "O" are located on the reverse side of each certificate of title and identify M. Garrison, as buyer.

107.     However, LAA did not run the AFC Vehicles through a competitive, public "auction sale on the auction block" as contemplated by the Auction Agreement.

108.     Instead, LAA chose to conduct non-public sales between the various sellers and M. Garrison.

109.     At no time did LAA notify AFC that the AFC Vehicles were not run "on the block" at a live, competitive and public auction during LAA's regularly scheduled auctions, which generally occurred every Wednesday each week.

110.     The amount AFC tendered to LAA for M. Garrison's purchase of the AFC Vehicles is listed under the column "Floored Amount" of the Exhibit "K" DPR and in the "Total Due" amount listed in the Exhibit "N" LAA auction invoices.

111.     For most of the AFC Vehicles, the title reassignment date on the back of the AFC's Vehicles' respective certificates of title reveals that the AFC's Vehicles were actually sold to M. Garrison days, and in some cases *months*, prior to their stated sale date on the Exhibit "N" LAA invoices, which is in contradiction to the sales date specified in the Exhibit "N" invoices.  The only three (3) AFC's Vehicles where the stated auction sale date in the Exhibit "N" invoices is prior to the Reassignment Date on the Exhibit "O" certificates of title are the vehicles with VIN numbers ending in 178761, 029809, and A28327.  All other AFC Vehicles

have significant discrepancies with respect to the auction sales date and reassignment date as referenced on the respective certificate of title.

112.     With respect to the alleged auction sale of the AFC Vehicles, the times and dates as stated in the Exhibit "N" auction invoices provided to AFC by LAA were deliberately fabricated by LAA and/or Lisa Druien.

113.     Further, the sale dates reflected in the Exhibit "O" reassignments of title to the AFC Vehicles do not correspond to the normal public auction dates and times for LAA and instead generally fall on days other than the public auction run date of Wednesday.  Thus, the purported sales of the AFC Vehicles were not "on the auction block or off of the auction block" sales at one of LAA's regularly scheduled sales and were not sold in the ordinary course of the LAA's business.

114.     For example, the Reassignment Date of May 31, 2019, for the 2002 Chevrolet Suburban with VIN ending in 293191 corresponds to a Friday, which is not a typical public auction day for LAA, which falls on a Wednesday.

115.     Moreover, with respect to the sale of the 2002 Suburban with VIN ending in 293191, the alleged auction sale date reflected in the Exhibit "N" LAA invoice of September 25, 2019, could not have occurred on September 25, 2019, because the reassignment of title reflected a purchase of the vehicle by M. Garrison *months* prior to the alleged auction date of September 25, 2019.

116.     For all such AFC Vehicles, the purported sales prices as stated on the Exhibit "N" LAA invoices were both fabricated and inflated by LAA, Lisa Druien, Emmett Druien, and/or M. Garrison.

117. ***None*** of the LAA invoices are signed by either M. Garrison or the seller, and the invoices do not have any seller's fees, which further indicate fabrication of invoices by LAA and/or Lisa Druien.

118. These false and fraudulent representations by LAA, Lisa Druien, Emmett Druien, and/or M. Garrison are contrary to LAA's representations and warranties in the Auction Agreement and M. Garrison's representations and warranties in the AFC Note.

119. In many instances in which the AFC Vehicles were sold through LAA, Lisa Druien notarized title documents prior to such alleged sale by LAA that reflect a purchase or assignment date of such AFC Vehicles on a different date than the corresponding Exhibit "N" invoice shows for such auction sale date.

120. Lisa Druien had direct and personal knowledge concerning the discrepancies between the reassignment dates reflected on the certificates of title for the AFC Vehicles and the sales date reflected on the Exhibit "N" auction invoices.

121. Despite having knowledge that discrepancies existed between the reassignment dates reflected on the certificates of title for the AFC Vehicles and the sales date reflected on the Exhibit "N" auction invoices for each corresponding AFC Fraud Vehicle, Lisa Druien intentionally withheld disclosing such information to AFC.

122. Further, Lisa Druien and/or Emmett Druien regularly communicated with M. Garrison to facilitate the transfer of the AFC Vehicles and completed the necessary paperwork on behalf of LAA to make it appear the AFC Vehicles were sold at a public auction on a regularly scheduled auction day.

123. However, Lisa Druien and/or Emmett Druien knew that the AFC Vehicles were not the subject of an "across the block" sale at one of LAA's regularly scheduled sales.

124.    Lisa Druien and/or Emmett Druien also knew that the AFC Vehicles were not sold in the ordinary course of LAA's business.

125.    Lisa Druien, Emmett Druien, LAA, and/or M. Garrison colluded with one another, and perhaps others, to establish an artificial sales price for the purposes of obtaining financing from AFC at a premium for vehicles whose value was substantially less than the market value of the amount financed.

126.    LAA, Emmett Druien, and/or Lisa Druien knowingly and intentionally generated false and fraudulent auction invoices and tickets with respect to the sale of the AFC Vehicles.

127.    LAA, Emmett Druien, Lisa Druien, and/or M. Garrison were aware the Exhibit "N" LAA invoices provided to AFC contained false information with respect to the auction sale date and amount in order to deceive AFC into believing the AFC Vehicles were sold at a public auction at fair market value.

128.    Had AFC been aware the auction invoices and tickets associated with the AFC Vehicles contained incorrect, false, or fictitious information pertaining to the sale date or sales amount, AFC would not have provided financing to M. Garrison based on the alleged sales price of the AFC Vehicles.

### Additional Fraudulent Conduct Regarding Sale of AFC Vehicles

129.    In addition to the forgoing regarding the discrepancies between the Exhibit "O" title reassignment dates and Exhibit "N" auction invoice sale dates for the AFC Vehicles, there exist additional indicia of fraudulent conduct by LAA, Emmett Druien Lisa Druien and/or M. Garrison that ultimately resulted in the inflated sales price listed on the Exhibit "N" auction invoices.

130.    The documents associated with the sale of the AFC Vehicles indicate such vehicles were not sold by LAA in the ordinary course of business.  For instance, in at least one (1) separate case, the LAA is identified as the *seller* of an AFC Vehicle.  The specific AFC Vehicle that was sold by the LAA, as seller, is as follows:

| Unit Year | Unit Make | VIN | Financed Amount | Reassignment Date | Auction Sale Date |
|---|---|---|---|---|---|
| 1995 | Trailer | 1GRAA9224SB029809 | $29,490.00 | 10/11/2019 | 10/2/2019 |

131.    The title reassignment as shown in Exhibit "O" for the above-referenced 1995 Trailer was notarized by Lisa Druien.

132.    It is unusual and outside the ordinary course of business for an auction or its principal to sell vehicles that are run through its own auction.  Such conduct by an auction is an indication that the true nature of the sales transaction, including the true identity of the seller and/or the true underlying sales price, has been concealed or altered.

133.    In the instant case, upon information and belief, the sales prices of the aforementioned 1995 Trailer was inflated beyond their fair market value based on its condition at the time of sale, enabling M. Garrison and/or LAA to receive additional financing from NextGear that they were otherwise not entitled to receive under the Note and/or Auction Agreement.

134.    In addition to the foregoing, the following described 2016 Pioneer was sold at the LAA by an affiliated entity of M. Garrison, Austin Garrison d/b/a Austin Financial Services:

| Unit Year | Unit Make | Unit Model | VIN | Financed Amount | Reassignment Date | Auction Sale Date |
|---|---|---|---|---|---|---|
| 2016 | Pioneer | 1000-5 Deluxe | 1HFVE04R7G4000179 | $17,290.00 | Reassignment date blank on title | 3/11/2020 |

135.     LAA, Emmett Druien, Lisa Druien, and/or M. Garrison, colluded amongst each other to generate LAA invoices reflecting the sale of the AFC Vehicles through LAA's auction with false sales information and inflated sales prices.

136.     Further, the auction seller identified in the Exhibit "N" invoice for the sale of the 2014 Dodge Ram ending with VIN 149807 as Michael Lawson of Bottoms Up Motorsports is, upon information and belief, a pseudonym or fictitious name and instead refers to M. Garrison, who was involved in orchestrating the fictitious and fraudulent sales of these vehicles at LAA.

137.     The AFC Vehicles were in poor condition when allegedly run through the LAA auction, if they were run through the auction at all.

138.     The AFC Vehicles also have discrepancies in their odometer readings between the time they were sold at the LAA auction and the time period AFC repossessed the AFC Vehicles from M. Garrison.  Based on AFC's review of the odometers in several of the recovered AFC Vehicles, the odometer readings set forth in the Exhibit "N" LAA invoices are not correct and/or understate the true odometer reading in the Odometer Disclosure Statement.

139.     LAA, Emmett Druien, Lisa Druien and/or M. Garrison were aware and had knowledge of the poor condition of the AFC Vehicles prior to the AFC Vehicles' purported "sale" at the LAA.

140.     LAA, Emmett Druien, Lisa Druien, and/or M. Garrison knew the odometer reading set forth in the Odometer Disclosure Statement portion of the Exhibit "N" LAA invoices were incorrect at the time the invoices were generated and/or provided to AFC.

141.     However, since LAA did not conduct a public auction, the sales price listed in the invoices generated by LAA did not account for the poor condition of the AFC Vehicles.

142.    LAA, Emmett Druien, Lisa Druien, and/or M. Garrison knew that by selling all or a portion of the AFC Vehicles at a non-public auction and outside the ordinary course of business, they would be able to manipulate the sales price of such AFC Vehicles.

143.    LAA, Emmett Druien, Lisa Druien, and/or M. Garrison knew that by manipulating and artificially inflating the sales price of the AFC Vehicles as reflected on the LAA invoices, AFC would be harmed by such conduct.

144.    AFC was harmed by the conduct of LAA, Emmett Druien, Lisa Druien and/or M. Garrison as the net sales proceeds obtained from the sale of the sixteen (16) AFC Sold Vehicles corresponds to approximately less than one third of the original financing provided by AFC based on the sales amounts in the Exhibit "N" invoices.  In many instances, the AFC Sold Vehicles were sold at a public auction at a significantly lower amount than the auction sales amount referenced in the Exhibit "N" invoices because the condition of such AFC Sold Vehicles was very poor.

145.    Defendants LAA, M. Garrison, Emmet Druien, and/or Lisa Druien intentionally and knowingly colluded amongst each other to improperly inflate the value and sales prices of the AFC Vehicles in order to obtain additional financing from AFC in violation of the terms of the Auction Agreement and AFC Note.

146.    Defendants LAA, Emmett Druien, and Lisa Druien knew that all or a portion of the AFC Vehicles were never run through LAA's auction but instead were the subject of sales that did not involve LAA, many of which were direct sales between the alleged "seller" and M. Garrison for much lower prices than those reflected on the Exhibit "N" invoices.

147.    All conditions precedent to this action were satisfied, waived or occurred.

**Attorneys' Fees**

148.     Pursuant to the M. Garrison NextGear Note, and the AFC Note, M. Garrison has expressly waived any right to any jury trial in any action, proceeding or counterclaim brought by either M. Garrison.

149.     Pursuant to the M. Garrison NextGear Note, the M. Garrison Guaranty, the AFC Note, and the AFC Guaranty (collectively, the "Notes and Guaranties"), defendant M. Garrison agreed to pay NextGear's and AFC's costs and expenses, including Plaintiffs' reasonable attorneys' fees and legal expenses incurred in connection with the enforcement of the Notes and Guaranties.

150.     Plaintiffs have retained the law firm of Padfield & Stout, LLP, to enforce the Plaintiffs' rights and remedies under the Notes and Guaranties, and defendant M. Garrison is obligated to pay the law firm's attorneys a reasonable fee for their services pursuant to the aforementioned Notes and Guaranties as well as Chapter 38.001 *et seq.* of the TEX. CIV. PRAC. & REM. CODE.

## V.
## CAUSES OF ACTION

**Count I – Breach of Contract (NextGear Only Against M. Garrison)**

151.     Plaintiffs incorporate the allegations of the preceding paragraphs of this Complaint as if fully set forth and restated herein.

152.     The conduct of M. Garrison constitutes a breach of contract.  M. Garrison failed to comply with his contractual obligations to NextGear.  Accordingly, M. Garrison's acts and omissions as described herein constitute an unexcused, unjustified, and material breach of contract.  As a proximate result of M. Garrison's breach of contract, NextGear has suffered actual damages in an amount within the jurisdiction limits of this Court in the amount of

**$936,999.94**, after consideration of all lawful offsets, payments, and credits, excluding prejudgment interest, attorneys' fees as a result of the economic damages for which NextGear sues M. Garrison.

WHEREFORE, NextGear prays that this Court: (1) enter a judgment against M. Garrison in the above-captioned action in the amount of **$936,999.94** for breach of contract, (2) NextGear be awarded its necessary and reasonable attorneys' fees, (3) NextGear be awarded pre-judgment and post-judgment interest as provided by law along with all costs of court, and (4) such other and further relief to which NextGear may be entitled at law or in equity.

### Count II – Breach of Contract (NextGear Only Against LAA)

153.    Plaintiffs incorporate the allegations of the preceding paragraphs of this Complaint as if fully set forth and restated herein.

154.    The conduct of LAA and its default under the Funding Agreement as set forth herein constitutes a breach of contract.  LAA failed to comply with its contractual obligations to NextGear.  Accordingly, LAA's acts and omissions as described herein constitute an unexcused, unjustified, and material breach of contract.  As a proximate result of LAA's breach of contract, NextGear has suffered actual damages in an amount within the jurisdiction limits of this for which NextGear seeks recovery, including any and all prejudgment interest and attorneys' fees as a result of the economic damages for which NextGear sues LAA.

WHEREFORE, NextGear prays that this Court: (1) enter a judgment against LAA in the above-captioned action for breach of contract, (2) NextGear be awarded its necessary and reasonable attorneys' fees, (3) NextGear be awarded pre-judgment and post-judgment interest as provided by law along with all costs of court, and (4) such other and further relief to which NextGear may be entitled at law or in equity.

### Count III – Breach of Contract (AFC Only Against M. Garrison)

155.    Plaintiffs incorporate the allegations of the preceding paragraphs of this Complaint as if fully set forth and restated herein.

156.    The conduct of M. Garrison and his default under the AFC Note and AFC Guaranty as set forth herein constitutes a breach of contract.  M. Garrison failed to comply with his contractual obligations to AFC.  Accordingly, M. Garrison's acts and omissions as described herein constitute an unexcused, unjustified, and material breach of contract.  As a proximate result of M. Garrison's breach of contract, AFC has suffered actual damages in an amount within the jurisdiction limits of this Court in the amount of **$392,994.79** after accounting for all lawful payments, offsets, and credits, excluding prejudgment interest, attorneys' fees as a result of the economic damages for which AFC sues M. Garrison.

WHEREFORE, AFC prays that this Court: (1) enter a judgment against M. Garrison in the above-captioned action in the amount of **$392,994.79** for breach of contract, (2) AFC be awarded its necessary and reasonable attorneys' fees, (3) AFC be awarded pre-judgment and post-judgment interest as provided by law along with all costs of court, and (4) such other and further relief to which AFC may be entitled at law or in equity.

### Count IV – Breach of Contract (AFC Only Against LAA)

157.    Plaintiffs incorporate the allegations of the preceding paragraphs of this Complaint as if fully set forth and restated herein.

158.    The conduct of LAA and its default under the Auction Agreement as set forth herein constitutes a breach of contract.  LAA failed to comply with its contractual obligations to AFC.  Accordingly, LAA's acts and omissions as described herein constitute an unexcused, unjustified, and material breach of contract.  As a proximate result of LAA's breach of contract,

AFC has suffered actual damages in the amount of **$392,994.79** for which AFC seeks recovery, including any and all prejudgment interest and attorneys' fees as a result of the economic damages for which AFC sues LAA.

WHEREFORE, AFC prays that this Court: (1) enter a judgment against LAA in the above-captioned action for breach of contract in the amount of **$392,994.79**, (2) AFC be awarded its necessary and reasonable attorneys' fees, (3) AFC be awarded pre-judgment and post-judgment interest as provided by law along with all costs of court, and (4) such other and further relief to which AFC may be entitled at law or in equity.

### Count V – Conversion (NextGear Only Against M. Garrison)

159.     Plaintiffs incorporate the allegations of the preceding paragraphs of this Complaint as if fully set forth and restated herein.

160.     Although previous demand was made for possession of the SOT Vehicles by NextGear's representatives to M. Garrison, M. Garrison has refused to turn over possession of the two (2) Unrecovered SOT Vehicles to NextGear, which are believed to have either been sold by M. Garrison to third parties or are unaccounted for and in the possession of third parties known only to M. Garrison.  M. Garrison's sale, transfer, and/or concealment of the two (2) Unrecovered SOT Vehicles as well as sales proceeds related to the possible sale of the two (2) Unrecovered SOT Vehicles constitutes an improper exercise of dominion and control over such Unrecovered SOT Vehicles and sales proceeds thereto in contravention to NextGear's perfected security interest and superior right of possession of same.

161.     NextGear there alleges that M. Garrison has unlawfully converted the two (2) Unrecovered SOT Vehicles, or to the extent such Unrecovered SOT Vehicles were sold in M. Garrison's business – the sales proceeds thereto – to NextGear's detriment in an amount equal to

the fair market value of each of the two (2) Unrecovered SOT Vehicles at the time and place of conversion. NextGear alleges the fair market value would be the total principal amount due on the two (2) Unrecovered SOT Vehicles in the amount of **$52,138.81**.

WHEREFORE PREMISES CONSIDERED, NextGear prays that that this Court: (1) enter a judgment against M. Garrison in the above-captioned action for conversion of the Unrecovered SOT Vehicles in the amount of **$52,138.81**, (2) NextGear be awarded pre-judgment and post-judgment interest as provided by law along with all costs of court, and (3) such other and further relief to which NextGear may be entitled at law or in equity.

### Count VI – Conversion (AFC Only Against M. Garrison)

162.    Plaintiffs incorporate the allegations of the preceding paragraphs of this Complaint as if fully set forth and restated herein.

163.    Although previous demand was made for possession of the AFC SOT Vehicle by AFC's representatives to M. Garrison, M. Garrison has refused to turn over possession of the AFC SOT Vehicle to AFC, which is believed to have either been sold by M. Garrison to third parties or are unaccounted for and in the possession of third parties known only to M. Garrison. M. Garrison's sale, transfer, and/or concealment of the AFC SOT Vehicle, as well as sales proceeds related to the possible sale of AFC SOT Vehicle, constitutes an improper exercise of dominion and control over such AFC SOT Vehicle and sales proceeds thereto in contravention to AFC's perfected security interest and superior right of possession of same.

164.    AFC there alleges that M. Garrison has unlawfully converted the AFC SOT Vehicle, or to the extent such AFC SOT Vehicle was sold in M. Garrison's business – the sales proceeds thereto – to AFC's detriment in an amount equal to the fair market value of the AFC

SOT Vehicle at the time and place of conversion.  AFC alleges the fair market value would be the total principal amount due on such AFC SOT Vehicle in the amount of **$28,304.42**.

WHEREFORE PREMISES CONSIDERED, AFC prays that that this Court: (1) enter a judgment against M. Garrison in the above-captioned action for conversion of the AFC SOT Vehicle in the amount of **$28,304.42**, (2) AFC be awarded pre-judgment and post-judgment interest as provided by law along with all costs of court, and (3) such other and further relief to which AFC may be entitled at law or in equity.

**Count VII – Fraud (NextGear Only Against LAA, Lisa Druien, and Emmett Druien)**

165.    Plaintiffs incorporate the allegations of the preceding paragraphs of this Complaint as if fully set forth and restated herein.

166.    Defendants LAA Emmett Druien, and Lisa Druien, by means of a scheme designed to artificially inflate the sales price of the NG Fraud Vehicles and/or Insider Fraud Vehicles sold at LAA auction, made misrepresentations and omissions of fact to NextGear concerning the value, status, auction sales process, and condition of the NG Fraud Vehicles and Insider Fraud Vehicles as set forth in the LAA auction invoices.  LAA, Emmett Druien, and/or Lisa Druien intentionally withheld information from NextGear that the NG Fraud Vehicles and Insider Fraud Vehicles were not sold "across the block" at a competitive, public auction.  When LAA Emmett Druien, and/or Lisa Druien made these representations and omissions to NextGear, LAA, Emmett Druien, and/or Lisa Druien knew they were false or made such assertions recklessly, as a positive assertion, and without knowledge of their truth.  Defendants LAA, Emmett Druien, and/or Lisa Druien further made such representations and omissions with the intent that NextGear act upon them and advance money for purposes of financing the NG Fraud Vehicles and/or Insider Fraud Vehicles.   NextGear relied on those representations and/or

omissions and suffered economic injury in the amount of at least **$650,279.48** as a result, which corresponds to the payoff for the NG Fraud Vehicles and Insider Fraud Vehicles of $836,471.21 less the net sales proceeds of $186,191.73 from the sale of the NG Sold Vehicles that were only acquired from LAA.

WHEREFORE PREMISES CONSIDERED, NextGear prays that that this Court: (1) enter a judgment against LAA, Emmett Druien, and Lisa Druien, jointly and severally, in the above-captioned action for their fraudulent conduct related to the NG Fraud Vehicles in the amount of **$650,279.48**, (2) NextGear be awarded pre-judgment and post-judgment interest as provided by law along with all costs of court, and (3) such other and further relief to which NextGear may be entitled at law or in equity.

### Count IX – Fraud (AFC Only Against LAA, Emmett Druien, and Lisa Druien)

167.    Plaintiffs incorporate the allegations of the preceding paragraphs of this Complaint as if fully set forth and restated herein.

168.    Defendants LAA, Emmett Druien, and Lisa Druien, by means of a scheme designed to artificially inflate the sales price of the AFC Vehicles sold at LAA auction, made misrepresentations and omissions of fact to AFC concerning the value, status, auction sales process, and condition of the AFC Vehicles as set forth in LAA auction invoices.  LAA, Emmett Druien, and/or Lisa Druien intentionally withheld information from AFC that the AFC Vehicles were not sold "across the block" at a competitive, public auction.  When LAA, Emmett Druien, and/or Lisa Druien made these representations and omissions to AFC, LAA, Emmett Druien, and/or Lisa Druien knew they were false or made such assertions recklessly, as a positive assertion, and without knowledge of their truth.  Defendants LAA, Emmett Druien, and/or Lisa Druien further made such representations and omissions with the intent that AFC act upon them

43

and advance money for purposes of financing the AFC Vehicles.   AFC relied on those representations and/or omissions and suffered economic injury in the amount of at least **$392,994.79** as a result, which corresponds to the amount advanced by AFC to LAA for the AFC Vehicles less the net sales proceeds obtained by AFC from the AFC Sold Vehicles.

WHEREFORE PREMISES CONSIDERED, AFC prays that that this Court: (1) enter a judgment against LAA, Emmett Druien, and Lisa Druien, jointly and severally, in the above-captioned action for their fraudulent conduct related to the AFC Vehicles in the amount of **$392,994.79**, (2) AFC be awarded pre-judgment and post-judgment interest as provided by law along with all costs of court, and (3) such other and further relief to which AFC may be entitled at law or in equity.

### Count IX – Conspiracy To Commit Fraud
### (NextGear Only Against LAA, Emmett Druien, Lisa Druien, and M. Garrison)

169.    Plaintiffs incorporate the allegations of the preceding paragraphs of this Complaint as if fully set forth and restated herein.

170.    Defendants LAA, Emmett Druien, Lisa Druien, and M. Garrison were members of a combination of two or more persons.

171.    The object of the combination was to accomplish an unlawful purpose or a lawful purpose by unlawful means.  Here, defendants conspired to artificially inflate the sales price of the NG Fraud Vehicles sold at LAA auction and misrepresent to NextGear the value, status, auction sales process, and condition of the NG Fraud Vehicles as set forth in the LAA auction invoices.

172.    LAA, Emmett Druien, Lisa Druien, and/or M. Garrison had a meeting of the minds on the object or course of action.

173.    LAA, Emmett Druien, Lisa Druien, and/or M. Garrison committed unlawful, overt acts to further the object or course of action.

174.    NextGear suffered injury as a proximate result of the wrongful actions in the amount of at least **$650,279.48** as a result, which corresponds to the payoff for the NG Fraud Vehicles and Insider Fraud Vehicles less the net sales proceeds of $186,191.73.

WHEREFORE PREMISES CONSIDERED, NextGear prays that that this Court: (1) enter a judgment against LAA, Emmett Druien, Lisa Druien, and M. Garrison jointly and severally, in the above-captioned action for their fraudulent conduct related to the NG Fraud Vehicles in the amount of **$650,279.48**, (2) NextGear be awarded pre-judgment and post-judgment interest as provided by law along with all costs of court, and (3) such other and further relief to which NextGear may be entitled at law or in equity.

### Count X – Conspiracy To Commit Fraud
### (AFC Only Against LAA, Emmett Druien, Lisa Druien, and M. Garrison)

175.    Plaintiffs incorporate the allegations of the preceding paragraphs of this Complaint as if fully set forth and restated herein.

176.    Defendants LAA, Emmett Druien, Lisa Druien, and M. Garrison were members of a combination of two or more persons.

177.    The object of the combination was to accomplish an unlawful purpose or a lawful purpose by unlawful means.  Here, defendants conspired to artificially inflate the sales price of the AFC Vehicles sold at LAA auction and misrepresent to AFC the value, status, auction sales process, and condition of the AFC Vehicles as set forth in the fraudulent and fictitious LAA auction invoices.

178.    LAA, Emmett Druien, Lisa Druien, and/or M. Garrison had a meeting of the minds on the object or course of action.

179.    LAA, Emmett Druien, Lisa Druien, and/or M. Garrison committed unlawful, overt acts to further the object or course of action.

180.    AFC suffered injury as a proximate result of the wrongful actions in the amount of at least **$392,994.79** as a result, which corresponds to the amount advanced by AFC to LAA for the AFC Vehicles less the net sales proceeds obtained by AFC from the AFC Sold Vehicles.

WHEREFORE PREMISES CONSIDERED, AFC prays that that this Court: (1) enter a judgment against LAA, Emmett Druien, Lisa Druien, and M. Garrison jointly and severally, in the above-captioned action for their fraudulent conduct related to the AFC Vehicles in the amount of **$392,994.79**, (2) AFC be awarded pre-judgment and post-judgment interest as provided by law along with all costs of court, and (3) such other and further relief to which AFC may be entitled at law or in equity.

### Count XI – Exemplary Damages
### (AFC and NextGear Against LAA, Emmett Druien Lisa Druien, and M. Garrison)

181.    Plaintiffs incorporate the allegations of the preceding paragraphs of this Complaint as if fully set forth and restated herein.

182.    A plaintiff who successfully prosecutes a suit for fraud can recover exemplary damages under Section 41.003(a)(1) of the Texas Civil Practices and Remedies Code.  Plaintiffs seek exemplary damages as provided for by Section 41.003 of the Texas Civil Practices & Remedies Code because defendants LAA, Emmett Druien, Lisa Druien, and M. Garrison perpetrated a fraud upon and acted with malice with respect to Plaintiffs.  The defendants, with the intent to defraud or harm Plaintiffs, engaged in an outrageous course of conduct.

WHEREFORE PREMISES CONSIDERED, NextGear and AFC seek exemplary damages against LAA, Emmett Druien, Lisa Druien, and M. Garrison as a result of their

fraudulent conduct, and further seek such other or additional relief to which NextGear and AFC

may be entitled in law or in equity.

**Respectfully submitted,**

PADFIELD & STOUT, L.L.P
420 Throckmorton Street, Suite 1210
Fort Worth, Texas 76102
Phone: 817-338-1616
Fax: 817-338-1610


/s/ Christopher V. Arisco
Alan B. Padfield
State Bar I.D.# 00784712
abp@padfieldstout.com
Christopher V. Arisco
State Bar I.D. #24064830
carisco@padfieldstout.com

*Attorneys for NextGear and AFC*

## CERTIFICATE OF SERVICE

This is to certify that on March 1, 2021, a true and correct copy of the foregoing Second Amended Complaint has been forwarded to defendant M. Garrison, *pro se*, at 549 i-30 E., Sulphur Springs, Texas 75482, defendant A. Garrison, *pro se*, at 4658 I30 E., Sulphur Springs, Texas 75482, and Druien, Inc. d/b/a Lawton Auto Auction a/k/a Lawton Cache Auto Auction and Lisa Druien, by and through their counsel of record, Joseph M. Vacek and Richard Tallini, of Bailey & Galyen at 1300 Summit Avenue, Suite 650, Fort Worth, Texas 76102, via certified mail, return receipt requested, and e-mail at jvacek@galyen and rtallini@galyen.com.


/s/ Christopher V. Arisco
Christopher V. Arisco

## DEMAND PROMISSORY NOTE
## AND LOAN AND SECURITY AGREEMENT

FOR VALUE RECEIVED, the undersigned borrower ("Borrower") promises to pay to the order of NextGear Capital, Inc. ("Lender"), with its principal office at 1320 City Center Drive, Suite 100, Carmel, Indiana 46032, or such other place as Lender may designate in writing or on the Discover Portal from time to time, in lawful money of the United States of America, the principal sum of One Hundred Fifty Thousand Dollars and Zero Cents ($150,000.00), or such greater or lesser sum which may be advanced to or on behalf of Borrower from time to time, together with all costs, interest, fees, and expenses as provided for under this Note. Unless otherwise stated in an addendum to this Note, this Note shall become effective on the date of Borrower's execution hereof as set forth below Borrower's signature (such date, or the effective date otherwise stated in the applicable addendum, the "Effective Date").

NOW, THEREFORE, in consideration of the mutual covenants, agreements and conditions contained herein, Borrower and Lender (each, a "Party" and collectively, the "Parties") agree as follows:

1.  DEFINITIONS   Capitalized terms used in this Note or in the other Loan Documents without definition shall have the respective meanings as set forth in Appendix A attached hereto and incorporated herein by reference (such meanings to be equally applicable to both the singular and plural forms of the terms defined).  Any capitalized terms used herein or in another Loan Document, but not otherwise defined herein or in such other Loan Document, as the case may be, shall have the meanings ascribed to them in the UCC.

2.  GRANT OF SECURITY INTEREST.   In order to secure full and prompt payment of all Liabilities and performance of all obligations of Borrower to Lender, its Affiliates, and/or their respective successors or assigns:

    (a)  Borrower grants to Lender a continuing security interest in all of Borrower's assets and properties, wherever located, including, without limitation, all equipment of any kind or nature; all vehicles and vehicle parts; all Inventory now owned or hereafter acquired, including, without limitation, all Lender Financed Inventory now owned or hereafter acquired; all amounts in Borrower's Reserve held by or on behalf of Lender, if any; all documents, documents of title, deposit accounts, accounts receivable, manufacturer rebates and incentive payments, chattel paper, including, without limitation, all Receivables and general intangibles now owned or hereafter acquired by Borrower; all cash reserves; all of Borrower's books and records (including any books and records contained on computer hardware or software or otherwise stored by or on behalf of Borrower in electronic or digital form); and all additions, accessions, accessories, replacements, substitutions, and proceeds of any of the foregoing (collectively, the "Collateral").

    (b)  The security interest given to Lender in Section 2(a) is given to Lender to secure payment of all Liabilities and the performance of all obligations of Borrower to Lender, under this Note, under any other Loan Document, or otherwise, all without relief from valuation or appraisement Laws.  Upon the request of Lender, Borrower shall promptly execute and deliver to Lender or its designee such further documents and instruments, and shall take such further actions, in each case as Lender may deem necessary or desirable to protect Lender's interest in the Collateral or otherwise effectuate the provisions of this Note and the other Loan Documents.  Without limiting the generality of the foregoing, Borrower shall, upon the request of Lender, (i) use its best efforts to secure all consents and approvals that may be necessary or appropriate for the assignment to Lender of any contract of Borrower that constitutes any portion of the Collateral); or that may be necessary in order for Lender to receive the full benefit of all Collateral and to enforce its security interest in the Collateral; (ii) provide Lender and its Representatives with full access to all Collateral, including any and all books and records relating thereto; and (iii) deliver to Lender all Collateral consisting of negotiable documents, chattel paper, and instruments not deposited for collection in the aggregate (in each case, accompanied by any related bills of sale or any other instruments of transfer executed for Borrower), in each case promptly after Borrower receives the same.

    (c)  Borrower authorizes Lender to file any UCC financing statements and any amendments thereto and any continuation statements under the UCC, in each case to the extent necessary or desirable to effect or preserve the security interest granted by Borrower hereunder or under any other Loan Document.  Further, Borrower hereby acknowledges, ratifies and approves any UCC financing statements or other filings under the UCC that may have been made by or on behalf of Lender and its Affiliates prior to the Effective Date.  The security interest granted by Borrower in Section 2(a) shall be in addition to, and not a substitution for, any right of offset, netting, or reclamation that Lender may have against Borrower, whether pursuant to this Note, any other Loan Document, or any Law.

3.  INTEREST RATE.  Interest shall accrue on Borrower's Liabilities to Lender in accordance with the following schedule:

    (a)  All outstanding Liabilities relating to a Floorplan Advance or a Receivable Advance shall accrue Interest on a per annum basis from the Floorplan Date or the Receivable Origination Date, as the case may be, based upon a 360-day year, and such Interest shall be compounded daily at the Base Rate, plus the Contract Rate, in each case as stated on the applicable Advance Schedule, until such outstanding Liabilities are paid in full.

    (b)  The Base Rate may be amended or modified by Lender from time to time in Lender's sole discretion by posting such amendment or modification on the Finance Program Rate, Term and Fee Schedule.  However, Lender may increase the Base Rate by no more than fifty (50) basis points (i.e. one-half of one percent) in any thirty (30) day period.

**EXHIBIT A**

Account #92421

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.0)

4.  **BORROWER'S REPRESENTATIONS, WARRANTIES, AND COVENANTS.** At the time of Borrower's execution of this Note and continuing at all times thereafter until all Liabilities have been indefeasibly paid and satisfied in full and this Note and all other Loan Documents terminated in accordance with their respective terms, Borrower hereby represents, warrants, covenants, and agrees:

   (a) To sell, lease, or rent Lender Financed Inventory only in the Ordinary Course of Business and in accordance with Law, and not to sell or otherwise dispose of any Lender Financed Inventory except as herein provided.

   (b) To keep Lender Financed Inventory only at Borrower's Place of Business and not to remove any Lender Financed Inventory from such place for a period exceeding twenty-four (24) hours, unless previously authorized in writing by Lender. Notwithstanding the foregoing, Borrower may request Lender to authorize Borrower to consign certain Lender Financed Inventory to another licensed dealer at such consignee dealer's place of business. Borrower's request to consign Lender Financed Inventory as referenced above is subject to Borrower and the consignee dealer executing and delivering to Lender any documentation that Lender may require, including a UCC financing statement or other similar filing on consignee dealer, or an authorization for Lender to make any such filing. Lender may deny Borrower's request to consign Lender Financed Inventory in Lender's sole and absolute discretion.

   (c) To keep Inventory in good repair and insured against all physical risks in such amounts and under such policies issued by such insurance companies as are deemed necessary and satisfactory by Lender; provided, however, that any insurance company issuing required coverage to Borrower pursuant to the requirements of this Section 4(c) shall have been assigned to an A.M. Best Financial Size Category (FSC) of "X" or higher, and shall have a minimum A.M. Best Financial Strength (FSR) rating of "A-". Lender shall be named "loss payee" on such insurance policies. Borrower shall provide Lender with a certificate or certificates of insurance evidencing that the above-mandated insurance requirements have been satisfied and specifying that the applicable insurance carriers will mail direct written notice to Lender at least thirty (30) days prior to any cancellation or non-renewal of any of the above-mandated policies. Alternatively, and unless the Unit of Lender Financed Inventory has been branded as "salvage" or is otherwise ineligible for the Collateral Protection Program, Borrower may satisfy the insurance coverages required under this Section 4(c) by voluntarily enrolling in Lender's Collateral Protection Program. In the event Borrower fails to procure, maintain or provide proof of the insurance coverages required under this Section 4(c), Lender may enroll Borrower in Lender's Collateral Protection Program, or, alternatively, Lender may secure on Borrower's behalf such policies of insurance as Lender, in its sole discretion, deems necessary, in each case from such insurers, in such amounts and with such coverages and deductibles as Lender, in its sole discretion, deems necessary. Charges incurred under the Collateral Protection Program are calculated as of the Floorplan Date from the amount of each original Floorplan Advance related to a Unit of Lender Financed Inventory, through the life of the Floorplan Advance. Borrower understands and agrees that Lender has an insurable interest in the Collateral, including all Lender Financed Inventory, by virtue of Borrower's pledge of the Collateral as security to Lender for the repayment of all Liabilities by Borrower to Lender under this Note and the other Loan Documents. Fees for the Collateral Protection Program are published in the Finance Program Rate, Term and Fee Schedule.

   (d) To keep at all times complete and accurate records of Borrower's Business and to promptly (but in any event within two (2) Business Days) provide to Lender copies of such records and any financial information regarding Borrower's Business or Borrower's financial condition generally, in each case as Lender may request. Borrower authorizes Lender to share such information and any and all other information that Lender may possess regarding Borrower's Credit Line or Borrower's relationship with Lender, including information regarding this Note and the other Loan Documents; Borrower's loan history; account history; payment history; audit history; account balance; loan application; credit worthiness; credit availability; and such other general business information regarding Borrower's Credit Line and Borrower's relationship with Lender, to any and all Persons that Lender, in its sole discretion, deems reasonable, including auctions. Without limiting the generality of the foregoing, Borrower shall maintain complete and accurate records and financial statements for all Advances requested or made hereunder, and all other transactions hereunder, including bank statements, cancelled checks, sales invoices, proofs of payment, and other sales files, in each case for at least a period of five (5) years after the date on which such Advance was made or such transaction occurred, as the case may be.

   (e) To allow Lender and its Representatives to inspect Lender Financed Inventory during normal business hours and at other reasonable times at Borrower's Place of Business and such other places as any Lender Financed Inventory may be located and to inspect and make copies of Borrower's books and records. Borrower shall pay Lender for the costs and expenses incurred by Lender or its Representatives to undertake such audits of any Lender Financed Inventory and such inspections and copying of Borrower's books and records, in each case on the applicable Maturity Date.

   (f) To hold all amounts received from the sale of any Unit of Lender Financed Inventory in the form as received in trust for the sole benefit of and for Lender, and to remit such funds satisfying all amounts due Lender and owing by Borrower for such Unit of Lender Financed Inventory, in each case within twenty-four (24) hours of Borrower's receipt of such funds (or receipt of such funds by any Affiliate of Borrower).

   (g) To hold all amounts received that relate to any Receivable that is subject to a Receivable Advance in the form as received in trust for the sole benefit of and for Lender, and to remit such funds satisfying all amounts due Lender and owing by Borrower for and in connection with such Receivable, in each case within twenty-four (24) hours of Borrower's receipt of such funds (or receipt of such funds by any Affiliate of Borrower).

   (h) That, for each Receivable which is the subject of a Receivable Advance, (i) Borrower is the sole and unconditional owner of such Receivable; (ii) such Receivable is not already encumbered by any voluntary or involuntary Liens which are senior to Lender's security

Page 2 of 12

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

interest in such Receivable; (iii) Borrower has a legal right to pledge such Receivable to Lender as security for Liabilities under this Note and the other Loan Documents; (iv) such Receivable represents an original bona fide sale to the buyer(s) named therein; (v) such Receivable is now and will remain free from any claim, defense, setoff, or counterclaim of any nature and is enforceable against the buyer(s) named therein and third parties according to its terms; (vi) all statements, facts, numbers, and other information in such Receivable and all related documents are true and accurate to the best of Borrower's knowledge, are free from fraud, and have not been altered or modified subsequent to their execution, except for such alterations or modifications as have been acknowledged and initialed by Borrower and the other parties thereto; (vii) Borrower has met all of Borrower's obligations to the subject buyer(s) for such Receivable, and Borrower has no knowledge of any event which indicates or suggests the prospective un-collectability of all or any portion of the Receivable; (viii) the Unit that is the subject of the Receivable was sold at fair market value, not as salvage, and has actually been delivered into the possession of and has been accepted by the subject buyer(s); and (ix) the sale and related financing of the Unit that is the subject of the Receivable complies with all Laws (including all usury Laws, the Uniform Consumer Credit Code, all consumer credit Laws, and all equal credit opportunity and disclosure Laws).

(i) That any request for an Advance shall constitute an affirmative representation by Borrower to Lender that Borrower is in full compliance with all terms, conditions, representations, warranties and covenants made under this Note and the other Loan Documents, in each case as of the date of such request.

(j) That Borrower now has, and will have at the time of any Advance and through the date of any repayment of the Liabilities thereunder, (i) sufficient cash and equity capital to conduct its Business and pay its debts as they mature; (ii) sufficient capital and other financial resources necessary to engage in the Business and perform its obligations under any agreement to which it is a party and any transaction in which it may engage hereafter; and (iii) ownership of property (including property of all wholly-owned and partially-owned subsidiaries of Borrower) having an aggregate fair market value that is greater than the sum of Borrower's debts (which shall include debts of all wholly-owned and partially-owned subsidiaries of Borrower).

(k) That, without Lender's prior written consent (which consent may be withheld by Lender in its sole discretion), Borrower shall not (i) make any distributions of its property or assets (including any cash), except for tax and other distributions that (A) are made in the Ordinary Course of Business and, (B) are made in compliance with all Laws, and (C) will not render Borrower or any of its Affiliates insolvent, or otherwise impair the ability of Borrower or any of its Affiliates to satisfy their respective financial obligations when and as such obligations become due; (ii) sell, issue, redeem, retire, purchase, or otherwise acquire, directly or indirectly, any of its capital stock or other equity, in any manner which would reduce, in the aggregate and on cumulative basis, either the cash position or "tangible net worth" of Borrower (as defined in accordance with United States generally accepted accounting principles) by more than ten percent (10%); (iii) make any material change in its capital structure, or make any material change in its Business or operations; (iv) make any loans or other advances of money or any loans or advances of Inventory or other property to any Person, including any officer, director, stockholder, employee, or Affiliate of Borrower, other than (A) advances against commissions, and other similar advances to employees in the Ordinary Course of Business, and (B) loans not exceeding an aggregate of two percent (2%) of the Credit Line; (v) undertake or permit any of its equity holders to undertake any transaction or series of transactions that would result in the equity holders of Borrower, as of the Effective Date, owning and controlling less than seventy-five percent (75%) of all classes of the outstanding equity of Borrower on a fully-diluted basis; or (vi) engage in any transaction or series of transactions to sell, liquidate, or otherwise transfer, all or substantially all of its assets. If Borrower desires to engage in any transaction or series of transactions that would, absent the written consent of Lender, be prohibited under this Section 4(k), Borrower shall provide Lender with no less than thirty (30) days' prior written notice describing the proposed transaction or series of transactions in reasonable detail, and Lender may, in its sole discretion, consent in writing to such transaction or series of transactions, as the case may be. For purposes of clarity, in no event shall any failure to respond by Lender be construed as acceptance or acquiescence to any transaction or series of transactions hereunder, or any waiver by Lender with respect to any transaction or series of transactions prohibited under this Section 4(k).

(l) To pay immediately and to remain current with all levied taxes, assessments, charges, judgments, and expenses which may now or hereafter be entered, levied, or assessed against Borrower, Borrower's Business or any other business in which Borrower may be involved, and/or any of the Collateral. Lender may, in its sole discretion, make an Advance to a third party on Borrower's behalf to pay such taxes, assessments, charges, judgments, and expenses to protect Lender's interests, and may thereafter collect the amount of any such Advance, together with any associated costs and expenses of Lender, from Borrower as an Administrative Charge pursuant to the terms of this Note.

(m) That Borrower has obtained all necessary permits and licenses required by Law to operate its Business as a wholesale or retail seller, lessor, or renter of Inventory, and that Borrower has complied with all filing requirements to operate as the entity or business type on record with the appropriate governmental office(s).

(n) That no legal, administrative, or arbitration proceedings are pending or threatened against Borrower which could reasonably affect Borrower, its Business or any Collateral, or which could materially and adversely affect any other business of Borrower or any properties or prospects, or the general condition, financial or otherwise, of Borrower, or Borrower's ability to repay all Liabilities and otherwise meet its obligations under this Note and the other Loan Documents.

(o) That Borrower shall immediately notify Lender in writing of any tax warrant, tax levy or any legal, administrative, or arbitration proceedings to which Borrower becomes a party after the Effective Date.

(p) That all payments made by Borrower to Lender via check or ACH, at the time of issuance, will be written or drawn upon an account that

Page 3 of 12

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

contains immediately available funds sufficient to cover the dollar amount of such check or ACH.

(q)  That Borrower's legal name and address as they appear in Section 15 are accurate and complete, and Borrower shall immediately notify Lender in writing of any change in Borrower's Place of Business, bank account information, legal name, physical address, contact information for Borrower or any principal of Borrower (including any change in telephone number), mailing address, business type, state of organization, ownership, management, or control and shall execute any and all documents requested by Lender at any time to bring Borrower into compliance with this Note and any other Loan Document.

(r)  That Borrower and all Guarantors are legally competent and have all necessary power and authority to enter into and perform their respective obligations under this Note and the other Loan Documents.

(s)  That Borrower shall not disclose to any third party, without the written consent of Lender, any terms and conditions applicable to Borrower's Credit Line, whether such terms and conditions are set forth on the applicable Advance Schedule, this Note or any other Loan Document.

(t)  That Borrower may have an account with Lender where information can be accessed and transmissions can be sent through the Discover Portal or by other electronic means, and Borrower shall have the means and the affirmative obligation to control access to the account information of Borrower by passwords and a Borrower account number. Borrower shall be solely responsible for any unauthorized access to Borrower's account. Access to Borrower's account may be revoked or otherwise restricted by Lender at any time, in Lender's sole discretion, without prior notice to Borrower.

(u)  That Borrower shall use Advances solely for Business purposes and not for personal, family, or household purposes. This means, among other things, that Borrower may not use Advances to purchase a vehicle for Borrower's personal, family, or household use, and no Lender Financed Inventory may be used for Borrower's personal, family, or household use. This Note and all Advances requested or made hereunder shall be requested and made only for commercial purposes and Borrower hereby expressly and unconditionally waives, to the fullest extent permitted by Law, the protections of any Law intended to protect consumers or regulate consumer loans.

(v)  That Borrower will provide Lender the name of each individual authorized to buy Inventory and make Advance requests hereunder on Borrower's behalf. Notwithstanding the foregoing or anything to the contrary in any Loan Document, Borrower shall be responsible and liable for all Advance requests and other Liabilities incurred by any such appointed individual or any other actual or apparent representative or agent of Borrower (regardless of whether such Person is specifically appointed by Borrower as contemplated above).

5.  CREDIT TERMS AND CONDITIONS  Borrower understands and agrees to the following terms, conditions, covenants, and other agreements relating to its Credit Line and any Advances made under this Note and the other Loan Documents, and acknowledges that any failure by Borrower to adhere to any such terms, conditions, covenants, or other agreements shall result in Lender having the right (in addition to any other right that Lender may have), in its sole discretion and without notice to Borrower, to declare a Maturity Event with respect to all related Advances:

(a)  The decision to make an Advance to or on behalf of Borrower is the exclusive right of Lender, whether or not an Event of Default has occurred, and Borrower understands that Lender may refuse to make an Advance at any time, with or without cause and without prior notice to Borrower or any Guarantors of such decision. Borrower is not obligated to finance any Inventory or Receivable through Lender.

(b)  Borrower's Credit Line may require a Reserve as a credit underwriting condition to the grant of credit and as additional security for the repayment of Liabilities under this Note and the other Loan Documents. In the event a Reserve is either requested by Borrower or required by Lender, Borrower will be required to execute a Reserve Agreement, and the applicable Required Reserve Amount and Reserve Charge will be indicated on the applicable Advance Schedule.

(c)  Borrower must deliver or cause to be delivered to Lender the Title or MSO for any Unit of Inventory and the time of any related Floorplan Advance request, or, in the event of a Universal Source Purchase, within seven (7) days after Lender funds the related Floorplan Advance.

(d)  Borrower must deliver or cause to be delivered to Lender the original Receivable which is the subject of a Receivable Advance request within seven (7) days after Lender funds such Receivable Advance. In the event that a Receivable Advance is made by Lender with respect to a Unit for which there is an unpaid Floorplan Advance, then any such Receivable Advance made to Borrower shall be net of such unpaid Floorplan Advance and all other unpaid Liabilities of Borrower with respect to such Unit.

(e)  Borrower must be in complete compliance with this Note and the other Loan Documents before an Advance request may be approved by Lender. Additionally, Lender may require certain other information from Borrower to be submitted before Lender will consider an Advance request.

(f)  Borrower shall pay all Liabilities, without notice, that concern or relate to a Floorplan Advance for any Unit of Lender Financed Inventory on or before the Maturity Date. Lender shall apply such payments to any and all Liabilities relating to such Floorplan Advance. Notwithstanding anything herein to the contrary, if a shortage exists between the payments received by Lender with respect to a Floorplan Advance, and the Liabilities relating to such Floorplan Advance, then such shortage shall be immediately due and payable and shall continue to be considered a Liability owed by Borrower to Lender, secured by the remaining Collateral.

Page 4 of 12

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

(g) Borrower shall pay all Liabilities, without notice, that concern or relate to a Receivable Advance for a subject Receivable on or before the Maturity Date. Lender shall apply such payments to any and all Liabilities relating to such Receivable Advance. Notwithstanding anything herein to the contrary, if a shortage exists between the payments received by Lender with respect to a Receivable Advance, and the Liabilities relating to such Receivable Advance, then such shortage shall be immediately due and payable and shall continue to be considered a Liability owed by Borrower to Lender, secured by the remaining Collateral.

(h) Borrower shall pay all Liabilities, without notice, which do not concern or relate to a Floorplan Advance or a Receivable Advance, including Administrative Charges and other account level charges, in each case on their respective Maturity Dates.

(i) With respect to payments that relate to a Floorplan Advance or a Receivable Advance which exceed the outstanding Liabilities owed by Borrower in connection with such Floorplan Advance or Receivable Advance, as the case may be, and with respect to payments for all other Liabilities, the order and method of application of such payments shall be at the sole discretion of Lender. Notwithstanding anything herein to the contrary, in the event Lender declares an Event of Default, Lender may apply all subsequent payments, including payments directly related to a Floorplan Advance or a Receivable Advance, in any manner or order. Payments initiated or received by Lender after 5:00PM EST may be applied the next Business Day.

(j) Unless either (i) the Maturity Date for a Floorplan Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (ii) such Floorplan Advance is in the final Period pursuant to the applicable Advance Schedule, a Curtailment of such Floorplan Advance will automatically be processed at the end of the current Period. Upon the processing of the Curtailment for a Floorplan Advance, Borrower shall pay the accrued Interest, accrued Floorplan Fee, any other accrued Floorplan Advance related fees, and a principal reduction of such Floorplan Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Floorplan Advance. Additionally, unless (a) the Maturity Date for a Floorplan Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (b) Borrower has notified Lender that Borrower has disposed of the subject Unit of Lender Financed Inventory by sale or otherwise, Borrower shall be deemed to have requested, and Lender may, in its sole discretion, automatically approve and process, an Extension with respect to such Floorplan Advance. With respect to any Extension, the Period, accrued Interest, accrued Floorplan Fee, any other Floorplan related fees, and the principal reduction required to be paid by Borrower for such Extension shall, in each case, be equal in all respects to those of the last Period, and, upon the processing of such Extension, Borrower shall pay such accrued Interest, accrued Floorplan Fee, any other accrued Floorplan Advance related fees, and principal reduction of such Floorplan Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Floorplan Advance. Additionally, for each Extension, Borrower shall be charged any applicable Universal Program Fee (including any Universal Extension Fee) set forth in the Finance Program Rate, Fee, and Term Schedule for the applicable Finance Program.

(k) Unless either (i) the Maturity Date for a Receivable Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; or (ii) such Receivable Advance is in the final Period pursuant to the applicable Advance Schedule, a Curtailment of such Receivable Advance will automatically be processed at the end of the current Period. Upon the processing of the Curtailment for a Receivable Advance, Borrower shall pay the accrued Interest, accrued Receivable Fee, any other accrued Receivable Advance related fees, and a principal reduction of such Receivable Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Receivable Advance. Additionally, unless (a) the Maturity Date for a Receivable Advance has been accelerated as the result of a Maturity Event or a declaration of an Event of Default; (b) Borrower has notified Lender that Borrower has received full payment on the subject Receivable; or (c) Borrower has notified Lender that Borrower has declared a default under such Receivable, Borrower shall be deemed to have requested, and Lender may, in its sole discretion, automatically approve and process an Extension with respect to such Receivable Advance. With respect to any Extension, the Period, accrued Interest, accrued Receivable Fee, any other Receivable related fees, and the principal reduction required to be paid by Borrower for such Extension shall, in each case, be equal in all respects to those of the last Period, and, upon the processing of such Extension, Borrower shall pay such accrued Interest, accrued Receivable Fee, any other accrued Receivable Advance related fees, and principal reduction of such Receivable Advance, in each case pursuant to this Note, the applicable Advance Schedule, and any applicable event sale or promotional terms in effect for such Receivable Advance. Additionally, for each Extension, Borrower shall be charged any applicable Universal Program Fee (including any Universal Extension Fee) set forth in the Finance Program Rate, Fee, and Term Schedule for the applicable Finance Program.

(l) Lender may hold any property (and proceeds thereof) or funds belonging to or payable to Borrower or any of its Affiliates ("Setoff Funds") and apply such Setoff Funds to any outstanding Liabilities of Borrower or to any amounts owing by Borrower to any Affiliate of Lender, and Borrower hereby grants to Lender or its Affiliates, as the case may be, a lien on such Setoff Funds. Lender and its Affiliates may at any time apply any or all of the Setoff Funds to any outstanding Liabilities of Borrower or to any amounts owing by Borrower to any Affiliate of Lender. Borrower expressly waives any requirement of maturity or mutuality among Lender and its various Affiliates.

(m) Any statement of Borrower's account furnished or made available to Borrower by Lender, to the extent no objection is made in writing by Borrower within ten (10) days after Borrower's receipt of such statement, shall constitute a definitive statement of Borrower's Credit Line and Liabilities as of the date of such statement and shall be binding upon Borrower.

(n) Borrower hereby expressly authorizes Lender and its Affiliates to communicate with Borrower via facsimile transmissions, email, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Borrower agrees that such express permission

Page 5 of 12

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

shall extend to any and all of the contact information that Borrower has provided herein, including physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Borrower may provide to Lender or that Lender may obtain from any third party at a later date.

(o) So long as Borrower is not in default of this Note or any other Loan Document, Borrower may sell Lender Financed Inventory to bona fide buyers in the Ordinary Course of Business, but nothing herein shall be deemed to waive or release any interest Lender may have hereunder or under any other agreement in any proceeds or replacements of such Lender Financed Inventory. Upon the sale of any Unit of Lender Financed Inventory, Borrower shall hold the proceeds from such sale in trust for the benefit of Lender, and Borrower shall pay to Lender, in accordance with this Note and the other Loan Documents, an amount equal to the unpaid balance of the Liabilities relating to such Unit of Lender Financed Inventory.

(p) Borrower shall allow Lender and its Representatives to access Borrower's books and records at Borrower's Place of Business and such other places as any Lender Financed Inventory may be located, in order to conduct audits of Borrower's Lender Financed Inventory, in each case without prior notice to Borrower of such audits. Borrower shall be responsible for and agrees to pay all of Lender's expenses in conducting such audits.

(q) Each Unit of Lender Financed Inventory must be physically verified at the time of any audit conducted by or on behalf of Lender to be at Borrower's Place of Business, or such other place as Lender may authorize. In the event that any Unit of Lender Financed Inventory is not so verified, Lender may, in its sole discretion, provide Borrower an opportunity to produce such Unit of Lender Financed Inventory at Borrower's Place of Business, or such other place as Lender may authorize.

(r) Borrower may request from Lender, for a legitimate business purpose, the Title to a Unit of Lender Financed Inventory, but Lender reserves the right to grant or deny such request in its sole discretion. In the event Lender grants any such request, any Title provided to Borrower or to any other Person on Borrower's behalf, must be returned to Lender by the close of business on the seventh (7th) day after the date of Lender's release of such Title.

(s) Borrower and each Guarantor authorize Lender to obtain and share credit information relating to Borrower and its Guarantors from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary. The individual signing below on behalf of Borrower expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the Effective Date. Borrower also authorizes Lender to contact any third parties to disclose information, including information contained in Lender application, for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, if a Credit Line is granted, Borrower and each Guarantor authorize Lender to review Borrower's account periodically, which may include obtaining additional credit information on Borrower and each Guarantor through any available medium.

(t) Borrower's account is subject to "NSF" fees in the amount stated in the Finance Program Rate, Fee, and Term Schedule or the maximum amount permitted by Law for each check or ACH issued by Borrower which is subsequently returned for insufficient funds, in addition to any charge or fee imposed by Borrower's and/or Lender's depository institution.

(u) Lender may process checks electronically, at first presentment and any re-presentments, by transmitting the amount of the check, routing number, account number, and check serial number to Borrower's financial institution. By submitting a check for payment, Borrower authorizes Lender to initiate an electronic debit from Borrower's bank account. When Lender processes Borrower's check electronically, Borrower's payment may be debited from Borrower's bank account as soon as the same day Lender receives Borrower's check.

(v) Borrower's account is subject to a late fee in the amount stated in the Finance Program Rate, Fee, and Term Schedule or the maximum amount permitted by Law for any Unit of Lender Financed Inventory for which Borrower fails to remit payment under this Note or any other Loan Document when due. Borrower acknowledges and agrees that the late fee charged by Lender is a reasonable estimate of Lender's additional administrative burden and costs incurred due to the delay and inconvenience to Lender associated with a late payment.

(w) Borrower's account is subject to Administrative Charges. Borrower acknowledges and agrees that any such Administrative Charge charged by Lender is permitted under this Note and the other Loan Documents, and Borrower consents to the assessment of any such Administrative Charge to Borrower's account.

(x) Borrower's account is subject to Universal Program Fees. Lender maintains and publishes the "Finance Program Rate, Fee, and Term Schedule" for each Finance Program applicable to Borrower's Credit Line via posting the same on the Discover Portal. Borrower may request a copy of the Finance Program Rate, Fee, and Term Schedule from Lender in writing at any time. All universal or generally applicable rates and fees and any amendments to the Terms and Conditions shall be published therein, incorporated herein by reference and made a part of this Note and any other applicable Loan Documents. The rates and fees applied to Borrower's Liabilities under this Note, any amended Terms and Conditions, or any applicable event sale or promotional terms in effect with respect to an eligible Floorplan Advance or Receivable Advance shall be (i) the applicable rates and fees set forth on the applicable Advance Schedule; (ii) the rates, fees, and amendments to the Terms and Conditions most recently published on the applicable Finance Program Rate, Fee, and Term Schedule; and (iii) the rates, fees, terms, and conditions as set forth in the applicable marketing materials outlining event sale and/or promotional terms. Lender may amend the rates, fees, and Terms and Conditions from time to time, at Lender's sole discretion, and without additional Notice to

Page 6 of 12

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

Borrower other than the publication of such amendments on the Discover Portal.

(y) Lender maintains and publishes the Lender Guide on the Discover Portal. Borrower acknowledges and agrees that the Lender Guide and the content found therein are not part of this Note or any other Loan Document, are for informational purposes only, and do not create any new or additional contract rights or obligations for Borrower or Lender. Borrower acknowledges and agrees that the Lender Guide and the content therein is subject to change by Lender at any time without notice. To the extent the Lender Guide and the content therein are determined to create or provide additional contractual rights for Borrower and a conflict exists between this Note or any other Loan Document, on the one hand, and the Lender Guide, on the other hand, the provision of this Note or the other Loan Document, as the case may be, shall prevail.

(z) Borrower waives demand, presentment for payment, notice of dishonor, protest, and notice of protest, and expressly agrees that this Note and all payments coming due under it and any other Loan Documents may be extended or modified from time to time without in any way affecting Borrower's Liability under this Note or any other Loan Document. Borrower and Guarantors understand that Lender may, at any time and without notice to Borrower, with or without cause, demand that this Note immediately be paid in full. The demand nature of this Note does not limit Lender's election of remedies upon an Event of Default by Borrower, and Borrower and Guarantors acknowledge that upon Lender's declaration of an occurrence of an Event of Default, all Liabilities under this Note and the other Loan Documents shall automatically accelerate and Lender may, at any time and without notice to Borrower, demand immediate payment of all Liabilities under this Note and the other Loan Documents and take such further action as may be contemplated under Section 7 or otherwise permitted by Law or in equity. Borrower shall have the right to pay all Liabilities in full at any time.

(aa) Notwithstanding Section 4(f), upon any disposition of a Unit of Lender Financed Inventory, whether by sale or otherwise, or the receipt by Borrower (or any other Person on behalf of Borrower) of full or partial payment by or on behalf of the purchaser of such Unit of Lender Financed Inventory, Lender may, without notice to Borrower and in Lender's sole discretion, declare a Maturity Event with respect to the related Floorplan Advance.

(bb) Notwithstanding Section 4(g), upon any receipt by Borrower of full payment under any Receivable that is subject to a Receivable Advance, or upon Borrower's declaration of a default under any such Receivable, Lender may, without notice to Borrower and in Lender's sole discretion, declare a Maturity Event with respect to the related Receivable Advance.

(cc) The receipt, by Lender or Borrower, or any third party on Borrower's behalf, of proceeds related to any Unit of Lender Financed Inventory shall constitute conclusive proof of the sale or other disposition of such Unit of Lender Financed Inventory.

6.  EVENTS OF DEFAULT. The occurrence of any of the following events shall be considered an event of default under this Note and the other Loan Documents (each, an "Event of Default"):

(a) Borrower or any Guarantor fails to perform any of its obligations, undertakings or covenants under this Note or under any other Loan Document, including any obligation to repay any Liability when due and Borrower's obligation to pay upon demand any outstanding Liability under this Note.

(b) Borrower or any Guarantor breaches or otherwise violates any provision of this Note or any other Loan Document.

(c) Borrower makes any representation or warranty to Lender, or provides to Lender any schedule, certificate, financial statement, report, notice, or other writing, which is false or misleading in any material respect when made or delivered.

(d) Any damage or destruction of any Inventory and appropriate insurance naming Lender as "Loss Payee" is not in effect as required under Section 4(e).

(e) Borrower or any Guarantor, or any of their respective Parent Companies, has defaulted in the payment or performance of any debt or obligation under any other agreement, whether to Lender or to a third party.

(f) Borrower or any Guarantor, or any of their respective Parent Companies, becomes insolvent or consents to the appointment of a trustee, receiver, or other custodian for such Borrower, Guarantor, or Parent Company, as the case may be, or for any property belonging to any of the foregoing Persons; or such Borrower, Guarantor, or Parent Company, as the case may be, makes a general assignment for the benefit of its creditors; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency Law, or a dissolution or liquidation proceeding, is commenced by or against such Borrower, Guarantor, or Parent Company, as the case may be.

(g) Any material change in the management, ownership, or control of Borrower or its Parent Company occurs (unless such material change has been consented to in writing by Lender).

(h) The voluntary or administrative dissolution, death, or incompetence of Borrower or any Guarantor, or any of their respective Parent Companies.

(i) Any change in the financial condition of Borrower or any Guarantor, or any of their respective Parent Companies, that Lender in good faith

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

deems adverse.

(j) Borrower or any Guarantor, or any of their respective Parent Companies, admits in writing that it is unable to pay its debts as they become due.

(k) Lender in good faith deems itself insecure for any reason.

7. RIGHTS AND REMEDIES. Upon any Event of Default, Lender may, at its option and without notice to Borrower, exercise any or all of the following rights in a separate, successive, or concurrent fashion, and Lender's exercise of any rights hereunder shall not preclude Lender from pursuing other rights and remedies in conjunction therewith or at a later time:

(a) Demand immediate payment of all Liabilities under this Note and the other Loan Documents and all other indebtedness and amounts owed to Lender and its Affiliates by Borrower and its Affiliates. Lender shall have all rights and remedies available hereunder and under the other Loan Documents, and all rights and remedies available to Lender at law or in equity, including the rights and remedies of a secured party under the UCC. These rights and remedies include the right to cancel any unfunded Advances; to enter into Borrower's premises with or without legal process, but without force, and to take possession of and remove any Collateral; and to notify any account debtors or other Person obligated on Collateral to make payment or otherwise render performance to or for the benefit of Lender. Lender shall have the right to contact any third parties, including auctions, governmental agencies, Borrower's licensing authorities, consumer finance companies, floorplan companies, other finance companies, consumers, other borrowers, Auction Insurance Agency, and such other Persons as Lender may elect to contact in its sole discretion, and to share such information as is necessary, in Lender's sole discretion, for any reason, including for purposes of and related to collection of any Liabilities under this Note and the other Loan Documents. At Lender's request, and to the extent Borrower may lawfully do so, Borrower shall assemble, prepare for removal, and make available to Lender at a place designated by Lender which is reasonably convenient for Lender and Borrower such Collateral as Lender may request.

(b) Initiate proceedings to appoint a receiver in any court of competent jurisdiction. To the extent permitted by Law, Borrower waives the right to notice and hearing of the appointment of a receiver and consents to such appointment without requiring Lender to post a bond.

(c) To the extent permitted by Law, Borrower gives consent to Lender to proceed in any action to collect on or execute against any and all bonds that Borrower or its Affiliates may have posted with any governmental authorities or third parties.

(d) Without limiting the foregoing, Lender may take control of any funds generated by any Collateral, and in Lender's name or Borrower's name, demand, collect, receipt for, settle, compromise, sue for, repossess, accept returns of, foreclose, or realize upon any Collateral. Borrower waives any and all rights it may have to notice prior to seizure by Lender of any Collateral. Borrower agrees that private sale of any Lender Financed Inventory at the amount then owed to Lender on such Lender Financed Inventory, less costs reasonably incurred by Lender in preparation of disposition of such Lender Financed Inventory, shall be a commercially reasonable method of disposition of such Collateral. Additionally, Borrower further agrees that any Inventory Collateral repossessed or otherwise obtained by Lender after an Event of Default may be disposed of by Lender, in Lender's sole discretion, at any regular or online sale of any wholesale auto auction that may be an Affiliate of Lender, or at any National Auto Auction Association member, and, in each case, any such a sale is and shall be deemed commercially reasonable for all purposes. Borrower shall be liable to Lender for any deficiency resulting from Lender's disposition of the Collateral. Borrower agrees that the Collateral is of the type customarily sold on a recognized market and that Lender therefore has no obligation to notify Borrower prior to a sale of any Collateral. Lender shall not be responsible for the accuracy or validity of any document or for the existence or value of any Collateral. Lender shall not be required to marshal any assets in favor of Borrower. Lender has no obligation to pursue any third party for any liability or obligation owed to Borrower. Borrower further agrees to pay all reasonable attorneys' fees and other collection costs incurred by Lender and its Affiliates in enforcing this Note and any other Loan Document after any Event of Default. To the extent not prohibited by Law, Borrower waives all appraisement, valuation, anti-deficiency, homestead, exemption, and usury Laws now or hereafter in effect, and releases all right to appeal after payment in full.

8. LOAN DOCUMENTS. In addition to the execution and delivery of this Note, upon the request of Lender, Borrower shall execute (or cause the execution of) the following additional documents in connection with Borrower's Credit Line (together with all other documents and instruments executed by Borrower in connection with this Note or Borrower's Credit Line, the "Loan Documents"), each of which shall be incorporated herein by reference and made a part of this Note: (a) a Power of Attorney in favor of Lender; (b) prior to Lender making any Advances under this Note, an Advance Schedule for each unique set of terms for the Finance Program applicable to Borrower, which may be amended from time to time; (c) such Guaranties of all of Borrower's Liabilities under this Note and the other Loan Documents as Lender may request, including Guaranties of all owners of Borrower; (d) a Reserve Agreement in favor of Lender; and (e) prior to Lender authorizing Borrower to place any Lender Financed Inventory on consignment with another licensed dealer, a Consignment Agreement acceptable to Lender.

9. ASSIGNMENT. This Note and any other Loan Document may be assigned by Lender without notice to Borrower, but Borrower may not assign this Note or any other Loan Document without the prior written consent of Lender.

10. THIRD PARTY BENEFICIARIES. Neither this Note nor any other Loan Document is intended to confer upon any Person other than the Parties any rights or remedies hereunder; provided, however, that the rights and remedies afforded to Lender under Sections 2, 5(l), 5(n), 5(s), 7, 11 and 14 shall also inure to the benefit of the Affiliates of Lender and such Affiliates shall be intended third party beneficiaries of the provisions thereof.

Page 8 of 12

NextGear Demand Promissory Note and Loan and Security Agreement (v. 1.0)

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

11. INDEMNIFICATION. Borrower shall, at its expense, defend, indemnify and hold harmless Lender and its Affiliates, and each of their respective directors, officers, principals, partners, shareholders or holders of any ownership interest, as the case may be, employees, Representatives, attorneys, and agents (the "Lender Parties") from and against any and all claims, judgments, losses, damages, demands, payments, fines, costs, expenses (including reasonable attorneys' fees and court costs), and liabilities of any nature or description incurred by a Lender Party to the extent arising from or relating to any of the following: (a) any personal injury or property damage caused by Borrower or any of its Representatives; (b) any breach by Borrower of this Note or any other Loan Document, including the breach of any representation, warranty, or other agreement contained in this Note or in any other Loan Document; and (c) Borrower's operation of its Business or any of Borrower's operations or activities.

12. NO JOINT VENTURE, PARTNERSHIP, OR AGENCY. Nothing contained in this Note or in any other Loan Document shall confer upon Lender or Borrower any interest in, or subject either of them to any liability for, or in respect of, the business, assets, profits, losses, or liabilities of the other. This Note does not constitute and shall not be characterized as a joint venture, partnership, or agency between Lender and Borrower. Nothing in this Section 12 shall limit or restrict the respective obligations and undertakings of Lender and Borrower hereunder.

13. AMENDMENT; MERGER. This Note and the other Loan Documents are intended by the Parties to be an amendment to and restatement of any prior Demand Promissory Note and Loan and Security Agreement or similar document or instrument (including any prior promissory note, loan and security agreement or similar contract) between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.) and Borrower. With the exception of the amendments and modifications that Lender is entitled to make without the prior written consent of Borrower pursuant to this Note or any other Loan Document, this Note may be modified or amended only upon the written consent of Lender and Borrower. In the case of the other Loan Documents, with the exception of the amendments and modifications that Lender is entitled to make without the prior written consent of Borrower pursuant to this Note or any other Loan Document, such other Loan Documents may be modified or amended only upon the written consent of Lender and the Person to whom such amendment relates. Additionally, the Finance Programs, Lender Guide, descriptions of specific Units of Lender Financed Inventory, amounts and terms of Advances, Maturity Dates, Extensions, Interest, Base Rates, Administrative Charges, Lender Universal Program Fees, late fees, NSF fees, and other charges allowed by this Note or any other Loan Document may be proven by the records kept by Lender. Notwithstanding the foregoing, any advance and/or loan originated pursuant to one or more agreements between Borrower and Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc. prior to the Effective Date for which indebtedness from Borrower remains outstanding as of the Effective Date, shall remain subject to the terms and conditions of such prior agreement(s) for all intents and purposes until such indebtedness has been indefeasibly repaid and satisfied in full.

14. EXECUTION. The Parties understand and agree that Lender may execute this Note and any other Loan Documents by affixing the signature of an authorized representative of Lender via signature stamp. Additionally, Lender may execute this Note and any other Loan Documents by affixing to this Note or such other Loan Document, as the case may be, an electronic or digital signature, which electronic or digital signature shall for all purposes be deemed effective to constitute the valid signature of Lender. Any electronic or digital signature affixed to this Note or any other Loan Documents by Lender shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "E-Sign Act"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures, and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. Notwithstanding the foregoing, Borrower may execute this Note and any other Loan Documents only by original signature of an authorized officer of Borrower, unless otherwise authorized by Lender. Lender may, in its sole discretion, permit Borrower and/or any Guarantor to execute this Note and any other Loan Documents by affixing to this Note or such other Loan Document, as the case may be, an electronic or digital signature. Borrower acknowledges and agrees that any electronic or digital signature of Borrower or any Guarantor shall for all purposes be deemed effective and constitute the valid signature of Borrower or Guarantor, as the case may be, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the E-Sign Act, and any other similar Laws relating to the validity or enforceability of electronic or digital signatures, and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. A facsimile or photocopied reproduction of signatures on this Note and any other Loan Documents shall be deemed original signatures for all intents and purposes. This Note and the other Loan Documents may be executed by the Parties in one or more counterparts which, collectively, shall constitute one and the same agreement.

15. NOTICES. All notices, demands and requests required or permitted to be given under this Note and any other Loan Document shall be (a) in writing, (b) sent by facsimile with receipt confirmed by telephone (but only if a facsimile number is provided below), delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested, (c) deemed to have been given on the date sent by facsimile with receipt confirmed by telephone, the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (d) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Borrower (through written notice, via the Discover Portal, or otherwise) for purposes of directing future notices, demands or requests):

If to Lender:        NextGear Capital, Inc., 1320 City Center Drive, Suite 100, Carmel, IN  46032
                     Telephone: (317) 571-3721 Facsimile: (317) 571-3737

                     with a copy to:

                     NextGear Capital, Inc., 1320 City Center Drive, Suite 100, Carmel, IN  46032
                     Telephone: (317) 571-3721 Facsimile: (317) 571-3737
                     Attention: Legal Department

Page 9 of 12

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

If to Borrower:    Michael Vernon Garrison, d/b/a Rock Hill Used Cars
                   519 Interstate Highway 30 E , Sulphur Springs, TX  754826153
                   Telephone: (903) 951-8597 Facsimile:

16. NO WAIVER.  No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect to any Term or Condition will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

17. TERMINATION.  No termination of this Note shall alter Borrower's obligations and Liabilities relating to Advances and amounts funded or committed prior to the effective date of such termination, and all rights and remedies, including the security interest granted herein and the rights of Lender as a secured party hereunder, shall extend until all Liabilities owed by Borrower to Lender have been indefeasibly paid and satisfied in full.

18. LEGAL FEES AND COLLECTION COSTS.  Borrower shall pay to Lender all reasonable legal fees, expenses, and collection costs incurred by Lender, Lender's Affiliates, and/or Lender's Representatives as a result of any Event of Default, Borrower's failure to perform any obligation or satisfy any Liability under this Note or any other Loan Document, and/or Borrower's unsuccessful prosecution of affirmative claims or counterclaims against such party or parties.

19. SEVERABILITY.  Any provision of this Note or any other Loan Document that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Note and the other Loan Documents or affecting the validity or enforceability of any provision of this Note or any other Loan Document in any other jurisdiction.

20. GOVERNING LAW.  Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 22 (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Note and the other Loan Documents shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof.

21. JURISDICTION AND VENUE.  As evidenced by Borrower's signature below, Borrower submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Note or any other Loan Document, or to any matter arising out of or related to this Note or any other Loan Document, initiated by Borrower against Lender, shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Borrower expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue, or forum non conveniens with respect to any such action. Borrower acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Borrower in any court of competent jurisdiction, and Borrower consents to such forum as Lender may elect.

22. DISPUTE RESOLUTION; WAIVER OF CLASS ACTION RIGHTS.

    (a) In most cases, any disputes or claims that Borrower may have can be resolved quickly and to Borrower's satisfaction by contacting Lender regarding such dispute or claims. In the unlikely event that Lender is unable to resolve a dispute or claim that Borrower may have, Borrower agrees to arbitrate any such dispute or claim. This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Note or any other Loan Document or any aspect of Borrower's relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all disputes, claims and counterclaims that may have arisen before this Note or any prior contract or agreement between Borrower and Lender (including all disputes, claims and counterclaims relating to any marketing or advertising by Lender); and (iii) any disputes, claims and counterclaims that may arise after the termination of this Note and any other Loan Document. Additionally, Borrower acknowledges that Lender may (but shall in no event be required to) arbitrate any dispute or claim that it may have against Borrower, with any such arbitration being governed by the provisions of this Section 22. Borrower, at its election, may opt-out of the arbitration provisions set forth in Sections 22(a), 22(c) and 22(d) by providing written notice of its election to opt-out no later than thirty (30) days after the Effective Date, which notice shall be provided to Lender pursuant to Section 15 ("Opt-Out Notice"), provided that such Opt-Out Notice shall become effective only upon Borrower's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period. Borrower acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Borrower shall in all events be subject to the provisions of Section 22(b).

    (b) ANY ARBITRATION PROCEEDING UNDER THIS NOTE WILL TAKE PLACE ON AN INDIVIDUAL BASIS.  CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED.  BORROWER AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.  BORROWER AGREES THAT, BY ENTERING INTO THIS NOTE, BORROWER IS WAIVING ITS RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING.  UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. BORROWER ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES, ARE UNIQUE TO AND NEGOTIATED BY BORROWER, AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS.

(c) Any dispute or claim subject to arbitration pursuant to this Section 22 shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures as then in effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 22 that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect on the Effective Date (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 22 will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be. The arbitrator shall be bound by and shall strictly enforce the terms of this Note and the other Loan Documents and may not limit, expand, or otherwise modify any term or provision of this Note or any other Loan Document or any other contract or document between Borrower and Lender. The arbitrator shall not have the power to award to Borrower any damages that are excluded or that have been waived by Borrower under this Note or any other Loan Document, and Borrower irrevocably waives any claim that it may have thereto. The arbitrator shall not have the power to order pre-hearing discovery of documents or the taking of depositions. The arbitrator shall render a written decision within six (6) months after being selected. Any arbitration will be held in Indianapolis, Indiana (or its greater metro area). Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in his or her discretion, award costs and fees to the prevailing Party. The result of any arbitration shall be final and binding upon the Parties. Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

(d) This Note and the other Loan Documents evidence transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 22, notwithstanding the provisions of Section 20.

23. WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND BORROWER KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY OTHER LOAN DOCUMENT, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR BORROWER. NEITHER LENDER NOR BORROWER SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR BORROWER EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND BORROWER.

24. LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR ANY ADVANCES MADE BY LENDER HEREUNDER OR THEREUNDER), EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS NOTE OR ANY OTHER LOAN DOCUMENT (OR IN CONNECTION WITH ANY ADVANCE BY LENDER HEREUNDER OR THEREUNDER) THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THIS NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

25. WAIVER OF BOND. BORROWER WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY BOND OR SURETY OR SECURITY ON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF LENDER DURING ATTEMPTS TO RECOVER COLLATERAL OR OTHERWISE.

26. CALIFORNIA BORROWERS. In the event Borrower's Place of Business is in the State of California, Borrower acknowledges and agrees that any initial Advance made under this Note must be in the amount of at least Five Thousand Dollars and Zero Cents ($5,000), and Borrower shall neither request nor accept any initial Advance under this Note in an amount less than Five Thousand Dollars and Zero Cents ($5,000).

27. DISCLAIMER. THE DISCOVER PORTAL LICENSED OR PROVIDED HEREUNDER IS PROVIDED AS A CONVENIENCE TO BORROWER AND ON AN "AS-IS" BASIS. LENDER MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, ORAL OR WRITTEN, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF NON-INFRINGEMENT, TITLE, ACCURACY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, LENDER MAKES NO REPRESENTATIONS OR WARRANTIES THAT THE DISCOVER PORTAL WILL OPERATE ERROR-FREE OR ON AN UNINTERRUPTED BASIS, AND LENDER SHALL IN NO EVENT BE LIABLE OR RESPONSIBLE FOR ANY OUTAGE OR OTHER LOSS OF FUNCTIONALITY OR CONNECTIVITY WITH RESPECT TO THE DISCOVER PORTAL, AND NO SUCH OUTAGE OR OTHER LOSS OF FUNCTIONALITY OR CONNECTIVITY SHALL EXCUSE ANY FAILURE BY BORROWER TO

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

TIMELY PERFORM ALL OF ITS OBLIGATIONS TO LENDER UNDER THIS NOTE AND THE OTHER LOAN DOCUMENTS.

28. DESCRIPTIVE HEADINGS; INTERPRETATION. The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Note. As used in this Note and the other Loan Documents, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import. Words (including the defined terms set forth in Appendix A) of one gender shall be held to include the other gender as the context requires. Any references in this Note or in the other Loan Documents to a particular statute or regulation shall be deemed to include all amendments thereto, rules and regulations thereunder and any successor statute, rule, or regulation, or published clarifications or interpretations with respect thereto, in each case as in effect from time to time.

29. EFFECTIVE DATE OF OTHER LOAN DOCUMENTS. Unless otherwise stated in the applicable Loan Document, the effective date of any Loan Document executed by a party shall be the later of (a) the Effective Date of this Note, or (b) the date of Borrower's execution thereof as set forth below Borrower's signature thereon (or, in the case of any Guaranty, the date of Guarantor's execution thereof as set forth below Guarantor's signature thereon). In the event that the date of Borrower's or Guarantor's execution of any Loan Document is not set forth below Borrower's or Guarantor's signature thereon, then the effective date of such Loan Document shall be deemed to be the Effective Date of this Note.

WHEREFORE, the Parties, by their respective duly authorized representatives, have executed this Demand Promissory Note and Loan and Security Agreement on the dates set forth below.

**BORROWER:**

Michael Vernon Garrison, d/b/a Rock Hill Used Cars

By: _____

Michael Vernon Garrison, Owner

Date: 5 - 6 - 1 5

**LENDER:**

NEXTGEAR CAPITAL, INC.

By: _____

Name (Print): _____

Date: 5 - 6 - 1 5

**GUARANTORS ACKNOWLEDGE AND CONSENT TO THE FOREGOING:**

Guarantor (Sign): _____

Michael Vernon Garrison

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

## APPENDIX A

(1) "Administrative Charge" shall mean any expense charged by Lender to Borrower that is reasonable or necessary, in Lender's sole discretion, to administer or monitor Borrower's account, to preserve any Collateral, or to collect any Liabilities under this Note.

(2) "Advance" shall mean any discretionary loan or payment in any amount, for any purpose, made pursuant to this Note by Lender to Borrower or on Borrower's behalf to any third party.

(3) "Advance Schedule" shall mean any addendum or other document executed pursuant to this Note, in each case as modified from time to time, which indicates the applicable specific terms regarding Borrower's Floorplan Fees, Receivable Fees, Contract Rate of Interest, Period(s), Required Reserve Amount, Reserve Charge, required principal reduction to obtain a Curtailment of the Maturity Date, and number of available Curtailments.

(4) "ACH" shall mean any payment by or on behalf of Borrower to Lender made via a nationwide electronic funds transfer network processing electronic debit and credit entries to or from Borrower's bank accounts.

(5) "Affiliate" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first-named Person (which shall, for purposes of clarity, include any parent company and any direct or indirect subsidiary of such first-named Person) and, if such first-named Person is a natural person, also includes any member of such first-named Person's immediate family. For purposes of this definition, the term "control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

(6) "Base Rate" shall mean the greater of that variable rate of interest or that fixed rate of interest as stated in the Finance Program Rate, Fee, and Term Schedule.

(7) "Borrower" shall have the meaning set forth in the Preamble.

(8) "Borrower's Place of Business" shall mean the primary place where the Collateral and Borrower's books and records are kept, and where Borrower's operations are conducted.

(9) "Business" shall mean Borrower's business, as it relates to the purchase and sale, lease, or rent of Inventory and/or the origination of any Receivables.

(10) "Business Day" shall mean any day other than a Saturday, Sunday, federal holiday or day on which banking institutions in Carmel, Indiana are authorized or obligated by Law or executive order to be closed.

(11) "Check" shall mean any payment by or on behalf of Borrower to Lender not made in cash, via certified funds, wire transfer, or ACH.

(12) "Collateral" shall have the meaning set forth in Section 2(a).

(13) "Collateral Protection Program" shall mean that certain program in which Borrower may participate in lieu of providing third party insurance as required under this Note.

(14) "Contract Rate" shall mean that rate of interest as stated on the applicable Advance Schedule.

(15) "Credit Line" shall mean Borrower's floorplan line of credit with Lender pursuant to and under this Note.

(16) "Curtailment" shall mean that grant by Lender, in its sole discretion, to Borrower of additional time extending the Maturity Date for an additional Period. The number of allowable Curtailments shall be as stated on the applicable Advance Schedule.

(17) "Discover Portal" shall mean that certain web-based portal located at http://www.nextgearcapital.com (or any similar successor portal, interface or website) owned, operated or maintained by Lender and, subject to the Terms and Conditions, to which Borrower shall have access to from time to time as determined by Lender.

(18) "Effective Date" shall have the meaning set forth in the Preamble.

(19) "E-Sign Act" shall have the meaning set forth in Section 14.

(20) "Event of Default" shall have the meaning set forth in Section 6.

(21) "Extension" shall mean that grant by Lender, in its sole discretion, to Borrower of additional time extending the Maturity Date beyond the last

Page 1 of 4

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

Period as stated on the applicable Advance Schedule.

(22) "Finance Program" shall mean any finance program offered by Lender and available to Borrower for the financing of Inventory or Receivables pursuant to an Advance under this Note.

(23) "Finance Program Rate, Fee, and Term Schedule" shall mean that current schedule of applicable universal interest rates, fees and term and condition amendments for each Finance Program, including Universal Program Fees; late fees; fees relating to returned checks or ACH payments due to insufficient funds; the Base Rate; Collateral Protection Program fees; and notice of amendments to the Terms and Conditions, published by Lender via posting such schedule of such universal rates and fees and notice of amendments to the Terms and Conditions on the Discover Portal.

(24) "Floorplan Advance" shall mean an Advance made pursuant to this Note relating to a Unit of Inventory to be offered for sale, lease or rent, or leased or rented by Borrower in the Ordinary Course of Business.

(25) "Floorplan Date" shall mean (a) for a Universal Source Purchase, the sale date, regardless of the date the Floorplan Advance is actually requested or funded; and (b) for a Specific Source Purchase, the date the request for the Floorplan Advance is received by Lender, regardless of the date such Floorplan Advance is actually funded.

(26) "Floorplan Fee" shall mean the fee charged by Lender to Borrower, as set forth on the applicable Advance Schedule, for each Unit of Lender Financed Inventory for each Period, including any Extensions thereof.

(27) "Guarantor" shall mean any Person executing this Note as a Guarantor or any Person executing any Guaranty pursuant to this Note.

(28) "Interest" shall mean the aggregate rate of interest which accrues on all Liabilities owed by Borrower to Lender under or arising out of this Note or the other Loan Documents.

(29) "Inventory" shall mean all Units held by Borrower for wholesale or retail sale, lease, or rent, or leased or rented by Borrower. "Inventory" includes Lender Financed Inventory.

(30) "JAMS" shall have the meaning set forth in Section 22(c).

(31) "JAMS Comprehensive Rules" shall have the meaning set forth in Section 22(c).

(32) "JAMS Standard Rules" shall have the meaning set forth in Section 22(c).

(33) "Law" or "Laws" shall mean applicable common law and any applicable statute, permit, ordinance, code or other law, rule, regulation or order enacted, adopted, promulgated or applied by any governmental authority, all as in effect from time to time.

(34) "Lender" shall have the meaning set forth in the Preamble.

(35) "Lender Financed Inventory" shall mean all Units for which an Advance has been made under this Note.

(36) "Lender Guide" shall mean those procedures and instructions for the use of Lender's system and the Discover Portal, in each case as modified by Lender from time to time in Lender's sole discretion, which are available in hard copy upon Borrower's written request to Lender or by Borrower logging onto the Discover Portal.

(37) "Lender Parties" shall have the meaning set forth in Section 11.

(38) "Liabilities" shall mean any and all Advances, debts, financial obligations, Administrative Charges, Lender Universal Program Fees, Interest, Floorplan Fees, NSF fees, late fees, charges, expenses, attorneys' fees, costs of collection, covenants, and duties owing, arising, due, or payable from Borrower to Lender of any kind or nature, present, or future, under any instrument, guaranty, or other document, whether arising under this Note, any other Loan Document, or otherwise, whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing, or hereafter arising, and however acquired.

(39) "Liens" shall mean any claims, liabilities, security interests, liens, mortgages, deeds of trust, pledges, conditions, charges, claims, options, rights of first refusal, easements, proxies, voting trusts or agreements, transfer restrictions under any contract or agreement or encumbrances of any kind or nature whatsoever.

(40) "Loan Documents" shall have the meaning set forth in Section 8.

(41) "Maturity Date" shall mean (a) for all Liabilities concerning or relating to a Floorplan Advance or a Receivable Advance, the earlier of the last day of the current Period or the day on which Lender declares a Maturity Event; (b) for all Liabilities not directly related to a Floorplan Advance or a Receivable Advance, ten (10) days after the date such Liability is posted to Borrower's account; and (c) for One Day Loans, the

ag1**©**@**A**

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

date such One Day Loan is posted to Borrower's account. Notwithstanding the foregoing, upon the declaration of an Event of Default by Lender, the Maturity Date for all Liabilities shall be the earlier of (i) the date on which such Event of Default is declared by Lender, or (ii) the date on which such Event of Default first occurred. In the event the Maturity Date is not a Business Day, the Maturity Date shall be deemed to be the next Business Day.

(42) "Maturity Event" shall mean any event, act or circumstance arising under this Note or any other Loan Document (including any failure by Borrower to adhere to any term or provision of this Note or any other Loan Document), which causes Lender to declare the event, act or circumstance a "Maturity Event" with respect to any Floorplan Advance or Receivable Advance.

(43) "MSO" shall mean the manufacturer's certificate of origin or other document evidencing ownership of a Unit issued by the manufacturer of the Unit.

(44) "Note" shall mean this Demand Promissory Note and Loan and Security Agreement and all present and future amendments, modifications, and addendums referenced herein.

(45) "One Day Loan" shall mean the amount of any Advance that is in excess of the market value of a Unit, as determined by Lender in its sole discretion. The determination of whether to approve an Advance which would result in the posting of a One Day Loan to Borrower's account shall be in Lender's sole discretion. One Day Loans mature on the date on which they post to Borrower's account.

(46) "Opt-Out Notice" shall have the meaning set forth in Section 22(a).

(47) "Ordinary Course of Business" shall mean the ordinary course of the Business of Borrower, consistent with past practices (but only to the extent such past practices were in compliance with Law and in accordance with best industry practices).

(48) "Parent Company" shall mean, with respect to Borrower or any Guarantor, the Person(s) that, directly or indirectly, have the power to direct or cause the direction of the management and policies of Borrower or Guarantor, as the case may be, whether through the ownership of voting securities, by contract or otherwise.

(49) "Party" or "Parties" shall have the meaning set forth in the Preamble.

(50) "Period" shall mean the number of days set forth on the applicable Advance Schedule, which (a) in the case of a Floorplan Advance, shall be calculated beginning on the Floorplan Date; and (b) in the case of a Receivable Advance, shall be calculated beginning on the Receivable Origination Date.

(51) "Person" shall mean any individual, corporation, joint stock company, association, partnership, joint ventures, trust, estate, limited liability company, limited liability partnership, governmental authority or other entity or organization.

(52) "Receivable" shall mean chattel paper, including a retail installment contract or buy here pay here contract, evidencing a monetary obligation of a buyer for the purchase of a motor vehicle from Borrower and the granting of a security interest in the vehicle to Borrower as security for the repayment of the monetary obligation.

(53) "Receivable Advance" shall mean an Advance made pursuant to this Note to provide Borrower with working capital secured by a specific Receivable owned and originated by Borrower in the Ordinary Course of Business.

(54) "Receivable Fee" shall mean the fee charged by Lender to Borrower, set forth on the applicable Advance Schedule, for each individual Receivable Advance for each Period, including any Extensions thereof.

(55) "Receivable Origination Date" shall mean, with respect to any Receivable for which a Receivable Advance is made pursuant to this Note, the date on which such Receivable was originated by Borrower.

(56) "Representative" shall mean, with respect to Borrower or Lender, as the case may be, the directors, officers, stockholders, employees, trustees, agents, and representatives, including any investment banker, consultant, attorney, or accountant, of Borrower or Lender, as the case may be.

(57) "Required Reserve Amount" shall mean the aggregate total amount of funds required to be remitted by Borrower to Lender, as set forth in the applicable Advance Schedule, and held in the Reserve as a condition to the grant of Credit under this Note and the other Loan Documents.

(58) "Reserve" shall mean the cash deposited with Lender by Borrower on a voluntary basis or as required as an underwriting condition and held by Lender as additional security for Borrower's Liabilities under this Note and the other Loan Documents, and Borrower's other Obligations (as defined in the Reserve Agreement) to the Lender Parties.

(59) "Reserve Charge" shall mean that charge by Lender to Borrower, as set forth on the applicable Advance Schedule, assessed for the purpose of funding any Reserve.

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

(60) "Setoff Funds" shall have the meaning set forth in Section 5(l).

(61) "Specific Source Purchase" shall mean all purchases or other requests for an Advance, made by or on behalf of Borrower, that do not constitute a Universal Source Purchase.

(62) "Terms and Conditions" shall mean all provisions of this Note and the other Loan Documents, with the exception of terms specifically referenced on the applicable Advance Schedule.

(63) "Title" shall mean the certificate of title or other document evidencing ownership of a Unit issued by a duly authorized state, commonwealth, province, or government agency.

(64) "UCC" shall mean the Uniform Commercial Code as enacted in the State where the Collateral at issue is located.

(65) "Unit" shall mean any manufactured item, including motor vehicles, for which there exists a Title, MSO, or other similar evidence of ownership acceptable to Lender.

(66) "Universal Program Fee" shall mean any published fee, as stated in the Finance Program Rate, Fee, and Term Schedule, charged by Lender to Borrower pursuant to a Finance Program.

(67) "Universal Source Purchase" shall mean any purchase made by or on behalf of Borrower for which (a) a request for an Advance is made by or on behalf of Borrower; (b) from an auction or third party business that has entered into a universal funding agreement with Lender; and (c) such request for an Advance is received by Lender within seven (7) days of Borrower's purchase of the vehicle that is the subject of such request.

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

## ADVANCE SCHEDULE
Wholesale

Borrower: Michael Vernon Garrison, d/b/a Rock Hill Used Cars          Market: Plano

Account Number: 92421                                          Finance Program: Core

This Advance Schedule is being entered into by the undersigned borrower ("Borrower") and NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

The Period(s) and the required principal reduction for Curtailment for each Advance made pursuant to the Note and this Advance Schedule shall be as follows:

| Period | Number of Days in Period | Required Principal Reduction to Extend Maturity Date | Floorplan Fee |
|--------|--------------------------|------------------------------------------------------|---------------|
| 1 | 45 | 7.50% | $85.00 |
| 2 | 45 | N/A - No Further Curtailments Available | $85.00 |

Contract Rate: 4.50%

Additional fees, charges, and other terms applicable to Advances made pursuant to the Note and this Advance Schedule are set forth on the Finance Program Rate, Fee, and Term Schedule, which can be found on the Discover Portal.

WHEREFORE, the Parties, by their respective duly authorized representatives, have executed this Advance Schedule on the dates set forth below.

**BORROWER:**

Michael Vernon Garrison, d/b/a Rock Hill Used Cars

By: _____

   Michael  Vernon Garrison, Owner

Date: 5 - 6 - 15

**LENDER:**

NEXTGEAR CAPITAL, INC.

By: _____

Name (Print): _____

Date: 5 - 6 - 15

Page 1 of 1

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

**POWER OF ATTORNEY**
**(Sole Proprietor)**

This Power of Attorney is executed by the undersigned borrower ("Borrower") and delivered to NextGear Capital, Inc. ("Lender") pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower and Lender (the "Note"). Capitalized terms used herein but not defined herein shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

1.  No Person to whom this Power of Attorney is presented, as authority for Lender to take any action described below, shall be required to inquire into or seek confirmation from Borrower as to the authority of Lender to take any action described below, or as to the existence of or fulfillment of any condition to this Power of Attorney, which is intended to grant to Lender unconditionally the authority to take and perform the actions described below. Borrower irrevocably waives any right that it may have, now or at any time in the future, to commence any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, against any Person acting in reliance upon or otherwise acknowledging any power or authority granted by Borrower under this Power of Attorney. The Power of Attorney granted hereby is coupled with an interest and may not be revoked or canceled by Borrower without Lender's written consent or as otherwise allowed by Law. This Power of Attorney shall be deemed a "Loan Document" for all intents and purposes as referenced in the Note.

2.  With or without the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to take any and all appropriate actions and to execute and deliver any and all documents and instruments which may be necessary or desirable to accomplish the purposes of the Note and each of the other Loan Documents. Without limiting the generality of the foregoing, Borrower hereby grants to Lender the power and right, on behalf of Borrower, without further notice to or assent by Borrower, at any time, to do the following:

    (a)  execute such security agreements, invoices, notes, and related documentation as may be necessary for Borrower to acquire, refinance, or sell any Collateral (including any Units secured or to be secured by Advances made thereon);

    (b)  execute all documents necessary for Lender to perfect or secure its interest in the Collateral;

    (c)  make, settle, and adjust claims under policies of insurance, and endorse any check, draft, instrument, or other item of payment for the proceeds of such policies of insurance, and make all determinations and decisions with respect to such policies of insurance;

    (d)  endorse the name of Borrower upon any document, instrument, certificate, evidence of title, state registration documents, trust receipt, checks or other items of payment, or any related or similar documents, in each case as necessary to pay for or protect the Collateral, including, without limitation, any agreements between Borrower and any global positioning satellite company;

    (e)  endorse the name of Borrower upon any items of payment or proceeds of any Collateral (including any Units constituting Collateral), and to deposit the same to the account of Lender on account of Borrower's Liabilities under the Note and the other Loan Documents;

    (f)  endorse the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading, or similar document or agreement relating to any Collateral;

    (g)  use the information recorded on or contained in any data processing equipment, computer hardware, or software relating to any Collateral to which Borrower has access;

    (h)  pay or discharge any taxes, liens, security interests, or other encumbrances levied or placed on or threatened against Borrower or any of the Collateral;

    (i)  communicate with any party to any contract with regard to the assignment of the right, title, and interest of Borrower in and under such contract and/or the Collateral, and other matters relating thereto;

    (j)  contact any third parties and disclose and/or receive any Borrower information, including, without limitation, information or data in Borrower's application for credit with Lender, the Note, or Borrower's Credit Line, in each case for the purpose of, among other things, preserving Lender's security interest in the Collateral and ensuring the satisfaction of Borrower's Liabilities under the Note and the other Loan Documents; and

    (k)  do all other things reasonably necessary to satisfy Borrower's Liabilities under the Note and the other Loan Documents.

3.  Upon the occurrence of an Event of Default under the Note, Borrower irrevocably appoints Lender (and all Representatives designated by Lender), with full power of substitution, as Borrower's true and lawful attorney-in-fact with full power and authority in the place and stead of Borrower and in the name of Borrower or in its own name, from time to time in Lender's discretion, to do the following:

    (a)  demand, collect, accept receipt for, settle, compromise, adjust, foreclose, or realize upon any of the Collateral, in each case in such manner as Lender may determine;

Page 1 of 2

NextGear Power of Attorney (Sole Proprietor) (v. 1.0)

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

(b) file or prosecute any claim, litigation, suit, petition, writ, or proceeding in any court of competent jurisdiction or before any arbitrator or other neutral, or take any other action otherwise deemed appropriate by Lender for the purpose of collecting any and all such moneys due to Borrower, whenever payable, and to enforce any other right in respect of the Collateral, including, without limitation, confessing to or consenting to judgments, writs of replevin or possession, and/or any equitable relief in favor of Lender or its Affiliates;

(c) file or prosecute all proofs of claim against any account debtor on behalf of Borrower; and

(d) notify the United States Postal Service of a change in address for the delivery of Borrower's mail to an address designated by Lender, and to receive Borrower's mail on behalf of Borrower.

4.   Any provision of this Power of Attorney that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Power of Attorney or affecting the validity or enforceability of any provision of this Power of Attorney in any other jurisdiction. Borrower hereby ratifies, to the extent permitted by Law, all that Lender or its designated Representatives shall lawfully do or cause to be done by virtue hereof. The rights and privileges set forth herein shall be deemed supplemental and in addition to any rights and privileges to which Lender or any other Person may be entitled under the Note or any other Loan Document. A facsimile or photocopied reproduction of any signature on this Power of Attorney shall be deemed an original signature for all intents and purposes.

WHEREFORE, Borrower has executed this Power of Attorney on the date set forth below.

**BORROWER:**

Michael Vernon Garrison, d/b/a Rock Hill Used Cars

By: _____

Michael Vernon Garrison, Owner

Date: 5 - 6 - 15

STATE OF: TEXAS )
                          )
COUNTY OF: HopKins )     SS:

Before me, a Notary Public in and for said County and State, personally appeared **Michael Garrison** who acknowledged the execution of the foregoing Power of Attorney, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this 6th day of MAY, 20 15.

Notary Signature    Linda Brown

Notary Name (Printed)    LINDA BrowN

My Commission Expires: July 27, 2016   County of Residence: HopKins

LINDA SUE BROWN
MY COMMISSION EXPIRES
July 27, 2016

Page 2 of 2

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

**EXHIBIT B**

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| CT Lien Solutions |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| |

| C. SEND ACKNOWLEDGMENT TO: (Name and Address) |
|---|
| **CT Lien Solutions<br>2727 Allen Parkway<br>Ste. 100<br>Houston, TX 77019<br>USA |

**FILING NUMBER:** 15-0014536196
**FILING DATE:** 05/11/2015      09:24 AM
**DOCUMENT NUMBER:** 605936970001
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | **Garrison** | **Michael** | **Vernon** | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **519 Interstate Highway 30 E** | **Sulphur Springs** | **TX** | **75482** | **USA** |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| OR | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | **Rock Hill Used Cars** | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **519 Interstate Highway 30 E** | **Sulphur Springs** | **TX** | **75482** | **USA** |

3. SECURED PARTY'S NAME (or Name of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| OR | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | **NEXTGEAR CAPITAL, INC.** | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **1320 CITY CENTER DR., STE 100** | **CARMEL** | **IN** | **46032** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
All Debtors assets and properties wherever located, including without limitation all equipment of any kind or nature, all vehicles, vehicle parts and inventory now owned or hereafter acquired, without limitation, purchase money inventory, the purchase of which was financed or floorplanned by NextGear Capital, Inc. for Debtor of whatever kind or nature, and all returns, repossessions, exchanges, substitutions, attachments, additions, accessions, accessories, replacements, and proceeds thereof; all accounts, accounts receivable, chattel paper, and general intangibles now owned or hereafter acquired by Debtor together with the proceeds thereof; all of Debtors documents, books and records relating to the forgoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY**

**UCC FINANCING STATEMENT AMENDMENT**
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Lien Solutions |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| |

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

**CT Lien Solutions
2929 Allen Parkway, Ste. 100
Houston, TX 77019
USA

**FILING NUMBER:** 19-00481575
**FILING DATE:** 12/24/2019    11:00 AM
**DOCUMENT NUMBER:** 933800130001
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| **15-0014536196** | Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of the Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT** (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9.
For partial assignment, complete item 7 and 9 and also indicate affected collateral in item 8

4. ☑ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes: This Change affects ☐ Debtor or ☐ Secured Party of record. AND Check one of these three boxes to:

☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c     ☐ ADD name: Complete item 7a or 7b, and item 7c     ☐ DELETE name: Give record name to be deleted in item 6a or 6b.

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| | 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| OR | | | | |
| | 7b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

8. ☐ **COLLATERAL CHANGE:** Also check one of these four boxes: ☐ ADD collateral  ☐ DELETE collateral  ☐ RESTATE covered collateral  ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)

If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| | 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | **NEXTGEAR CAPITAL, INC.** | | | |
| OR | 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:

**FILING OFFICE COPY**

**INDIVIDUAL GUARANTY**

THIS INDIVIDUAL GUARANTY (this "Guaranty") is made and entered into by the undersigned guarantor ("Guarantor") in favor of NextGear Capital, Inc. ("Lender"), pursuant to that certain Demand Promissory Note and Loan and Security Agreement by and between Borrower (as defined below) and Lender (the "Note").

NOW, THEREFORE, in consideration of any loan or other financial accommodation heretofore or hereafter at any time made or granted to Borrower by Lender, and the mutual covenants, agreements, and conditions contained herein, Guarantor agrees as follows:

1. DEFINITIONS. Capitalized terms used herein and not defined in this Section 1 or elsewhere in this Guaranty shall have the respective meanings as set forth in the Note (such meanings to be equally applicable to both the singular and plural forms of the terms defined). Any capitalized terms used herein, but not otherwise defined herein or in the Note, as the case may be, shall have the meanings ascribed to them in the UCC.

   (a) "Borrower" shall mean the Person listed below, including any Affiliates of such Person, whether now in existence or hereinafter established or acquired:

   > Michael Vernon Garrison, d/b/a Rock Hill Used Cars
   > 519 Interstate Highway 30 E , Sulphur Springs, TX 754826153
   > Telephone: (903) 951-8597 Facsimile:

   (b) "Liabilities" shall mean any and all Advances, debts, financial obligations, fees, charges, expenses, attorneys' fees, and costs of collection owing, arising, due, or payable from Borrower to Lender or any of its Affiliates, of any kind or nature, present or future, under any instrument, guaranty, or other document, whether arising under the Note or any other Loan Document, whether directly or indirectly, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, and however acquired.

2. GUARANTY AND OTHER AGREEMENTS.

   (a) Guaranty Obligations. Guarantor hereby voluntarily, unconditionally, and absolutely guarantees (i) the full and prompt payment when due, whether by acceleration or otherwise, and at all times hereafter, of all Liabilities; and (ii) the full and prompt performance of all the terms, covenants, conditions, and agreements related to the Liabilities. Guarantor further agrees to pay all expenses, including attorneys' fees and court costs (including, in each case, those relating to bankruptcy and appeals), paid or incurred by Lender or its Affiliates in endeavoring to collect on any Liabilities, in enforcing this Guaranty or in defending any claims by Borrower or any Guarantor related to any of the Liabilities, plus interest on such amounts at the lesser of (A) thirteen percent (13%) per annum, compounded daily, or (B) the maximum rate permitted by Law. Interest on such amounts paid or incurred by Lender shall be computed from the date of payment made by Lender and shall be payable on demand.

   (b) General Nature of Guaranty. Guarantor acknowledges that this Guaranty is a guaranty of payment and not of collection, and that his or her obligations hereunder shall be absolute, unconditional, and unaffected by: (i) the waiver of the performance or observance by Borrower or any Guarantor of any agreement, covenant, term, or condition to be performed or observed by Borrower or any such Guarantor, as the case may be, (ii) the extension of time for the payment of any sums owing or payable with respect to any of the Liabilities or the time for performance of any other obligation arising out of or relating to any of the Liabilities, (iii) the modification, alteration, or amendment of any obligation arising out of or relating to any of the Liabilities; (iv) any failure, delay, or omission by Lender to enforce, assert, or exercise any right, power, or remedy in connection with any of the Liabilities; (v) the genuineness, validity, or enforceability of any of the Liabilities or any document related thereto; (vi) the existence, value, or condition of, or failure of Lender to perfect its lien against, any security pledged in connection with the Liabilities; (vii) the release of any security pledged in connection with the Liabilities, or the release, modification, waiver, or failure to enforce any other guaranty, pledge, or security agreement; (viii) the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the property, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition, or readjustment or other similar application or proceeding affecting Borrower or any assets of Borrower; (ix) the release or discharge of Borrower or any other Guarantor from the performance or observance of any agreements, covenants, terms, or conditions in connection with any of the Liabilities, by operation of Law or otherwise; (x) the default of Borrower in any obligations to Guarantor or any torts committed by Borrower against Guarantor, even if Lender is alleged to be complicit or to have committed a direct tort against Guarantor; or (xi) any change in Borrower's ownership, entity type, legal structure, or state of organization or formation, or in Guarantor's relationship to Borrower or any other Guarantor.

   (c) Continuing and Unlimited Nature of Guaranty. The obligations of Guarantor under this Guaranty shall be continuing and shall cover any and all Liabilities existing as of the effective date of this Guaranty and any and all Liabilities thereafter incurred by Borrwer, including any and all Liabilities existing at the time of any termination of this Guaranty. This Guaranty shall be unlimited in amount and shall continue in effect until this Guaranty is terminated pursuant to Section 3.

   (d) Waivers by Guarantor. Guarantor hereby expressly waives: (i) notice of the acceptance by Lender of this Guaranty; (ii) notice of the existence, creation, or non-payment of all or any of the Liabilities; (iii) presentment, demand, notice of dishonor, protest, and all other notices whatsoever; (iv) diligence in collection or protection of, or realization upon any of the Liabilities, any obligation under this Guaranty, or any security for or guaranty of any of the foregoing; (v) impairment of any collateral securing the Liabilities; (vi) notice of any change in Borrower's credit terms or limits with Lender, including any temporary or permanent increases in Borrower's Credit Line (and Guarantor prospectively consents to any such change); (vii) any non-contractual duties of Lender to Borrower or any Guarantor; and (viii) the protections of any Laws intended to protect consumers or regulate consumer loans, as the Liabilities are commercial in nature.

Page 1 of 5

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

EXHIBIT C

(e) <u>Authorization</u>. Guarantor authorizes Lender to obtain and share credit information relating to Guarantor from and with credit bureaus, financial institutions, trade creditors, affiliates, and others and to conduct such other credit investigations that Lender in its sole discretion deems necessary. Guarantor expressly authorizes Lender to obtain his or her consumer credit report from time to time at Lender's discretion, and expressly ratifies any such consumer credit report that may have been obtained by or on behalf of Lender prior to the effective date of this Guaranty. Guarantor also authorizes Lender to contact any third parties to disclose information for the purpose of, among other things, obtaining intercreditor agreements and perfecting Lender's security interest. Further, Guarantor authorizes Lender to periodically obtain additional credit information on Guarantor through any available medium.

(f) <u>Communication</u>. Guarantor hereby expressly authorizes Lender and its Affiliates to communicate with Guarantor via facsimile transmissions, email messages, telephonic transmissions, both to a residential telephone line and/or cell phone, including text messaging, using an automatic telephone dialing system or an artificial or prerecorded voice message, and/or any other forms of communication, for any purpose, including general business matters, account information, marketing materials, collection, and/or any other communication needs. Guarantor acknowledges and agrees that such express permission shall extend to any and all of the contact information that Guarantor has provided herein, including any physical and email addresses, phone numbers, fax numbers, etc., and to such other addresses, phone numbers, email addresses, online chat, social media platforms, etc. that Guarantor may provide to Lender or that Lender may obtain from any third party at a later date.

(g) <u>Enforcement</u>. In no event shall Lender have any obligation to proceed against Borrower, any other Guarantor or any other Person, or any security pledged in connection with the Liabilities, before seeking satisfaction from Guarantor. Lender may, at its option, proceed, prior or subsequent to, or simultaneously with, the enforcement of its rights hereunder, to exercise any right or remedy it may have against Borrower, any other Guarantor or other Person, or any security pledged in connection with the Liabilities. This Guaranty is in addition to, and not in substitution for, any other guaranty or other securities which Lender may now or hereafter hold.

(h) <u>Reinstatement</u>. Guarantor agrees that, if, at any time, all or any part of any payment theretofore applied by Lender to any of the Liabilities is or must be rescinded or returned by Lender for any reason whatsoever (including as a result of any insolvency, bankruptcy, or reorganization of Borrower or any of his or her Affiliates), such Liabilities shall, for purposes of this Guaranty, to the extent that such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender, and this Guaranty shall continue to be effective or reinstated, as applicable, as to all such Liabilities, all as though such application by Lender had not been made.

(i) <u>Financial Statements</u>. Upon Lender's request, Guarantor will provide Lender with Guarantor's audited financial statements, as certified by Guarantor's independent certified public accountant, and such other financial statements, information, and other materials as Lender may request from time to time.

(j) <u>Application of Payments; Subrogation</u>. Any amounts received by Lender from any source on account of the Liabilities may be applied by it toward the payment of such of the Liabilities, and in such order of application, as Lender may from time to time elect. Notwithstanding any payments made by or for the account of Guarantor, Guarantor shall not be subrogated to any rights of Lender.

3. TERMINATION.

(a) <u>Payment of Liabilities and Termination of Credit Line</u>. This Guaranty shall be terminated upon the occurrence of all of the following: (i) the payment by Borrower or any Guarantor, either jointly or severally, of all Liabilities outstanding; (ii) the payment of all obligations by Guarantor which may be due to Lender under this Guaranty; and (iii) the filing of a UCC termination statement as to Borrower by or on behalf of Lender, or other written verification from Lender that Borrower's Credit Line is terminated.

(b) <u>Revocation of Guaranty</u>. This Guaranty may be revoked by Guarantor upon written notice to Lender by certified mail, return receipt requested, to the address provided in Section 5(d). This Guaranty shall be deemed terminated upon the occurrence of a revocation in the manner provided in this Section 3(b). However, such revocation and termination shall in no way terminate or otherwise affect: (i) any obligations of Guarantor existing on or prior to the effective date of such revocation or termination; or (ii) any obligations of Guarantor arising after the effective date of such revocation or termination with respect to any Liabilities incurred by Borrower on or before the effective date of such revocation or termination.

4. EVENTS OF DEFAULT. The occurrence of any of the following events shall be considered an event of default under this Guaranty (each, an "<u>Event of Default</u>"):

(a) Guarantor fails to make full payment of any amount owed hereunder after notice from Lender;

(b) Guarantor fails to perform or observe any agreement, covenant, term, or condition contained in this Guaranty (other than any monetary obligation described in clause (a) above), and such failure continues for ten (10) days after notice from Lender;

(c) Guarantor makes an assignment for the benefit of creditors or fails to pay his or her debts as the same become due and payable;

(d) Guarantor petitions or applies to any tribunal for the appointment of a trustee or receiver of the business, estate, or assets or of any substantial portion of his or her business, estate, or assets, or commences any proceedings relating to Guarantor under any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution, or liquidation Law of any jurisdiction, whether now or hereafter in effect (each, a "<u>Bankruptcy Filing</u>");

Page 2 of 5

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

(e) any Bankruptcy Filing is filed or any related proceedings commenced against Guarantor, and Guarantor by any act indicates his or her approval thereof, consent thereto, or acquiescence therein, or any order is entered appointing any trustee or receiver, declaring Guarantor bankrupt or insolvent, or approving or accepting the Bankruptcy Filing in any such proceedings;

(f) any suit or proceeding is filed or any related proceedings commenced against Guarantor or any of his or her Affiliates, which, if adversely determined, could substantially impair the ability of Guarantor or Borrower to perform any of their respective obligations with respect to this Guaranty or any of the Liabilities, in each case as determined by Lender in its sole and absolute discretion; or

(g) there is any Event of Default by Guarantor under the Note.

If an Event of Default under this Guaranty shall have occurred, in addition to pursuing any remedies which may be available to Lender with respect to the Liabilities, Lender, at its option, may take whatever action at law or in equity Lender may deem necessary, regardless of whether Lender shall have exercised any of its rights or remedies with respect to any of the Liabilities, and Lender may demand, at its option, that Guarantor pay forthwith the full amount which would be due and payable hereunder as if all Liabilities were then due and payable.

5.   GENERAL.

(a) <u>Assignment; Successors and Assigns</u>. This Guaranty may be assigned by Lender without notice to Guarantor, but Guarantor may not assign this Guaranty without the prior written consent of Lender. The guaranty and the other agreements contained herein shall bind the legal representatives, heirs, successors, and assigns of Guarantor, and shall inure to the benefit of Lender and its successors and assigns. Each reference to Guarantor herein shall be deemed to include the legal representatives, heirs, and agents of Guarantor, and their respective successors and assigns.

(b) <u>Amendment; Merger</u>. This Guaranty is intended by the Parties to be an amendment to and restatement of any prior Individual Guaranty or other similar document or instrument between Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.) and Guarantor, or otherwise executed by Guarantor for the benefit Lender (or any predecessor of Lender, including Dealer Services Corporation and/or Manheim Automotive Financial Services, Inc.). This Guaranty may be modified or amended only upon the written consent of Lender and Guarantor. The Parties acknowledge that Guarantor may have also acknowledged and cosented to the terms and conditions set forth in the Note, and, in such event, this Guaranty shall be deemed supplemental and in addition to the terms and conditions of the Note to which Guarantor has acknowledged and consented. In the event of any conflict between a term or provision set forth in this Guaranty, and a term or provision set forth in the Note, the term or provision set forth in this Guaranty shall, as between Lender and Guarantor, be deemed controlling.

(c) <u>Execution</u>. Guarantor may execute this Guaranty only by original signature of Guarantor, unless otherwise authorized by Lender. Lender may, in its sole discretion, permit Guarantor to execute this Guaranty by affixing to this Guaranty an electronic or digital signature. Guarantor acknowledges and agrees that any electronic or digital signature of Guarantor shall for all purposes be deemed effective and constitute the valid signature of Guarantor, and shall be deemed to satisfy all requirements imposed on electronic or digital signatures under the UCC, the Electronic Signatures in Global and National Commerce Act (the "<u>E-Sign Act</u>"), and any other similar Laws relating to the validity or enforceability of electronic or digital signatures, and such electronic or digital signature shall not be denied legal effect, validity, or enforceability solely because it is in electronic or digital form. A facsimile or photocopied reproduction of the signatures on this Guaranty shall be deemed original signatures for all intents and purposes.

(d) <u>Notices</u>. All notices, demands and requests required or permitted to be given under this Guaranty shall be (i) in writing, (ii) sent by facsimile with receipt confirmed by telephone (but only if a facsimile number is provided below), delivered by personal delivery or sent by commercial delivery service or certified mail, return receipt requested (except with respect to notices pursuant to Section 3(b), which notices may only be given by certified mail, return receipt requested), (iii) deemed to have been given on the date sent by facsimile with receipt confirmed by telephone, the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (iv) addressed as follows (or, in the case of Lender, to any other subsequent address that Lender may provide to Guarantor (through written notice or otherwise) for purposes of directing future notices, demands or requests):

> If to Lender:      NextGear Capital, Inc., 1320 City Center Drive, Suite 100, Carmel, IN 46032
> Telephone: (317) 571-3721 Facsimile: (317) 571-3737
>
> with a copy to:
>
> NextGear Capital, Inc., 1320 City Center Drive, Suite 100, Carmel, IN 46032
> Telephone: (317) 571-3721 Facsimile: (317) 571-3737
> Attention: Legal Department
>
> If to Guarantor:   Michael Vernon Garrison
> 549 Interstate Highway 30 ESulphur Springs, TX 754826153
> Telephone: (903) 951-8597 Mobile: (903) 951-8597

(e) <u>No Waiver</u>. No failure or delay by Lender in exercising any right, power, or privilege or the granting of an exception by Lender with respect

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

to any term or condition of this Guaranty will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege by Lender.

(f) <u>Severability</u>. Any provision of this Guaranty that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Guaranty or affecting the validity or enforceability of any provision of this Guaranty in any other jurisdiction.

(g) <u>Governing Law</u>. Except with respect to the interpretation or enforcement of the arbitration and other provisions set forth in Section 5(i) (which shall be governed by the Federal Arbitration Act), the validity, enforceability, and interpretation of this Guaranty shall be governed by the internal Laws of the State of Indiana, without regard to conflicts of Laws provisions thereof.

(h) <u>Jurisdiction and Venue</u>. As evidenced by Guarantor's signature below, Guarantor submits to the personal jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, and agrees that any and all claims or disputes pertaining to this Guaranty, or to any matter arising out of or related to this Guaranty, initiated by Guarantor against Lender, shall be brought in the state or federal courts of Marion County or Hamilton County, Indiana. Further, Guarantor expressly consents to the jurisdiction and venue of the state and federal courts of Marion County and Hamilton County, Indiana, as to any legal or equitable action that may be brought in such court by Lender, and waives any objection based upon lack of personal jurisdiction, improper venue or forum non conveniens with respect to any such action. Guarantor acknowledges and agrees that Lender reserves the right to initiate and prosecute any action against Guarantor in any court of competent jurisdiction, and Guarantor consents to such forum as Lender may elect.

(i) <u>Dispute Resolution; Waiver of Class Action Rights</u>.

(i) In the unlikely event that Lender is unable to resolve a dispute or claim that Guarantor may have, Guarantor agrees to arbitrate any such dispute or claim. This agreement to arbitrate is intended to be broadly interpreted, and includes (i) all disputes, claims and counterclaims arising out of or relating to this Guaranty or any aspect of Guarantor's relationship with Lender, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory, (ii) all disputes, claims and counterclaims that may have arisen before this Guaranty or any prior contract or agreement between Guarantor and Lender, and (iii) any disputes, claims and counterclaims that may arise after the termination of this Guaranty. Additionally, Guarantor acknowledges that Lender may (but shall in no event be required to) arbitrate any dispute or claim that it may have against Guarantor, with any such arbitration being governed by the provisions of this Section 5(i). Guarantor, at his or her election, may opt-out of the arbitration provisions set forth in Sections 5(i)(i), 5(i)(iii) and 5(i)(iv) by providing written notice of his or her election to opt-out no later than thirty (30) days after Guarantor's execution of this Guaranty, which notice shall be provided to Lender pursuant to Section 5(d) ("Opt-Out Notice"), provided that such Opt-Out Notice shall become effective only upon Guarantor's receipt of written confirmation from Lender that such Opt-Out Notice has been received by Lender within the required time period. Guarantor acknowledges and agrees that, irrespective of any Opt-Out Notice or any written confirmation thereof, Guarantor shall in all events be subject to the provisions of Section 5(i)(ii).

(ii) ANY ARBITRATION PROCEEDING UNDER THIS GUARANTY WILL TAKE PLACE ON AN INDIVIDUAL BASIS. CLASS ARBITRATIONS AND CLASS ACTIONS OF ANY KIND (WHETHER PURSUED THROUGH ARBITRATION OR THROUGH THE COURTS) ARE NOT PERMITTED. GUARANTOR AGREES THAT IT MAY BRING CLAIMS AGAINST LENDER ONLY IN HIS OR HER INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. GUARANTOR AGREES THAT, BY ENTERING INTO THIS GUARANTY, GUARANTOR IS WAIVING HIS OR HER RIGHT TO PARTICIPATE IN ANY CLASS ACTION OR OTHER SIMILAR REPRESENTATIVE PROCEEDING. UNLESS CONSENTED TO IN WRITING BY LENDER, THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING. GUARANTOR ACKNOWLEDGES AND AGREES THAT THE SIZE OF BORROWER'S CREDIT LINE, THE INTEREST RATE TO WHICH ADVANCES ARE SUBJECT AND CERTAIN FEES CHARGED TO BORROWER, AS WELL AS THE SIZE AND DATES OF SPECIFIC ADVANCES AND WHAT (IF ANY) GUARANTIES ARE REQUIRED, ARE UNIQUE TO AND NEGOTIATED BY BORROWER (AND, IF APPLICABLE, GUARANTOR), AND THAT SUCH FACTORS WILL AND DO VARY AMONG BORROWERS AND OTHER GUARANTORS.

(iii) Any dispute or claim subject to arbitration pursuant to this Section 5(i) shall be submitted to binding arbitration administered by the Judicial Arbitration and Mediation Service ("JAMS") pursuant to its Comprehensive Arbitration Rules and Procedures as then in effect (the "JAMS Comprehensive Rules"); provided, however, that any dispute or claim that is subject to arbitration pursuant to this Section 5(i) and that involves disputes or claims where the aggregate amount reasonably in dispute or controversy is less than $100,000, shall be submitted to binding arbitration administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures as in effect as of the effective date of this Guaranty (the "JAMS Streamlined Rules"). The disputes and claims subject to arbitration pursuant to this Section 5(i) will be resolved by a single arbitrator selected pursuant to the JAMS Comprehensive Rules or the JAMS Streamlined Rules, as the case may be. The arbitrator shall be bound by and shall strictly enforce the terms of this Guaranty and may not limit, expand or otherwise modify any term or provision of this Guaranty or any other contract or document between Guarantor and Lender. The arbitrator shall not have the power to award to Guarantor any damages that are excluded or that have been waived by Guarantor under this Guaranty, and Guarantor irrevocably waives any claim that it may have thereto. The arbitrator shall not have the power to order pre-hearing discovery of documents or the taking of depositions. The arbitrator shall render a written decision within six (6) months after being selected. Any arbitration will be held in Indianapolis, Indiana (or its greater metro area). Each Party will bear its own expenses in the arbitration and will share equally the costs of the arbitration; provided, however, that the arbitrator may, in his or

Page 4 of 5

NextGear Individual Guaranty (v. 1.0)

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.

her discretion, award costs and fees to the prevailing Party. The result of any arbitration shall be final and binding upon the Parties. Judgment upon any arbitration award may be entered in any court having jurisdiction over the award or over the applicable party or its assets.

(iv) This Guaranty evidences transactions in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this Section 5(i), notwithstanding the provisions of Section 5(g).

(j) WAIVER OF JURY TRIAL. AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, LENDER AND GUARANTOR KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT EITHER PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS GUARANTY, OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS GUARANTY, OR ANY COURSE OF CONDUCT, STATEMENT, WHETHER ORAL OR WRITTEN, OR ACTIONS OF LENDER OR GUARANTOR. NEITHER LENDER NOR GUARANTOR SHALL SEEK TO CONSOLIDATE, BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT HAVE BEEN DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY LENDER OR GUARANTOR EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY BOTH LENDER AND GUARANTOR.

(k) LIMITATION OF LIABILITY. IN NO EVENT SHALL ANY LENDER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, PUNITIVE, INCIDENTAL, MULTIPLE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF PROFITS, LOSS OF BUSINESS OR OTHER ECONOMIC LOSS) ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, EVEN IF SUCH LENDER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. FURTHER, IN NO EVENT SHALL THE LENDER PARTIES, COLLECTIVELY, BE LIABLE FOR ANY DAMAGES UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENT THAT EXCEED, IN THE AGGREGATE, AN AMOUNT EQUAL TO THE SUM OF THE INTEREST AND FLOORPLAN FEES ACTUALLY PAID TO LENDER BY BORROWER UNDER THE NOTE DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM AT ISSUE (OR, IN THE CASE OF MULTIPLE EVENTS, THE FIRST SUCH EVENT GIVING RISE TO THE CLAIM AT ISSUE).

(l) Descriptive Headings; Interpretation. The descriptive headings herein are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Guaranty. As used in this Guaranty, the terms "include," "includes," and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

WHEREFORE, Guarantor has executed this Guaranty on the date set forth below.

GUARANTOR:

By: _____

Michael Vernon Garrison

Date: 5-6-15

STATE OF: TEXAS )
                )  SS:
COUNTY OF: HOPKINS )

Before me, a Notary Public in and for said County and State, personally appeared Michael Garrison who acknowledged the execution of the foregoing Individual Guaranty, and who, having been duly sworn, states that any representations contained therein are true.

Witness my hand and Notarial Seal this 6th day of MAY, 2015.

Notary Signature _____Linda Brown_____

Notary Name (Printed) ___Linda Brown___

My Commission Expires: July 27, 2016  County of Residence: HOPKINS

LINDA SUE BROWN
MY COMMISSION EXPIRES
July 27, 2016

Page 5 of 5

NextGear Individual Guaranty (v. 1.0)

TRIAL MODE - a valid license will remove this message. See the keywords property of this PDF for more information.



**Receivable Detail**

**Requested by** : MAN\GENE.WHEELER **Requested on** : 2020-05-01 01:28:05 PM



EXHIBIT D

**Regions** : None Selected  **Markets** : None Selected
**Delinquency Flag** : All  **Dealer Type** : None Selected
**Business** : 92421  **Dealer Finance Program** : None Selected
**Exclude Default Dealers** : No  **Exclude Account Level Charges:** No
**Include Comments** : No **Summary Type** : None

| Customer Profile | |
|---|---|
| Name: | Rock Hill Used Cars |
| Dealer #: | 92421 |
| Address Line 1: | 519 Interstate Highway 30 E |
| Address Line 2: | |
| City, State, ZIP: | Sulphur Springs, TX 754826153 |
| Phone: | (903) 951-8597 |
| Fax: | (n/a) - |

| Market Info & Account Profile | |
|---|---|
| Market: | Plano |
| Market Phone: | (214) 282-5039 |
| Finance Program: | Core |
| Dealer Status: | DL |
| Lot Audit: | Incomplete |
| Unapplied Funds: | $.00 |
| Reserved Funds: | $.00 |

| Fee Type | Description | Amount Due | Date Incurred |
|---|---|---|---|
| NSF | | $25.00 | 2020/04/02 |
| **Total Account Charges for Rock Hill Used Cars (92421)** | | **$25.00** | |

| LOC Type | Approved Credit | Temp. Credit | Temp. Expiration | Total Credit | Outstanding Principal | Pending | Credit Available | Term Plan |
|---|---|---|---|---|---|---|---|---|
| Wholesale | $800,000.00 | $.00 | | $800,000.00 | $818,653.39 | $0.00 | $.00 | D60/30/30 -- F75/40/40 -- R4.0 -- C%10/5 |
| Heavy Trucks | $100,000.00 | $.00 | | $100,000.00 | $329,402.50 | $0.00 | $.00 | D60/60/30 -- F150/0/75 -- R0.25 -- C%10/10 |
| **Total Lines of Credit for Rock Hill Used Cars (92421)** | | | | | | | | |
| | **$900,000.00** | **$.00** | | **$900,000.00** | **$1,148,055.89** | **$.00** | **$.00** | |

## Heavy Trucks Inventory for Rock Hill Used Cars (92421)

| Floor Date | Days | Last Paid | VS | Vehicle Description | Col or | VIN | Stk # | TS | Due | Disb | Source | Original Amount | Principal Balance | One Day Balance | Fee | Interest | Collateral Protection | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/27/19 | 156 | 01/27/20 | RHD | 1995 GDAN 1GR | Whi | 1GRAA9 22XSB0 29801 | 317 | FR | 04/27/20 | S | LAWTON CACHE AUTO AUCTION | $16,280.00 | $14,652.00 | $.00 | $75.00 | $266.32 | $270.65 | $85.00 | $15,348.97 |
| 12/02/19 | 150 | 01/31/20 | RHD | 2001 HDAB 53' | Bla | 1H9CE5 3311A26 3507 | 314 | FR | 04/30/20 | S | LAWTON CACHE AUTO AUCTION | $27,480.00 | $24,732.00 | $.00 | $75.00 | $430.35 | $437.62 | $170.00 | $25,844.97 |
| 12/11/19 | 142 | 02/10/20 | RHD | 2014 Ford F350 | Whi | 1FT8W3 DT0EEB 34184 | 319 | ST | 05/11/20 | S | Lone Star Auto Auction | $30,450.00 | $27,405.00 | $.00 | $75.00 | $421.07 | $431.63 | $135.00 | $28,467.70 |
| 12/30/19 | 123 | 02/28/20 | RHD | 2007 VOLV VN | Whi | 4V4NC9 GH87N4 69707 | 325 | ST | 05/28/20 | S | LAWTON CACHE AUTO AUCTION | $28,990.00 | $26,091.00 | $.00 | $75.00 | $307.27 | $319.61 | $.00 | $26,792.88 |
| 01/08/20 | 114 | 03/09/20 | RHD | 2004 GMC C750 | Whi | 1GDM7 C1384F 512353 | 330 | FR | 05/08/20 | S | Lubbock Auto Auction | $34,325.00 | $30,892.50 | $.00 | $75.00 | $303.09 | $318.36 | $.00 | $31,513.95 |
| 01/22/20 | 100 | | RHD | 2007 inte 7000 | Bla | 1HTWB AAR67J 461931 | 340 | ST | 05/22/20 | S | LAWTON CACHE AUTO AUCTION | $35,070.00 | $35,070.00 | $.00 | $150.00 | $673.91 | $613.73 | $238.00 | $36,745.64 |
| 01/24/20 | 98 | | RHD | 1992 GMC DUMP | Whi | 1GDG6 H1J6NJ 501295 | 337 | ST | 05/26/20 | S | Route 66 Auto Auction of El Reno, LLC | $19,100.00 | $19,100.00 | $.00 | $150.00 | $360.04 | $327.57 | $68.00 | $20,005.61 |
| 01/24/20 | 98 | | RHD | 2000 INTE DUMP | Whi | 1HTSDA AN2YH3 14391 | 336 | ST | 05/26/20 | S | Route 66 Auto Auction of El Reno, LLC | $26,100.00 | $26,100.00 | $.00 | $150.00 | $490.83 | $447.62 | $68.00 | $27,256.45 |
| 01/29/20 | 93 | | RHD | 2001 ORBI TRAI | Unk | 109US4 0212P12 8652 | 342 | FR | 05/29/20 | S | Lone Star Auto Auction | $15,125.00 | $15,125.00 | $.00 | $150.00 | $271.41 | $246.16 | $103.00 | $15,895.57 |
| 02/12/20 | 79 | | RHD | 2016 Ram 3500 | Whi | 3C7WR TCL9GG 178005 | 350 | ST | 06/12/20 | S | LAWTON CACHE AUTO AUCTION | $26,470.00 | $26,470.00 | $.00 | $150.00 | $397.66 | $365.95 | $68.00 | $27,451.61 |
| 02/19/20 | 72 | | RHD | 2005 FORD F750 | Whi | 3FRXF7 5S95V1 56426 | 351 | ST | 06/19/20 | S | LAWTON CACHE AUTO AUCTION | $29,990.00 | $29,990.00 | $.00 | $150.00 | $408.61 | $377.87 | $68.00 | $30,994.48 |
| 03/06/20 | 56 | | RHD | 1989 FORD WEST | Whi | 1FDXK6 4A3KVA 37099 | 358 | ST | 05/05/20 | S | Route 66 Auto Auction of El Reno, LLC | $25,100.00 | $25,100.00 | $.00 | $150.00 | $262.82 | $245.98 | $68.00 | $25,826.80 |
| 03/18/20 | 44 | | CUV | 2008 FORD F-55 | Unk | 1FDAX5 7R18ED 86326 | 361 | FR | 05/18/20 | S | Lone Star Auto Auction | $28,675.00 | $28,675.00 | $.00 | $150.00 | $232.06 | $220.80 | $18.00 | $29,295.86 |
| **Total Heavy Trucks** **Unit Count: 13** | | | | | | | | | | | | **$343,155.00** | **$329,402.50** | **$.00** | **$1,500.00** | **$4,825.44** | **$4,623.55** | **$1,089.00** | **$341,440.49** |

**Receivable Detail**

Requested by : MAN\GENE.WHEELER **Requested on :** 2020-05-01 01:28:05 PM

## Wholesale Inventory for Rock Hill Used Cars (92421)

| Floor Date | Days | Last Paid | VS | Vehicle Description | Col or | VIN | Stk # | TS | Due | Disb | Source | Original Amount | Principal Balance | One Day Balance | Fee | Interest | Collateral Protection | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/15/19 | 260 | 02/13/20 | RHD | 2004 Chev Aval | Blu | 3gnec12t04g171303 | 264 | ST | 03/30/20 | S | LAWTON CACHE AUTO AUCTION | $11,230.00 | $8,221.42 | $.00 | $85.00 | $200.34 | $153.29 | $50.00 | $8,710.05 |
| 10/09/19 | 205 | 02/24/20 | RHD | 2013 Lexu ES 3 | Whi | jthbk1gg6d2020256 | 274 | ST | 05/26/20 | S | LAWTON CACHE AUTO AUCTION | $15,280.00 | $12,093.40 | $.00 | $170.00 | $253.40 | $179.16 | $225.00 | $12,920.96 |
| 10/16/19 | 198 | 03/16/20 | RHD | 2004 GMC C5C | Whi | 1GDJ5C1114F500844 | 285 | FR | 05/15/20 | S | LAWTON CACHE AUTO AUCTION | $34,470.00 | $26,598.35 | $.00 | $355.76 | $277.49 | $175.00 | | $27,486.60 |
| 10/16/19 | 198 | 03/16/20 | RHD | 1999 Dodg Ram | Whi | 1B7KF2368XJ512080 | 284 | ST | 05/15/20 | S | LAWTON CACHE AUTO AUCTION | $9,702.00 | $7,486.43 | $.00 | $80.00 | $102.01 | $78.10 | $225.00 | $7,971.54 |
| 10/16/19 | 198 | 03/16/20 | RHD | 2009 Ford F250 | Whi | 1FTSX20R19EA01706 | 286 | ST | 05/15/20 | S | LAWTON CACHE AUTO AUCTION | $16,280.00 | $12,562.26 | $.00 | $169.41 | $131.05 | $225.00 | | $13,167.72 |
| 10/16/19 | 198 | 03/16/20 | RHD | 2008 FORD SUPE | Whi | 1FDAF57R48EB34427 | 276 | FR | 05/15/20 | S | LAWTON CACHE AUTO AUCTION | $28,990.00 | $22,369.77 | $.00 | $299.61 | $233.37 | $175.00 | | $23,157.75 |
| 10/29/19 | 184 | 02/28/20 | RHD | 2013 Ford F150 | Whi | 1FTFW1ET7DFB02285 | 296 | ST | 04/29/20 | S | Route 66 Auto Auction of El Reno, LLC | $17,500.00 | $14,214.38 | $.00 | $80.00 | $264.50 | $192.93 | $175.00 | $14,926.81 |
| 10/30/19 | 184 | 02/28/20 | RHD | 2011 Chev Taho | Sil | 1GNSCDFJ5BR260679 | 302 | ST | 04/29/20 | S | LAWTON CACHE AUTO AUCTION | $25,940.00 | $21,069.77 | $.00 | $390.85 | $285.99 | $175.00 | | $22,001.61 |
| 11/06/19 | 177 | 03/06/20 | RHD | 2007 inte semi | Whi | 2HSCNSCR97C389008 | 305 | ST | 05/06/20 | S | LAWTON CACHE AUTO AUCTION | $27,480.00 | $22,320.63 | $.00 | $366.32 | $269.30 | $175.00 | | $23,211.25 |
| 11/13/19 | 170 | 03/12/20 | RHD | 2007 Dodg Ram | Whi | 3D6WH46A27G712729 | 309 | ST | 05/13/20 | S | LAWTON CACHE AUTO AUCTION | $28,990.00 | $23,547.13 | $.00 | $80.00 | $343.33 | $253.66 | $175.00 | $24,399.12 |
| 11/20/19 | 163 | 02/20/20 | RHD | 2004 Mits FE6 | Whi | JL6AAE1H44K000734 | 311 | ST | 05/22/20 | S | LAWTON CACHE AUTO AUCTION | $29,490.00 | $25,213.95 | $.00 | $120.00 | $530.28 | $366.41 | $260.00 | $26,490.64 |
| 11/20/19 | 163 | 02/20/20 | RHD | 2004 Ford F350 | Whi | 1ftsw31p04ea21086 | 312 | ST | 05/22/20 | S | LAWTON CACHE AUTO AUCTION | $16,780.00 | $14,346.90 | $.00 | $120.00 | $302.15 | $208.49 | $175.00 | $15,152.54 |
| 11/27/19 | 156 | 02/25/20 | RHD | 2007 dodg ram | Whi | 3D6WG36A67G817092 | 316 | ST | 04/27/20 | S | LAWTON CACHE AUTO AUCTION | $26,470.00 | $25,146.50 | $.00 | $60.00 | $299.86 | $305.73 | $50.00 | $25,862.09 |
| 12/04/19 | 149 | 03/03/20 | RHD | 2007 Dodg Ram | Bla | 3d7mx48cx7g723854 | 318 | ST | 05/04/20 | S | LAWTON CACHE AUTO AUCTION | $19,320.00 | $18,354.00 | $.00 | $60.00 | $194.58 | $199.48 | $50.00 | $18,858.06 |
| 12/18/19 | 135 | 03/17/20 | RHD | 2014 Ford F350 | Whi | 1fd8w3gt5eea25582 | 322 | ST | 05/18/20 | S | LAWTON CACHE AUTO AUCTION | $26,970.00 | $25,621.50 | $.00 | $60.00 | $203.42 | $212.39 | $50.00 | $26,147.31 |
| 12/18/19 | 135 | 03/17/20 | RHD | 2014 Ford F350 | Whi | 1fd8w3gt7eea25583 | 324 | ST | 05/18/20 | S | LAWTON CACHE AUTO AUCTION | $29,000.00 | $27,550.00 | $.00 | $60.00 | $218.70 | $228.38 | $50.00 | $28,107.08 |
| 12/18/19 | 135 | 03/17/20 | RHD | 2015 Ford F350 | Whi | 1fd8w3dt0fea26911 | 321 | ST | 05/18/20 | S | LAWTON CACHE AUTO AUCTION | $23,500.00 | $22,325.00 | $.00 | $60.00 | $177.28 | $185.06 | $50.00 | $22,797.34 |
| 01/03/20 | 119 | | RHD | 2005 Chev Silv | Whi | 1gcjk332 45f935684 | 327 | ST | 05/04/20 | S | LAWTON CACHE AUTO AUCTION | $26,470.00 | $26,470.00 | $.00 | $80.00 | $584.21 | $551.24 | $68.00 | $27,753.45 |

## Wholesale Inventory for Rock Hill Used Cars (92421)

| Floor Date | Days | Last Paid | VS | Vehicle Description | Col or | VIN | Stk # | TS | Due | Disb | Source | Original Amount | Principal Balance | One Day Balance | Fee | Interest | Collateral Protection | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/03/20 | 119 | | RHD | 2002 Dodg Ram | Sil | 3b7kc23 c92m23 6518 | 326 | ST | 05/04/20 | S | LAWTON CACHE AUTO AUCTION | $15,170.00 | $15,170.00 | $.00 | $80.00 | $335.52 | $315.92 | $68.00 | $15,969.44 |
| 01/08/20 | 114 | | RHD | 2011 Ford F350 | Whi | 1FT7X3 B64BEB 25540 | 329 | ST | 05/07/20 | S | Lubbock Auto Auction | $17,725.00 | $17,725.00 | $.00 | $80.00 | $374.69 | $353.61 | $68.00 | $18,601.30 |
| 01/08/20 | 114 | | RHD | 2005 Dodg Ram | Red | 3D7KS2 8C05G7 51217 | 331 | ST | 05/07/20 | S | Lubbock Auto Auction | $16,725.00 | $16,725.00 | $.00 | $80.00 | $353.64 | $333.66 | $68.00 | $17,560.30 |
| 01/08/20 | 114 | 03/09/20 | RHD | 2011 Ram 2500 | Gra | 3D7TT2 CT2BG5 11932 | 333 | ST | 05/08/20 | S | LAWTON CACHE AUTO AUCTION | $22,940.00 | $20,646.00 | $.00 | $80.00 | $318.84 | $212.77 | $50.00 | $21,307.61 |
| 01/08/20 | 114 | 03/09/20 | RHD | 2006 Chev Silv | Blu | 1GCJK3 3D46F2 52242 | 332 | ST | 05/08/20 | S | LAWTON CACHE AUTO AUCTION | $21,940.00 | $19,746.00 | $.00 | $80.00 | $304.98 | $203.49 | $50.00 | $20,384.47 |
| 01/22/20 | 100 | | RHD | 2005 Dodg Ram | Whi | 3D7KR2 8C65G7 06682 | 341 | ST | 05/22/20 | S | LAWTON CACHE AUTO AUCTION | $14,270.00 | $14,270.00 | $.00 | $155.00 | $427.85 | $249.73 | $68.00 | $15,170.58 |
| 01/22/20 | 100 | | RHD | 2015 Ford F250 | Whi | 1ft7w2bt xfec1091 1 | 335 | ST | 05/21/20 | S | LAWTON CACHE AUTO AUCTION | $26,970.00 | $26,970.00 | $.00 | $80.00 | $496.85 | $471.98 | $68.00 | $28,086.83 |
| 01/23/20 | 99 | | CUV | 2015 Ram 3500 | Gra | 3C63RR HLXFG6 42243 | 334 | FR | 05/22/20 | S | Lone Star Auto Auction | $27,125.00 | $27,125.00 | $.00 | $80.00 | $494.48 | $469.94 | $18.00 | $28,187.42 |
| 01/29/20 | 93 | | RHD | 2006 Niss Maxi | Mar | 1n4ba41 e46c810 994 | 348 | ST | 05/29/20 | S | LAWTON CACHE AUTO AUCTION | $7,180.00 | $7,180.00 | $.00 | $155.00 | $201.14 | $116.85 | $68.00 | $7,720.99 |
| 01/29/20 | 93 | | CUV | 2014 Ram 3500 | Bla | 3c63rrgl 7eg2357 72 | 346 | FR | 05/29/20 | S | LAWTON CACHE AUTO AUCTION | $36,070.00 | $36,070.00 | $.00 | $155.00 | $1,000.87 | $587.04 | $188.00 | $38,000.91 |
| 01/29/20 | 93 | | RHD | 1996 Ford Wind | Whi | 2fmda51 48tbb47 033 | 347 | ST | 05/29/20 | S | LAWTON CACHE AUTO AUCTION | $8,190.00 | $8,190.00 | $.00 | $155.00 | $229.01 | $133.29 | $68.00 | $8,775.30 |
| 01/29/20 | 93 | | RHD | 2011 GMC Sier | Unk | 1GT523 C81BZ2 65964 | 343 | ST | 05/29/20 | S | Lone Star Auto Auction | $27,125.00 | $27,125.00 | $.00 | $155.00 | $751.60 | $441.46 | $68.00 | $28,541.06 |
| 01/29/20 | 93 | | RHD | 1996 Ford F250 | Blu | 1fthf26h 2teb027 56 | 345 | FR | 05/29/20 | S | LAWTON CACHE AUTO AUCTION | $10,000.00 | $10,000.00 | $.00 | $155.00 | $278.92 | $162.75 | $18.00 | $10,614.67 |
| 01/29/20 | 93 | | RHD | 2009 Dodg Ram | Unk | 3D7KR2 8L39G5 35332 | 344 | ST | 05/29/20 | S | Lone Star Auto Auction | $20,625.00 | $20,625.00 | $.00 | $155.00 | $572.21 | $335.67 | $68.00 | $21,755.88 |
| 01/29/20 | 93 | | RHD | 2009 Ford F350 | Gra | 1ftww33r 09ea448 75 | 349 | ST | 05/29/20 | S | LAWTON CACHE AUTO AUCTION | $19,820.00 | $19,820.00 | $.00 | $155.00 | $549.99 | $322.57 | $68.00 | $20,915.56 |
| 02/26/20 | 65 | | RHD | 2006 Dodg Ram | Red | 3d7rnx4 8c06g22 3278 | 353 | FR | 05/27/20 | S | LAWTON CACHE AUTO AUCTION | $21,940.00 | $21,940.00 | $.00 | $115.00 | $419.64 | $249.57 | $18.00 | $22,742.21 |
| 02/26/20 | 65 | | RHD | 2002 Ford F250 | Whi | 1fnw21f 42ea899 84 | 354 | ST | 05/27/20 | S | LAWTON CACHE AUTO AUCTION | $23,940.00 | $23,940.00 | $.00 | $115.00 | $457.77 | $272.32 | $68.00 | $24,853.09 |
| 02/26/20 | 65 | | RHD | 2014 Ford Expe | Red | 1fmjk1j5 7eef151 45 | 352 | ST | 05/27/20 | S | LAWTON CACHE AUTO AUCTION | $23,440.00 | $23,440.00 | $.00 | $115.00 | $448.25 | $266.63 | $68.00 | $24,337.88 |

## Wholesale Inventory for Rock Hill Used Cars (92421)

| Floor Date | Days | Last Paid | VS | Vehicle Description | Col or | VIN | Stk # | TS | Due | Disb | Source | Original Amount | Principal Balance | One Day Balance | Fee | Interest | Collateral Protection | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03/04/20 | 58 | | RHD | 2012 Ford F350 | Unk | 1FD8W3 HT5CEC 10971 | 355 | ST | 05/04/20 | S | Lone Star Auto Auction | $24,125.00 | $24,125.00 | $.00 | $75.00 | $409.73 | $244.87 | $68.00 | $24,922.60 |
| 03/04/20 | 58 | | CUV | 2000 Ford Must | Unk | 1FAFP4 446YF23 9383 | 356 | FR | 05/04/20 | S | Lone Star Auto Auction | $10,265.00 | $10,265.00 | $.00 | $75.00 | $175.22 | $104.19 | $18.00 | $10,637.41 |
| 03/04/20 | 58 | | RHD | 1994 Ford F150 | Whi | 1FTEX1 5N9RKA 15724 | 357 | ST | 05/04/20 | S | LAWTON CACHE AUTO AUCTION | $8,990.00 | $8,990.00 | $.00 | $75.00 | $153.70 | $91.25 | $68.00 | $9,377.95 |
| 03/11/20 | 51 | | RHD | 2015 Ford Comm | Unk | 1FDXE4 FSXFDA 07194 | 360 | ST | 05/11/20 | S | LAWTON CACHE AUTO AUCTION | $25,440.00 | $25,440.00 | $.00 | $75.00 | $377.77 | $227.05 | $68.00 | $26,187.82 |
| 03/11/20 | 51 | | RHD | 2015 Ram 3500 | Unk | 3c63rrgl 4fg7025 52 | 359 | ST | 05/11/20 | S | LAWTON CACHE AUTO AUCTION | $23,940.00 | $23,940.00 | $.00 | $75.00 | $355.58 | $213.66 | $68.00 | $24,652.24 |
| 03/18/20 | 44 | | CUV | 2011 Niss Sent | Red | 3N1AB6 AP3BL6 46445 | 362 | FR | 05/18/20 | S | Lone Star Auto Auction | $13,675.00 | $13,675.00 | $.00 | $75.00 | $174.51 | $105.30 | $18.00 | $14,047.81 |

**Total Wholesale**
**Unit Count: 42**

| | | | | | | | | | | | | Original Amount | Principal Balance | One Day Balance | Fee | Interest | Collateral Protection | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | $881,492.00 | $818,653.39 | $.00 | $4,110.00 | $14,918.77 | $10,797.09 | $3,994.00 | $852,473.25 |

# SOT Vehicle Report



EXHIBIT E

**Business:** Rock Hill Used Cars (92421)

**Buyer Business Status:** Non Performing

**LOC Type:** All

**Run Date:** 5/1/2020 1:45 PM

**Flooring Status:** Both (Approved & Written Off)

**Unit Status:** CUV, SAU, SOT

**Requested By:** Gene Wheeler

| Stock # | Date Floored | Vehicle Description | VIN | Original Amount | Principal Balance | Written Off Principal | Vehicle Status |
|---------|-------------|--------------------|----|----------------|------------------|----------------------|----------------|
| 334 | 1/23/2020 | 2015 Ram 3500 | 3C63RRHLXFG642243 | $ 27,125.00 | $ 27,125.00 | $ 0.00 | CUV |
| 346 | 1/29/2020 | 2014 Ram 3500 | 3c63rrgl7eg235772 | $ 36,070.00 | $ 36,070.00 | $ 0.00 | CUV |
| 356 | 3/4/2020 | 2000 Ford Mustang | 1FAFP4446YF239383 | $ 10,265.00 | $ 10,265.00 | $ 0.00 | CUV |
| 361 | 3/18/2020 | 2008 FORD F-550 F SUPER DUTY | 1FDAX57R18ED86326 | $ 28,675.00 | $ 28,675.00 | $ 0.00 | CUV |
| 362 | 3/18/2020 | 2011 Nissan Sentra | 3N1AB6AP3BL646445 | $ 13,675.00 | $ 13,675.00 | $ 0.00 | CUV |
| **Total: 5 Records** | | | | **$ 115,810.00** | **$ 115,810.00** | **$ 0.00** | |

# EXHIBIT F

## UNIVERSAL FUNDING AGREEMENT

This Universal Funding Agreement (hereinafter referred to as the "Agreement") is made and entered into on this 27 day of _September_, 20 10, by and among DEALER SERVICES CORPORATION (hereinafter referred to as "DSC"), and **LAWTON CACHE AUTO AUCTION** (hereinafter referred to as "Auction").

WHEREAS, Auction conducts the sale of Vehicles through its facility located in Lawton, OK; and

WHEREAS, DSC desires to allow Dealers (as defined below), to use their DSC Credit (as defined below) for purposes of financing their Vehicle (as defined below) purchases from Auction.

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants set forth herein, and other good and valuable consideration, the undersigned hereby agree as follows:

1.  Definitions.  Unless defined in this section or the context otherwise requires, all terms used herein which are defined in the Uniform Commercial Code shall have the meanings therein stated.

    a.  "Advance" shall mean all loans or payments by DSC to Dealer or on Dealer's behalf to any third party.

    b.  "Bill of Sale" shall mean the valid block ticket or other document generated by Auction evidencing the purchase of a Vehicle at a regularly scheduled Auction sales event and disclosing (i) the name, address and phone number for the buying Dealer and the seller; (ii) the signature of the buying Dealer and seller; (iii) the make, model, year, color, mileage and the entire vehicle identification number for the subject Vehicle; (iv) the sale date for the Subject Vehicle; (v) the sale price for the subject Vehicle; and (vi) each Auction charge for which Auction has requested to be funded in the subject Vehicle's Auction Payment.

    c.  "Credit" shall mean that line of credit Dealer has been granted by DSC for purposes of financing its used Vehicle purchases.

    d.  "Dealer" shall mean an individual or entity which holds a used vehicle dealers license and has been granted Credit by DSC.

    e.  "DSC Number" shall mean the DSC assigned account number associated with a particular Dealer.

    f.  "Auction Payment" shall mean the aggregate of the sale price of a Vehicle purchased by Dealer at a scheduled Auction sale and the related buyer's fee and post-sale inspection fee due Auction for any such Vehicle purchased at Auction by Dealer with Credit.

    g.  "Inventory" shall mean all Dealer's Vehicles, Vehicle parts, other inventory and all additions, accessions, accessories, replacements, and proceeds thereof, now owned or hereafter acquired, held for sale or lease in the ordinary course of Dealer's business.

    h.  "Person" shall mean any individual sole proprietorship, partnership, corporation, limited liability company, joint venture, association or estate.

    i.  "Vehicle" shall mean any automobile, truck, boat, RV, powersports unit, or salvage Vehicle which Dealer purchases with Credit at Auction, and Auction requests DSC to remit the Auction Payment to Auction.

2.      Terms and Conditions.

    a.    DSC shall have the sole right and discretion as to the terms and conditions for Dealer's Credit and the ultimate authority in the decision to grant Credit to any Dealer.

    b.    Only DSC pre-approved and pre-registered Dealers and their representatives are authorized to purchase Vehicles with Credit.  Auction shall not allow unauthorized Persons to purchase Vehicles with Dealer's Credit.

    c.    DSC shall not be required to approve any Advance request or fund an Auction Payment for a Vehicle purchased by a Dealer with Credit for any Vehicle with a sale price equal to or greater than $50,000 without Auction and Dealer obtaining prior written approval via email or facsimile from DSC to approve and fund such Advance.

    d.    DSC may provide notice to Auction that a Dealer is in default of its DSC line of credit.  In the event DSC provides such notice of a default to Auction, Auction shall advise DSC whether the identified Dealer has any Inventory located at Auction's facility and whether the Auction is holding checks or drafts made payable to the Dealer for sold Inventory.  Auction shall tender such Inventory, checks or drafts to DSC upon DSC's request for turnover and agreement to indemnify and hold harmless Auction for Auction's compliance with DSC's request.

3.      Floorplanning and Funding Procedures.

    a.    DSC shall have assigned each Dealer a DSC Number prior to Dealer making any purchases at Auction with Credit.  Prior to any such purchases with Credit, the Dealer shall have authorized Auction to use Dealer's DSC Number to verify Dealer's available Credit.  Auction may verify Dealer's available Credit by accessing Dealer's information online at www.discoverdsc.com and may print a report containing such information.  DSC agrees to pay Auction Payment up to and including the available amount of Credit showing on Dealer's account report at the time Auction verified Dealer's available Credit and for a 24 hour period thereafter.  In the event Auction permits Dealer to purchase a Vehicle with Credit without Auction verifying Dealer's Credit availability prior to the purchase, DSC reserves the right to refuse funding the Advance.

    b.    Within 24 hours upon conclusion of the sale at which a Vehicle is purchased by Dealer with Credit, Auction shall go online to www.discoverdsc.com and enter, for each Subject Vehicle, (i) the Dealer's DSC Number; (ii) the Auction Payment; (iii) the entire identification number (VIN); (iv) the make, model, color and year;  (v) Auction's unique identity number for the Vehicle, (i.e., the last 6 numbers of the VIN, lot number or other); and (vi) the odometer reading.  DSC may but shall not be required to approve any Advance request by Dealer or fund an Auction Payment request by Auction for any Vehicle purchase made by Dealer where Auction fails to enter (i) the Dealer's DSC Number; (ii) the Auction Payment; (iii) the entire identification number (VIN); (iv) the make, model, color and year;  (v) Auction's unique identity number for the Vehicle, (i.e., the last 6 numbers of the VIN, lot number or other); and (vi) the odometer reading within 24 hours of the conclusion of the sale at which the purchase of the subject Vehicle was made.  Auction shall enter the certificate of title  number and State of issuance for each subject Vehicle at such time that Auction has acquired actual possession of the subject Vehicle's certificate of title.

    c.    Auction shall have previously provided DSC with Auction's bank account information including the name of the bank, account number and routing number.  Upon satisfaction of all conditions required for funding a specific Vehicle purchased by Dealer with Credit pursuant to paragraph 3(b) above DSC shall ACH the Auction Payment for the subject Vehicle to Auction's designated account and provide Auction with a detailed description of the ACH transaction by making such information available online at www.discoverdsc.com.  Within seven (7) days from the date DSC funds Auction Payment to Auction's designated bank account, Auction is responsible for delivering via overnight FedEx, UPS, DHL or next day certified mail the subject Vehicle's certificate of title and related Bill of Sale for the transaction to the Dealer's assigned DSC branch

(or as otherwise directed by DSC pursuant to the notice provisions of this Agreement). In the event the subject Vehicle's certificate of title and related Bill of Sale for the transaction are not received by DSC within seven (7) days from the date DSC funds Auction Payment to Auction, DSC reserves the right to require the immediate return of such Auction Payment by Auction.

d.   The Certificate of Title for any Vehicle shall not be delivered directly to the purchasing Dealer under any circumstance. In the event the certificate of title for any Vehicle purchased by a Dealer with Credit for which the Auction Payment has been remitted to Auction is delivered directly to a purchasing Dealer by Auction, Auction shall return the Auction Payment within twenty-four (24) hours from demand by DSC. In the event the certificate of title for any Vehicle purchased by Dealer with Credit is delivered directly to a purchasing Dealer by Auction, DSC shall not be required to approve the Advance and remit the Auction Payment, regardless of Dealer's Credit availability at the time of the Vehicle Purchase.

e.   In the event a Vehicle that has been funded by DSC to Auction pursuant to this Agreement and has been subsequently voided due to arbitration or otherwise by Auction, Auction shall immediately, but in any event within 24 hours from the time the transaction was voided, notify DSC of the voided transaction. Auction shall within seven (7) days from the date of notification to DSC of the hereunto referenced voided transaction, return to DSC the Auction Payment remitted by DSC to Auction relating to the specific voided transaction.

f.   In the event DSC deems it necessary to withdraw a Dealer's Credit during an Auction sale, DSC must immediately, by telephone, facsimile or e-mail, notify the appropriate Auction personnel of such action. Upon receipt of such notice, Auction shall use its best efforts to notify Dealer of such withdrawal of Credit and prevent Dealer from further purchases with Credit. In any event, after receipt of such notice from DSC, Auction shall not issue gate passes to Dealer for Vehicles purchased with Credit regardless of whether the vehicle was purchased before or after notice to the Auction that the Dealer's Credit has been withdrawn unless approved by DSC prior to issuance of such gate pass.

4.   <u>Confidentiality</u>.

a.   DSC acknowledges that it could gain access to confidential information about Auction, the disclosure of which could substantially harm the business of Auction. DSC agrees not to disclose to any third party any confidential information about Auction which it receives from Auction.

b.   Auction acknowledges that it could gain access to confidential information about DSC, the disclosure of which could substantially harm the business of DSC. Auction agrees not to disclose to any third party any confidential information about DSC which it receives from DSC.

5.   <u>Auction Representations and Warranties</u>. Auction represents and warrants to DSC that with respect to each purchase of a Vehicle by a Dealer with Credit through Auction for which Auction requests the Auction Payment be funded by DSC to Auction that:

a.   Such Vehicle actually exists;

b.   Such Vehicle was the subject of an "across the block" sale at one of Auction's regularly scheduled sales, and such sale was conducted by Auction in the ordinary course of Auction's business;

c.   Such Vehicle is available immediately for the purchasing Dealer's actual possession;

d.   The certificate of title for such Vehicle is valid and is under the control of Auction on the day of funding;

e.   The Bill of Sale for such Vehicle accurately reflects (i) the name, address and phone number for the buying Dealer and the seller; (ii) the signature of the buying Dealer and seller; (iii) the make, model, year, color, mileage and the entire vehicle identification number for the subject Vehicle;

(iv) the sale date for the Subject Vehicle; (v) the sale price for the subject Vehicle; and (vi) each Auction charge for which Auction has requested to be funded in the subject Auction Payment.

f.    The Dealer is not in the Auction Insurance Agency "KO" book at the time of Dealer's purchase of the Vehicle with Credit;

g.    The Dealer is not materially in default of the terms and conditions of any agreement between Auction and Dealer at the time of Dealer's purchase of the Vehicle with Credit; and

h.    Such vehicle is free of all Auction liens, security interests, and other encumbrances.

6.    <u>Termination</u>.

a.    This Agreement may be terminated by either party giving thirty (30) days prior written notice to the other party.

b.    Upon termination, the parties' obligations arising out of transactions consummated prior to termination shall survive.

7.    <u>Miscellaneous Provisions</u>.

a.    The parties to this Agreement may not assign their respective rights, duties or obligations contained herein to any other Person, in whole or in part, without the prior written consent of the other party.  The parties shall not unreasonably withhold such written consent.

b.    This Agreement and all its provisions shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns and shall not benefit any person other than those enumerated above.

c.    This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument.

d.    This Agreement is intended by the parties to be the final expression of their agreement with respect to the terms included in this Agreement and may not be contradicted by evidence of any prior or contemporaneous agreement.

e.    This Agreement may not be modified or amended except by mutual letter of agreement signed by all parties.

f.    Any provision of this Agreement that is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining provisions of this Agreement or affecting the validity or enforceability of any provision of this Agreement in any other jurisdiction.

g.    This Agreement shall be governed by the laws of the State of Indiana.

h.    All parties hereto shall be responsible for their own legal fees.

i.    Unless otherwise provided for in this Agreement, all notices and other official communications given under this Agreement shall be in writing and shall be delivered in person, by certified mail, return receipt requested, postage prepaid, overnight courier or by confirmed facsimile transmission.  All notices to a party will be sent to the address set forth below or to such other addresses as such party may designate by notice to the other party hereunder.

To DSC:  Dealer Services Corporation
1320 City Center Dr., Suite 100
Carmel, IN  46032
Attn: CEO/President
Phone: (317) 571-3721
Facsimile:  (317) 571-3737

To Auction:  **LAWTON CACHE AUTO AUCTION**
# 9 Southwest 112th St.

Lawton, OK  73505
Attn: _Lisa Druien_
Phone: (580) 536-4645
Fax:     (580) 536-4645

j.  Auction  shall not use the name, logo, trade name, trademark or other proprietary indicia of DSC, except as herein provided, without DSC's prior written consent.  Likewise, DSC shall not use Auction's name, logo, trade name, trademark or other proprietary indicia without its prior written consent.

k.  Headings have been inserted in the Agreement as a matter of convenience of reference only; such headings are not a part of the Agreement and shall not be used in the interpretation of this Agreement.

The parties are signing this Agreement as of the date first above written.

**DEALER SERVICES CORPORATION**                    **LAWTON CACHE AUTO AUCTION**

By: _____                    By: _____

Its: _____                    Its: _Vice President_

**DSC**

CREDIT AUTHORIZATION TO
DEALER SERVICES CORPORATION FOR ACH DEPOSIT

## Facility Information

Name of Facility: LAWTON CACHE AUTO AUCTION

Address: # 9 Southwest 112th St.

City: Lawton                State: OK                        Zip: 73505

Phone Number: (580) 536-4645          Fax Number: (580) 536-4645

FEIN #: ███ 37 9          General Manager: Lisa Druien

Website: Lawton Auto Auction.com   Email: Cleanlisa@sw.rr.com

## Mailing Address (If Different from Above)

Mailing Address: #9444   Same

City:                      State:              Zip:

Phone Number:                      Fax Number:

## Bank Information

Bank Name: First National Bank

Bank Address: 3801 Fairway Blvd

City: Wichita Falls   State: Texas          Zip: 76310

Bank Phone Number: 940-696-3000      Bank Fax Number:

Contact at Bank: Jeanie

## Account Information

Full Account Name: Druien, Inc.      Account Type: Checking

Account Number: ███ 260

Routing Number: ███ 452

## Signature

**Facility desires to have and authorizes Dealer Services Corporation ("DSC") to initiate electronic credit entries, and if necessary, debit entries and adjustments for any credit entries in error to Facility's account listed below. This authorization will remain in effect until DSC receives written notice of termination from Facility. Facility authorizes DSC to stop any ACH to Facility's account without advance notice.**

I certify as the ( Vice President) of Facility that I am authorized to contract on the behalf of Facility and that all information provided is accurate.

Signature: Lisa Druien          Name (Printed): Lisa Druien   Date: 9-27-10

The above information is a:   ☐ Bank Account Change   ☐ Facility Address Change   ☐ Facility Phone/Fax Change

# STATE OF OKLAHOMA

| VEHICLE IDENTIFICATION NUMBER | YEAR | MAKE | | TITLE NO. |
|---|---|---|---|---|
| 3GNEC12T04G171303 | 2004 | CHEV | | 810006241985 |

| BODY TYPE | MODEL | | DATE 1st SOLD | DATE ISSUED |
|---|---|---|---|---|
| PK | CAV | | 26-Jan-2009 | 07-Jan-2019 |

AGENT NO.
M0923

APPLICATION DATE
04-Jan-2019

ODOMETER

Exempt

TYPE OF TITLE
Transfer

DATE INS.
LOSS OR SALVAGE

NAME AND ADDRESS OF VEHICLE OWNER

KELLY LONG
11713 NW 116TH ST
YUKON OK 73099-8107

THIS VEHICLE IS SUBJECT TO THE FOLLOWING LIEN(S):

**EXHIBIT G**

*It is hereby certified that according to the records of the Oklahoma Tax Commission, the person named hereon is the owner of the vehicle described above which is subject to a lien(s) as shown; however, the vehicle may be subject to other liens or security interests.*

CONTROL NO.
46639629

(This is not a title number)



## ASSIGNMENT OF TITLE BY REGISTERED OWNER   (If Dealer, List License # Here: _____ )

IF REGISTERED
OWNER (SELLER) IS
A LICENSED DEALER,
PLACE OKLAHOMA
MOTOR VEHICLE TAX
STAMP HERE

I/we hereby assign and warrant ownership of the vehicle described on this certificate to the following, subject only to the liens or encumbrances, if any, properly noted on this certificate.

Purchaser(s) Name (Type or Print): Mainer Ford
                                     PO Box 834
Purchaser(s) Complete Address: Okarche, OK 73762

Actual Purchase Price of Vehicle: _____

I certify to the best of my knowledge that the ODOMETER READING reflected on the vehicle's odometer and listed below is the ACTUAL MILEAGE of the vehicle UNLESS one of the accompanying statements is checked:

(NO TENTHS)

☐ 1. The odometer has exceeded its mechanical limits.
☐ 2. The odometer reading is NOT the actual mileage. **Warning — Odometer Discrepancy**

Signature of Seller(s): _____   Printed Name of Seller(s): Kelly Long

Subscribed and Sworn to Before me this 8 Day of June , 20 19

Notary Public: Kathy Martin   Commission Expiration: _____

Notarization required only of seller's signature(s). Affix notary seal/stamp to the right.

Signature of Buyer(s): Christi Sander   Printed Name of Buyer(s): CHRISTI SANDERS

KATHY MARTINE
NOTARY
# 00019494
EXP. 11/22/20
STATE OF OKLA.
PUBLIC

VOID IF ALTERED

## Ownership Transfer Information

Federal and state law requires that the odometer reading and its accuracy be disclosed upon every transfer of ownership of a motor vehicle unless otherwise exempted. Failure to complete or providing false information may result in fines and/or imprisonment.

The presence of any lien or encumbrance on this vehicle is to be so noted where indicated on the bottom of this page.

State law requires a transfer of ownership to be completed within thirty (30) days of acquiring ownership. Failure to do so subjects the owner or possessor to the assessment of delinquent penalties, as provided by law.

**ALL SELLERS SIGNATURES ON THIS DOCUMENT MUST BE SWORN TO BEFORE A NOTARY PUBLIC.**

---

### REASSIGNMENT OF TITLE BY LICENSED DEALER NUMBER: _UD 2133_

OKLAHOMA
MOTOR VEHICLE
**$3.50**
TAX STAMP
2598515

I/we hereby assign and warrant ownership of the vehicle described on this certificate to the following, subject only to the liens or encumbrances, if any, properly noted on this certificate

Purchaser(s) Name (Type or Print): _Rock Hill Used Cars_

Purchaser(s) Complete Address: _549 I-30 East   Sulphur Springs TX  75482_

Actual Purchase Price of Vehicle, Excluding Credit for Any Trade-in: _____

I certify to the best of my knowledge that the ODOMETER READING reflected on the vehicle's odometer and listed below is the ACTUAL MILEAGE of the vehicle UNLESS one of the accompanying statements is checked:

_exempt_ (NO.TENTHS)

☐ 1. The odometer has exceeded its mechanical limits.

☐ 2. The odometer reading is NOT the actual mileage. **Warning — Odometer Discrepancy**

Signature of Seller(s): _Christi Sanders_   Printed Name of Seller(s): _CHRISTI SANDERS_

Subscribed and Sworn to Before me this _12_ Day of _July_, 20_19_

Notary Public: _Kathy Martin_   Commission Expiration: _____

Affix Notary Seal/Stamp

KATHY MARTIN
NOTARY PUBLIC
# 0001944
EXP. 11/22/20
STATE OF OKLAHOMA

*Notarization required only of seller's signature(s). Affix notary seal/stamp to the right.*

Signature of Buyer(s): _____   Printed Name of Buyer(s): _____

---

### REASSIGNMENT OF TITLE BY LICENSED DEALER NUMBER: _____

PLACE OKLAHOMA
MOTOR VEHICLE TAX
STAMP HERE

I/we hereby assign and warrant ownership of the vehicle described on this certificate to the following, subject only to the liens or encumbrances, if any, properly noted on this certificate.

Purchaser(s) Name (Type or Print): _____

Purchaser(s) Complete Address: _____

Actual Purchase Price of Vehicle, Excluding Credit for Any Trade-in: _____

I certify to the best of my knowledge that the ODOMETER READING reflected on the vehicle's odometer and listed below is the ACTUAL MILEAGE of the vehicle UNLESS one of the accompanying statements is checked:

☐☐☐☐☐☐ (NO TENTHS)

☐ 1. The odometer has exceeded its mechanical limits.

☐ 2. The odometer reading is NOT the actual mileage. **Warning — Odometer Discrepancy**

Signature of Seller(s): _____   Printed Name of Seller(s): _____

Subscribed and Sworn to Before me this _____ Day of _____, 20 _____

Notary Public: _____   Commission Expiration: _____

Affix Notary Seal / Stamp Here

*Notarization required only of seller's signature(s). Affix notary seal/stamp to the right.*

Signature of Buyer(s): _____   Printed Name of Buyer(s): _____

---

### LIENHOLDER INFORMATION

Any active lien or encumbrance against this vehicle is to be described below. Any active lien reflected on the face of this certificate will carry forward to any subsequent Oklahoma title issued unless a proper release of lien has been executed.

LIENHOLDER NAME: _____   DATE OF LIEN: _____

LIENHOLDER ADDRESS / CITY / STATE / ZIP: _____

Lawton Cache Auto Auction

**INVOICE & BILL OF SALE**
580-536-4645
Print Date:  8/15/2019
Print Time:  11:59 AM

1 Southwest 112th St.
Lawton, OK 73505

ANNOUNCED CONDITIONS OR COMMENTS:

UNIT#   010

| BUYER(Purchaser) :P-109420        376 | Seller        **UD2133** | SALE#:        36483 |
|---|---|---|
| Mike  Garrison                903-440-5557 | UD2133  Mainer Ford | DATE:        8/14/19 |
| Rock Hill Used Cars | Christi Sanders | STATUS:        SLD |
| 549 Interstate 30 East | PO Box 834 | DRIVE:        Green |
| Sulphur Springs, TX 75482 | Okarche, OK 73762 | LANE |

**VEHICLE DESCRIPTION**

| SERIAL    3GNEC12T04G171303        171303 |
|---|
| ODOMETER STATUS |

| YEAR | 2004 | MAKE | CHEVROLE |
|---|---|---|---|
| MODEL | AVALANCHE | BODY | WAGON |
| COLOR | Blue | RADIO | |
| LICENSE | | FUEL | Diesel |
| TITLE | | TRANS | AUTO |

| | SALE PRICE: | 11,000 |
|---|---|---|
| | BUYER FEE: | 230.00 |
| | DRAFT FEE: | |
| | SALES TAX | |
| | TOTAL DUE: | 11,230.00 |
| | PAID: | 11,230.00 |
| | BALANCE: | $0.00 |
| | PD BY:FI      NEXTGEAR | |

ODOMETER DISCLOSURE STATEMENT

**Federal law (and state law, if applicable) requires**    that you state the mileage upon transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

I _____    state that the odometer
*(Transferor's /seller hand printed name)*

(Of the vehicle herein described) now reads    **71430**    miles and to the best of my knowledge,  it reflects the actual mileage of the vehicle, unless one of the following statements is checked.

☐ (1) I hereby certify that to the best of my knowledge the odometer reading
        reflects the amount of mileage in excess of its mechanical limits.
☐ (2) I hereby certify that the odometer reading is NOT the actual mileage.
        **WARNING - ODOMETER DISCREPANCY.**

Transferor's (Seller) signature _____

Transferee's (buyer) signature _____

Transferee's (buyer) signature _____

Printed name of person(buyer) signing _____

ALL SALES FINAL DAY OF SALE. It is understood and agreed, between the consignor, the purchaser and Lawton Cache Auto Auction is not responsible for fire, theft, or damage to the above described vehicle while on the premises before, during or after the sale. LAWTON CACHE AUTO AUCTION DOES NOT HAVE INSURANCE COVERING ANY VEHICLE. "This sale is solely a transaction between the buyer and the seller parties" ~ Subject to final handing and approving of the Auction. The buyer is expected to pay for any vehicle which he/she buys unless excused by the Auction. Please clear all items promptly after purchase. The Auction does not guarantee the mileage, year, model or factory warranty on any vehicle sold through this auction. Seller warrants that he/she has good negotiable title and that it is free and clear of all items and or encumbrances. Signatory parties agree that sale transaction is not complete until all drafts or checks have cleared and title is assigned to purchaser.

Effective IMMEDIATELY, AS OF TODAY January 17, 2018, ALL SALES MUST be paid for the night of the Auction, with cash, check or a floor plan company.  If NO payment is here at the time title arrives, a fee of $25.00 will be added to your total daily.

.

LAWTON AUTO AUCTION
1 SW 112 St.
Lawton, OK 73505

15 AUG 2019 PM 4 L

Nextgear - Funding Service
1320 City Center Dr. Suite 100 A
Carmel, Indiana
46032

46032-381599

# STATE OF OKLAHOMA

| VEHICLE IDENTIFICATION NUMBER | YEAR | MAKE | TITLE NO. |
|---|---|---|---|
| 1FDAF57R48EB34427 | 2008 | FORD | 810006408904 |

| BODY TYPE | MODEL | | |
|---|---|---|---|
| CB | F5D | DATE 1st SOLD | DATE ISSUED |
| | | 18-Oct-2007 | 11-Mar-2019 |

| AGENT NO. | APPLICATION DATE | ODOMETER | TYPE OF TITLE |
|---|---|---|---|
| M3219 | 08-Mar-2019 | | Transfer |
| | | Exempt | DATE INS. LOSS OR SALVAGE |

NAME AND ADDRESS OF VEHICLE OWNER

MAINER FORD
PO BOX 3177
MCALESTER OK 74502-3177

THIS VEHICLE IS SUBJECT TO THE FOLLOWING LIEN(S):

*It is hereby certified that according to the records of the Oklahoma Tax Commission, the person named hereon is the owner of the vehicle described above which is subject to a lien(s) as shown; however, the vehicle may be subject to other liens or security interests.*

CONTROL NO.
46895304

(This is not a title number)

---

**ASSIGNMENT OF TITLE BY REGISTERED OWNER** (If Dealer, List License # Here: U02316 )

IF REGISTERED OWNER (SELLER) IS A LICENSED DEALER, PLACE OKLAHOMA MOTOR VEHICLE TAX STAMP HERE

I/we hereby assign and warrant ownership of the vehicle described on this certificate to the following, subject only to the liens or encumbrances, if any, properly noted on this certificate.

Purchaser(s) Name (Type or Print): Big Dawg Motorz

Purchaser(s) Complete Address: 210 MAin StD Hotsprings AR. 7520l

Actual Purchase Price of Vehicle: _____

I certify to the best of my knowledge that the ODOMETER READING reflected on the vehicle's odometer and listed below is the ACTUAL MILEAGE of the vehicle UNLESS one of the accompanying statements is checked:

☐ 1. The odometer has exceeded its mechanical limits.
☐ 2. The odometer reading is NOT the actual mileage. **Warning** — Odometer discrepancy

Odometer: E Y 5 M P T (NO TENTHS)

Signature of Seller(s): _____ Printed Name of Seller(s): Jason B

Subscribed and Sworn to Before me this 14 Day of March , 20 19

Notary Public: Ben D Choggins Commission Expiration: _____



*Notarization required only of seller's signature(s). Affix notary seal/stamp to the right.*

Signature of Buyer(s): Kyle Lucy Printed Name of Buyer(s): Kyle LuAs

VOID IF ALTERED

## Ownership Transfer Information

Federal and state law requires that the odometer reading and its accuracy be disclosed upon every transfer of ownership of a motor vehicle unless otherwise exempted. Failure to complete or providing false information may result in fines and/or imprisonment.

The presence of any lien or encumbrance on this vehicle is to be so noted where indicated on the bottom of this page.

State law requires a transfer of ownership to be completed within thirty (30) days of acquiring ownership. Failure to do so subjects the owner or possessor to the assessment of delinquent penalties, as provided by law.

**ALL SELLERS SIGNATURES ON THIS DOCUMENT MUST BE SWORN TO BEFORE A NOTARY PUBLIC.**

---

### REASSIGNMENT OF TITLE BY LICENSED DEALER NUMBER: 1003316

**OKLAHOMA MOTOR VEHICLE $3.50 TAX STAMP 2288787**

I/we hereby assign and warrant ownership of the vehicle described on this certificate to the following, subject only to the liens or encumbrances, if any, properly noted on this certificate.

Purchaser(s) Name (Type or Print): Rockhill Used Cars

Purchaser(s) Complete Address: 519 I-30 Sulphur Springs tx 75482

Actual Purchase Price of Vehicle, Excluding Credit for Any Trade-in: _____

I certify to the best of my knowledge that the ODOMETER READING reflected on the vehicle's odometer and listed below is the ACTUAL MILEAGE of the vehicle UNLESS one of the accompanying statements is checked:

[ 1 ] [ Y ] [ Σ ] [ 4 ] [ 0 ] [ T ]  (NO TENTHS)

1. The odometer has exceeded its mechanical limits.
2. The odometer reading is NOT the actual mileage. **Warning — Odometer Discrepancy**

Signature of Seller(s): _____

Printed Name of Seller(s): Aaron Ball

Subscribed and Sworn to Before me this 15 Day of April, 20 19

Notary Public: _____ Commission Expiration: _____

*Notarization required only of seller's signature(s). Affix notary seal/stamp to the right.*

Signature of Buyer(s): _____   Printed Name of Buyer(s): _____

---

### REASSIGNMENT OF TITLE BY LICENSED DEALER NUMBER: _____

PLACE OKLAHOMA MOTOR VEHICLE TAX STAMP HERE

I/we hereby assign and warrant ownership of the vehicle described on this certificate to the following, subject only to the liens or encumbrances, if any, properly noted on this certificate.

Purchaser(s) Name (Type or Print): _____

Purchaser(s) Complete Address: _____

Actual Purchase Price of Vehicle, Excluding Credit for Any Trade-in: _____

I certify to the best of my knowledge that the ODOMETER READING reflected on the vehicle's odometer and listed below is the ACTUAL MILEAGE of the vehicle UNLESS one of the accompanying statements is checked:

[ ] [ ] [ ] [ ] [ ] [ ]  (NO TENTHS)

1. The odometer has exceeded its mechanical limits.
2. The odometer reading is NOT the actual mileage. **Warning — Odometer Discrepancy**

Signature of Seller(s): _____   Printed Name of Seller(s): _____

Subscribed and Sworn to Before me this _____ Day of _____, 20 _____

Notary Public: _____ Commission Expiration: _____

*Affix Notary Seal / Stamp Here*

*Notarization required only of seller's signature(s). Affix notary seal/stamp to the right.*

Signature of Buyer(s): _____   Printed Name of Buyer(s): _____

---

### LIENHOLDER INFORMATION

Any active lien or encumbrance against this vehicle is to be described below. Any active lien reflected on the face of this certificate will carry forward to any subsequent Oklahoma title issued unless a proper release of lien has been executed.

LIENHOLDER NAME: _____   DATE OF LIEN: _____

LIENHOLDER ADDRESS / CITY / STATE / ZIP: _____

Lawton Cache Auto Auction

**INVOICE & BILL OF SALE**
580-536-4645
Print Date:  10/17/2019
Print Time:  1:57 PM

1 Southwest 112th St.
Lawton, OK 73505

ANNOUNCED CONDITIONS OR COMMENTS:

UNIT#   **030**

| BUYER(Purchaser) :P-109420      376 | Seller        M-7119 | SALE#:      37723 |
|---|---|---|
| Mike  Garrison                  903-440-5557 | M-7119  Big Dawg Motors | DATE:    10/16/19 |
| Rock Hill Used Cars | Kyle Way | STATUS:      SLD |
| 549 Interstate 30 East | 236 Main St | DRIVE:      Yellow |
| Sulphur Springs, TX 75482 | Hot Springs, AR | LANE |

### VEHICLE DESCRIPTION

SERIAL   1FDAF57R48EB34427      **B34427**
ODOMETER STATUS
YEAR     2008          MAKE   FORD
MODEL    SUPER DUTY F  BODY
COLOR    White         RADIO
LICENSE                FUEL   Diesel
TITLE                  TRANS  AUTO

| | |
|---|---|
| SALE PRICE: | 28,500 |
| BUYER FEE: | 490.00 |
| DRAFT FEE: | |
| SALES TAX | |
| TOTAL DUE: | 28,990.00 |
| PAID: | |
| BALANCE: | $28,990.00 |
| PD BY: | |

### ODOMETER DISCLOSURE STATEMENT

**Federal law (and state law, if applicable) requires**   that you state the mileage upon transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

I _____   state that the odometer
*(Transferor's /seller hand printed name)*

(Of the vehicle herein described) now reads   **199211**   miles and to the best of my knowledge,  it reflects the actual mileage of the vehicle, unless one of the following statements is checked.

☐ (1) I hereby certify that to the best of my knowledge the odometer reading reflects the amount of mileage in excess of its mechanical limits.
☐ (2) I hereby certify that the odometer reading is NOT the actual mileage.
      **WARNING - ODOMETER DISCREPANCY.**

Transferor's (Seller) signature _____

Transferee's (buyer) signature _____

Transferee's (buyer) signature _____

Printed name of person(buyer) signing _____

ALL SALES FINAL DAY OF SALE. It is understood and agreed, between the consignor, the purchaser and Lawton Cache Auto Auction is not responsible for fire, theft, or damage to the above described vehicle while on the premises before, during or after the sale. LAWTON CACHE AUTO AUCTION DOES NOT HAVE INSURANCE COVERING ANY VEHICLE. "This sale is solely a transaction between the buyer and the seller parties" ~ Subject to final handing and approving of the Auction. The buyer is expected to pay for any vehicle which he/she buys unless excused by the Auction. Please clear all items promptly after purchase. The Auction does not guarantee the mileage, year, model or factory warranty on any vehicle sold through this auction. Seller warrants that he/she has good negotiable title and that it is free and clear of all items and or encumbrances. Signatory parties agree that sale transaction is not complete until all drafts or checks have cleared and title is assigned to purchaser.
Effective IMMEDIATELY, AS OF TODAY January 17, 2018, ALL SALES MUST be paid for the night of the Auction, with cash, check or a floor plan company.  If NO payment is here at the time title arrives, a fee of $25.00 will be added to your total daily.

LAWTON AUTO AUCTION
1 SW 112 St.
Lawton, OK 73505

OKLAHOMA CITY

18 OCT '19

PM 5 L



Next gear
1320 City Center Drive, Ste 100A
Carmel, IN 46032

46032-381599

# STATE OF OKLAHOMA

| VEHICLE IDENTIFICATION NUMBER | YEAR | MAKE | TITLE NO. |
|---|---|---|---|
| 1GDJ5C1114F500844 | 2004 | GMC | 726304117001A |

| BODY TYPE | MODEL | | | DATE 1st SOLD | DATE ISSUED |
|---|---|---|---|---|---|
| CB | C5C | | | 03/31/2004 | 07/24/2004 |

| AGENT NO. | | ODOMETER | TYPE OF TITLE |
|---|---|---|---|
| 7263 | | 900 | TRANSFER |
| | | ACTUAL | DATE INS. |
| | | | LOSS OR SALVAGE |

NAME AND ADDRESS OF VEHICLE OWNER

||..|.|..||...|.|.|.|.||...||..|.|.|.|.|.|.|.|.|..||

ROBERT J. &/OR JEAN A. JOHNSON
DBA/JOHNSON MACHINE INC.
PO BOX 324
OWASSO        OK   74055-0324

THIS VEHICLE IS SUBJECT TO THE FOLLOWING LIEN(S):

04/01/2004 09:25 GMAC

*It is hereby certified that according to the records of the Oklahoma Tax Commission, the person named hereon is the owner of the vehicle described above which is subject to a lien(s) as shown; however, the vehicle may be subject to other liens or security interests.*

CONTROL NO.        042067263A3397

## 25422260
(This is not a title number)



VOID IF ALTERED

Federal law requires that you state the mileage in connection with the transfer of ownership. Failure to complete or providing a false statement may result in

**IMPORTANT NOTICE**

Each person, except a licensed used car dealer, is required by law to obtain a transfer title in his name within THIRTY days after acquiring ownership or possession of this vehicle. Failure to do so subjects the owner or possessor to a fine and a penalty.

Assignment below positively must be signed and sworn to before a NOTARY PUBLIC.

| | |
|---|---|
| **ASSIGNMENT OF TITLE BY REGISTERED OWNER**<br><br>USE ONLY IF DEALER ASSIGNMENT<br><br>PLACE OKLAHOMA MOTOR VEHICLE TAX STAMP IN THIS SPACE | I/we hereby assign and warrant title of the vehicle described on the reverse side of this certificate subject to the following liens or encumbrances, if any, and none other. |

PURCHASERS NAME (TYPE OR PRINT)  BIG DAWG MOTOTS

PURCHASERS ADDRESS  22 MAIN ST    CITY HOT SPRINGS   ST. AR.   ZIP

LIEN HOLDER                                    DATE OF LIEN

LIEN HOLDER ADDRESS                    CITY              ST.        ZIP

I certify to the best of my knowledge that the ODOMETER READING is the ACTUAL MILEAGE of the vehicle unless one of the following statements is checked:

ODOMETER READING  E X E , M A T   ☐ NO TENTHS

☐ 1. The amount of mileage stated is in excess of mechanical limits.
☐ 2. The odometer reading is NOT the actual mileage. WARNING-ODOMETER DISCREPANCY.

**ACTUAL SELLING PRICE** $

SIGNATURE(S) of Buyer(s): Kyle Way          of Seller(s): Robert Johnson
PRINTED NAME: of Buyer(s): Kyle Way       of Seller(s): Robert Johnson

Subscribed and sworn to before me this _____ day of _____

My Commission Expires _____

NOTARY PUBLIC

| | |
|---|---|
| **RE-ASSIGNMENT BY OKLAHOMA DEALER**<br><br>NO. _____<br><br>PLACE OKLAHOMA MOTOR VEHICLE TAX STAMP IN THIS SPACE | I/we hereby assign and warrant title of the vehicle described on the reverse side of this certificate subject to the following liens or encumbrances, if any, and none other. |

PURCHASERS NAME (TYPE OR PRINT)  ROCK Hill USED CARS

PURCHASERS ADDRESS  519 I-30 Sulphur Springs   CITY   ST. TX   ZIP 75482

LIEN HOLDER                                    DATE OF LIEN

LIEN HOLDER ADDRESS                    CITY              ST.        ZIP

I certify to the best of my knowledge that the ODOMETER READING is the ACTUAL MILEAGE of the vehicle unless one of the following statements is checked:

ODOMETER READING  E X E , M P T   ☐ NO TENTHS

☐ 1. The amount of mileage stated is in excess of mechanical limits.
☐ 2. The odometer reading is NOT the actual mileage. WARNING-ODOMETER DISCREPANCY.

**ACTUAL SELLING PRICE** $

SIGNATURE(S) of Buyer(s): _____          of Seller(s): Kyle Way
PRINTED NAME: of Buyer(s): _____       of Seller(s): Kyle Way

Subscribed and sworn to before me this _____ day of _____

My Commission Expires _____

NOTARY PUBLIC

| | |
|---|---|
| **RE-ASSIGNMENT BY OKLAHOMA DEALER**<br><br>NO. _____<br><br>PLACE OKLAHOMA MOTOR VEHICLE TAX STAMP IN THIS SPACE | I/we hereby assign and warrant title of the vehicle described on the reverse side of this certificate subject to the following liens or encumbrances, if any, and none other. |

PURCHASERS NAME (TYPE OR PRINT)

PURCHASERS ADDRESS                    CITY              ST.        ZIP

LIEN HOLDER                                    DATE OF LIEN

LIEN HOLDER ADDRESS                    CITY              ST.        ZIP

I certify to the best of my knowledge that the ODOMETER READING is the ACTUAL MILEAGE of the vehicle unless one of the following statements is checked:

ODOMETER READING  ☐ NO TENTHS

☐ 1. The amount of mileage stated is in excess of mechanical limits.
☐ 2. The odometer reading is NOT the actual mileage. WARNING-ODOMETER DISCREPANCY.

**ACTUAL SELLING PRICE** $

SIGNATURE(S) of Buyer(s): _____          of Seller(s): _____
PRINTED NAME: of Buyer(s): _____       of Seller(s): _____

Subscribed and sworn to before me this _____ day of _____

My Commission Expires _____

NOTARY PUBLIC

| DEBTOR NAMES AND ADDRESSES (Last Name First) | SECURED PARTY NAME AND ADDRESS | OKLAHOMA TAX COMMISSION USE ONLY |
|---|---|---|

Johnson., Jean A.
504 E. 19th
Owasso, OK    74055

Rush Truck Center
6015 S. 49th W. Ave.
Tulsa, OK    741072

**MOTOR LICENSE AGENT USE ONLY**

| DATE L.E.F. RECEIVED | TIME RECEIVED | ☒ A.M. |
|---|---|---|
| 4  1  2004 | ☒ 9:25 | ☐ P.M. |

RECEIPT NUMBER

040927251A5188

THIS LIEN FORM COVERS THE FOLLOWING VEHICLE:

| DATE OF SECURITY AGREEMENT | ORIGINAL OKLAHOMA TITLE NO. | VEHICLE IDENTIFICATION NO. (V.I.N.) |
|---|---|---|
| 03/31/04 | MSO | 1GDJ5C1114F500844 |

MOTOR LICENSE AGENT (Identification/Signature)

040927251A5188

| MODEL YEAR | MAKE AND MODEL | BODY TYPE |
|---|---|---|
| 2004 | GMC    TC5C042 | Regular Cab |

BILLIE GIVENS 7251PJ

**DEAR CUSTOMER:**

We have released the lien on your vehicle described above, as of the "Release Effective Date" shown by my signature, and have advised the Oklahoma Tax Commission of this Release.  To obtain a new Certificate of Title, with our lien omitted, please take this Release and your present Title to you local Motor License Agent. The Motor License Agent will issue a new Certificate of Title to you, for which there will be a small fee.

Please call if you should have any questions concerning this Release.

REPRESENTING THE SECURED PARTY

X _____

GMAC

RELEASE EFFECTIVE DATE

1/20/09

**ASSIGNEE OF SECURED PARTY AND ADDRESS**

GMAC
P.O. Box 8102
Cockeysville, MD    21030

**ENCLOSURES**

☐ CERTIFICATE OF TITLE
☐ APPLICATION FOR TITLE
☐ MANUFACTURER'S STATEMENT OF ORIGIN (M.S.O.)
☐ FEE

**SECURED PARTY/ASSIGNEE SIGNATURES**

/ Rush Truck Center

By: _____
Representing Secured Parties or Assignee

Date Executed

03/31/04

**LIEN ENTRY FORM — MOTOR VEHICLE — OKLAHOMA**

Form Approved by Oklahoma Tax Commission 7/79

Lawton Cache Auto Auction

Title

**INVOICE & BILL OF SALE**
580-536-4645

1 Southwest 112th St.
Lawton, OK 73505

Print Date: 10/22/2019
Print Time:  2:22 PM

| ANNOUNCED CONDITIONS OR COMMENTS: | UNIT#  009 |
|---|---|

| BUYER(Purchaser) :P-109420        376 | Seller       P-109420 | SALE#:      37728 |
|---|---|---|
| Mike  Garrison                   903-440-5557 | P-109420  Rock Hill Used Cars | DATE:    10/16/19 |
| Rock Hill Used Cars | Mike Garrison | STATUS:      SLD |
| 549 Interstate 30 East | 549 Interstate 30 East | DRIVE:      Green |
| Sulphur Springs, TX 75482 | Sulphur Springs, TX 75482 | LANE |

**VEHICLE DESCRIPTION**

| SERIAL    1CDJ5C1114F500844        500844 |
|---|
| ODOMETER STATUS |
| YEAR     2004              MAKE  GMC |
| MODEL    C5C               BODY |
| COLOR    WHITE             RADIO |
| LICENSE                    FUEL   Diesel |
| TITLE                      TRANS AUTO |

| | SALE PRICE: | 33,900 |
|---|---|---|
| | BUYER FEE: | 570.00 |
| | DRAFT FEE: | |
| | SALES TAX | |
| | TOTAL DUE: | 34,470.00 |
| | PAID: | 34,470.00 |
| | BALANCE: | $0.00 |
| | PD BY:FI NEXT | |

### ODOMETER DISCLOSURE STATEMENT

**Federal law (and state law, if applicable) requires** that you state the mileage upon transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

I _____ state that the odometer
*(Transferor's /seller hand printed name)*

(Of the vehicle herein described) now reads  **62400**      miles and to the best of my knowledge, it reflects the actual mileage of the vehicle, unless one of the following statements is checked.

☐ (1) I hereby certify that to the best of my knowledge the odometer reading reflects the amount of mileage in excess of its mechanical limits.

☐ (2) I hereby certify that the odometer reading is NOT the actual mileage.
**WARNING - ODOMETER DISCREPANCY.**

Transferor's (Seller) signature _____

Transferee's (buyer) signature _____

Transferee's (buyer) signature _____

Printed name of person(buyer) signing _____

ALL SALES FINAL DAY OF SALE. It is understood and agreed, between the consignor, the purchaser and Lawton Cache Auto Auction is not responsible for fire, theft, or damage to the above described vehicle while on the premises before, during or after the sale. LAWTON CACHE AUTO AUCTION DOES NOT HAVE INSURANCE COVERING ANY VEHICLE. "This sale is solely a transaction between the buyer and the seller parties" ~ Subject to final handing and approving of the Auction. The buyer is expected to pay for any vehicle which he/she buys unless excused by the Auction. Please clear all items promptly after purchase. The Auction does not guarantee the mileage, year, model or factory warranty on any vehicle sold through this auction. Seller warrants that he/she has good negotiable title and that it is free and clear of all items and or encumbrances. Signatory parties agree that sale transaction is not complete until all drafts or checks have cleared and title is assigned to purchaser.

Effective IMMEDIATELY, AS OF TODAY January 17, 2018, ALL SALES MUST be paid for the night of the Auction, with cash, check or a floor plan company.  If NO payment is here at the time title arrives, a fee of $25.00 will be added to your total daily.

.